### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

      Plaintiff,

          v.

JULIO M. HERRERA-VELUTINI,

      Defendant.

CRIMINAL NO. 22-342 (RAM)

**ORAL ARGUMENT
REQUESTED**

### MOTION TO DISMISS THE INDICTMENT
### FOR OUTRAGEOUS GOVERNMENT MISCONDUCT

**KASOWITZ BENSON TORRES LLP**

/s/ *Marc E. Kasowitz*
Marc E. Kasowitz (admitted *pro hac vice*)
Jason M. Short (admitted *pro hac vice*)
1633 Broadway
New York, NY 10019
mkasowitz@kasowitz.com
jshort@kasowitz.com
Telephone: (212) 506-1700

Robin Rathmell (admitted *pro hac vice*)
1401 New York Avenue NW
Suite 401
Washington, D.C. 20005
rrathmell@kasowitz.com
Telephone: (202) 760-3410

**DLA Piper (Puerto Rico) LLC**

/s/ *Sonia I. Torres-Pabón*
Sonia I. Torres-Pabón, Esq.
USDC-PR No. 209310
500 Calle de la Tanca, Ste. 401
Sonia.torres@us.dlapiper.com
San Juan, PR 00901-1969
Tel: 787-945-9101

**The LS Law Firm**

<u>/s/ *Lilly Ann Sanchez*</u>
Lilly Ann Sanchez, Esq.
Fla. Bar No. 195677
One Biscayne Tower, Suite 2530
2 South Biscayne Blvd.
Miami, Florida 33131
Email: lsanchez@thelsfirm.com
Telephone: (305) 503-5503
Facsimile: (305) 503-6801

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................ 6

A.    A Years-Long "Examination" Process is Commenced Against the Bank ......................... 7

B.    The FBI Uses OCIF as a Stalking Horse ........................................................ 12

C.    The Government is Actively Concealing its Use of OCIF as a Stalking Horse by Refusing to Produce Relevant Discovery ........................................................ 15

D.    The Government Knowingly Omits Key Facts and/or Provides False or Misleading Information to the Reviewing Court and the Grand Jury ............................. 17

    1.    ███████████ ................................................................. 19

    2.    ████████████ ................................................................ 21

    3.    ███████████████ ........................................................ 22

    4.    ███████████ ................................................................. 24

    5.    ███████████ ................................................................. 25

LEGAL STANDARD .................................................................................... 27

A.    Dismissal for Outrageous Governmental Misconduct ...................................... 27

ARGUMENT ............................................................................................... 29

A.    The Court Should Dismiss the Indictment Based Upon the Government's Wanton and Extensive Violations of Mr. Herrera's Due Process Rights ......................... 29

    1.    The Government Engaged in Egregious Misconduct by Using OCIF as a Stalking Horse for its Own Criminal Investigation ............................. 29

    2.    The Government Engaged in Egregious Misconduct by Repeatedly Contacting Represented Parties and Knowingly Disregarding Attorney-Client Privilege ................................................................. 33

        i.    The Government Repeatedly Endeavors to Contact and Gather Information from Parties Knowingly Represented by Counsel ............... 34

        ii.    The Government Repeatedly Utilizes Privileged Materials in Seeking to Obtain Additional Evidence Against Mr. Herrera ................. 36

3. The Government Engaged in Egregious Misconduct by Knowingly Presenting Misleading Testimony to the Grand Jury............................................ 42

4. The Government Engaged in Egregious Misconduct by Withholding Exculpatory and/or Impeachment Evidence from the Defense ........................... 53

B. The Court Should Dismiss the Indictment Pursuant to Its Own Supervisory Powers.................................................................................................................... 58

C. An Evidentiary Hearing Regarding the Suppression of Evidence Would Be Insufficient to Redress the Pervasive and Incurable Harms to Mr. Herrera's Due Process Rights.................................................................................................. 60

CONCLUSION.................................................................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988).................................................................................59

*Bell v. Bell*,
    512 F.3d 223 (6th Cir. 2008) ...................................................................54

*Berger v. United States*,
    295 U.S. 78 (1935)......................................................................................6

*Brady v. Maryland*,
    373 U.S. 83 (1963) ........................................................................... *passim*

*Carey v. Duckworth*,
    738 F.2d 875 (7th Cir. 1984) ...................................................................54

*Coolidge v. New Hampshire*,
    403 U.S. 443 (1971)..................................................................................10

*Giglio v. United States*,
    405 U.S. 150 (1972).......................................................................... *passim*

*Pleasant v. Lovell*,
    876 F.2d 787 (10th Cir. 1989) .................................................................36

*Speeht v. Jensen*,
    832 F.2d 1516 (10th Cir. 1987) ...............................................................36

*Strickler v. Greene*,
    527 U.S. 263 (1999)..................................................................................54

*Tuesta-Toro v. United States*,
    No. 99-1371, 2000 WL 1160442 (1st Cir. 2000)....................................54

*U.S. v. Brooks*,
    966 F.2d 1500 (D.C. Cir. 1992) ...............................................................54

*U.S. v. Risha*,
    445 F.3d 298 (3d Cir. 2006)......................................................................54

*United States v. Anzalone*,
    923 F.3d 1 (1st Cir. 2019).........................................................................58

*United States v. Chapman*,
   524 F.3d 1073 (9th Cir. 2008) ..............................................................27, 57, 58, 59

*United States v. Cobb*,
   No. 2:14-CR-194, 2015 WL 556327 (D. Nev. Feb. 9, 2015) ....................................52

*United States v. Colburn*,
   546 F. Supp. 3d 22 (D. Mass. 2021) ......................................................................27

*United States v. Diaz-Lopez*,
   No. 21-CR-157 (RAM), 2022 U.S. Dist. LEXIS 104042 (D.P.R. Apr. 5, 2022) ...................55

*United States v. Djokich*,
   718 F. Supp. 2d 173 (D. Mass. 2010), *aff'd*, 693 F.3d 37 (1st Cir. 2012)..............................28

*United States v. Dvorin*,
   817 F.3d 438 (5th Cir. 2016) ................................................................................53

*United States v. Hammad*,
   858 F.2d 834 (2d Cir. 1988).................................................................................36

*United States v. Hogan*,
   712 F.2d 757 (2d Cir. 1983).................................................................................49

*United States v. Isgro*,
   974 F.2d 1091 (9th Cir. 1992) ..........................................................................42, 43

*United States v. Kojayan*,
   8 F.3d 1315 (9th Cir. 1993) .................................................................................59

*United States v. Kordel*,
   397 U.S. 1 (1970)...................................................................................30, 31, 33

*United States v. LaSalle Nat'l Bank*,
   437 U.S. 298 (1978)........................................................................................30, 33

*United States v. Levy*,
   577 F.2d 200 (3d Cir. 1978).............................................................................58, 60

*United States v. Lyons*,
   352 F. Supp. 2d 1231 (M.D. Fla. 2004) ...................................................................59

*United States v. Marshank*,
   777 F. Supp. 1507 (N.D. Cal. 1991) ..........................................................34, 58, 60, 61

*United States v. McCord*,
   509 F.2d 334 (D.C. Cir. 1974) .........................................................................29, 58

*United States v. Morrison*,
    449 U.S. 361 (1981)........................................................................................60

*United States v. Omni Int'l Corp.*,
    634 F. Supp. 1414 (D. Md. 1986) ..............................................52, 59, 60, 61

*United States v. Owen*,
    580 F.2d 365 (9th Cir. 1978) ....................................................28, 29, 58

*United States v. Pierce*,
    893 F.2d 669 (5th Cir. 1990) ..............................................................36

*United States v. Rhodes*,
    No. 18-CR-887, 2019 WL 3162221 (S.D.N.Y. July 16, 2019) ............................30

*United States v. Rogers*,
    751 F.2d 1074 (9th Cir. 1985) ..............................................................60

*United States v. Russell*,
    411 U.S. 423 (1973)..............................................................2, 27, 34

*United States v. Samango*,
    607 F.2d 877 (9th Cir. 1979) ..............................................................52

*United States v. Santana*,
    6 F.3d 1 (1st Cir. 1993)......................................................................27

*United States v. Santopietro*,
    809 F. Supp. 1008 (D. Conn. 1992)........................................................27

*United States v. Scrushy*,
    366 F. Supp. 2d 1134 (N.D. Ala. 2005)....................................31, 32, 33

*United States v. Stevens*,
    No. 08-CR-231 EGS, 2009 WL 6525926 (D.D.C. Apr. 7, 2009).................55, 58

*United States v. Stringer*,
    535 F.3d 929 (9th Cir. 2008) ..............................................................31

*United States v. Therrien*,
    847 F.3d 9 (1st Cir. 2017).................................................................28

*United States v. Tison*,
    780 F.2d 1569 (11th Cir. 1986) ..........................................................31

*United States v. Towne*,
    705 F. Supp. 2d 125 (D. Mass. 2010) ..................................................28

*United States v. Ullah*,
No. 04-CR-30A(F), 2005 WL 629487 (W.D.N.Y. Mar. 17, 2005), *aff'd in relevant part*, No. 04-CR-30A, 2006 WL 1994678 (W.D.N.Y. July 14, 2006) .....................24

*United States v. Williams*,
504 U.S. 36 (1992) ................................................................................43, 53, 59

*United States v. Yarborough*,
No. 06-CR-190(A), 2007 WL 962926 (W.D.N.Y. Mar. 28, 2007) .........................................54

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987) ....................................................................................................1

**Statutes**

3 L.P.R.A. § 1857a(s) ............................................................................................11

18 U.S.C. § 2511 .........................................................................................................14

Bank Secrecy Action, 31 U.S.C. 5311 § et seq....................................................10

Due Process Protections Act, S. 1380, Pub. L. No. 116-182( .............................56

Puerto Rico's Government's Ethics Act of 2011 .........................................................11

**Other Authorities**

Fed. R. Crim. Pro. 5(f) ...........................................................................................56, 57

**TO THE HONORABLE COURT:**

COMES NOW the defendant, Julio M. Herrera-Velutini ("Mr. Herrera" or the "Defendant"), through his undersigned attorneys, respectfully submits the instant Memorandum of Law in support of his Motion to Dismiss the Indictment for Outrageous Government Misconduct.

## INTRODUCTION

*"[W]e must have assurance that [the Government] who [] wield this power will be guided solely by their sense of public responsibility for the attainment of justice."*

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814 (1987).

Mr. Herrera and the bank which he owns and for which he served as Chairman, Bancrédito International Bank & Trust Corporation (the "Bank"), had a history of good work and good deeds in the Commonwealth of Puerto Rico. They were subjected to misconduct at the hands of the Office of the Commissioner of Financial Institutions ("OCIF"), the Commonwealth's bank regulator, for more than six years pursuant to an endless series of audits. Mr. Herrera mistakenly believed that his responsiveness to OCIF's demands, and the investment of millions of dollars in additional compliance, consultants, and enhancements allegedly sought by OCIF as a condition of relief, would satisfy OCIF and allow the Bank to continue serving its customers and the Commonwealth as a whole. Mr. Herrera only ever sought fair treatment for the Bank, yet the Bank was utterly denied any such fair treatment for reasons Mr. Herrera did not understand – that is, until the Government began producing, in a drip-feed fashion, much-delayed discovery in this case.

In stark contrast to Mr. Herrera's reasonable expectation for genuine and equitable treatment of himself and the Bank, the discovery produced to date by the Government instead irrefutably demonstrates that Mr. Herrera and the Bank were subjected to a multi-year campaign

of wrongful conduct by the Government – including, in particular, the Federal Bureau of Investigation (the "FBI") – which had commandeered OCIF in order to in any way possible generate a federal criminal case against Mr. Herrera and the Bank.  The campaign against Mr. Herrera wrongfully harnessed OCIF's regulatory authority in service of the federal criminal investigation that led to the Indictment, violated ethical rules protecting Mr. Herrera's right to counsel, surrounded him with deceitful informants who engaged in or facilitated the conduct with which Mr. Herrera was wrongfully charged, and failed to properly disclose these issues to the Grand Jury and the reviewing Court.

Until today, Mr. Herrera has sought in earnest to genuinely confer and coordinate with the Government in order to raise and address these concerns, and to seek in discovery material exculpatory and impeachment evidence necessary for Mr. Herrera to understand the extent of the Government's misconduct and mount a proper defense at trial.  Until today, Mr. Herrera has abstained from seeking from this Court the extraordinary remedy of dismissal of the Indictment based upon misconduct by the Government, which includes the Government's persistent refusal to make disclosures to which Mr. Herrera is entitled under the Due Process Clause of the Constitution.  Until today, Mr. Herrera has remained mindful that – although dismissal of an indictment for deliberate governmental impropriety may be viewed as a harsh, ultimate sanction – "some day [the court may] be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  *See United States v. Russell*, 411 U.S. 423, 431–32 (1973).  Unfortunately, that day has come.

As set forth below, Mr. Herrera has been compelled to respectfully move this Court to dismiss the Indictment against him due to misconduct by the Government so outrageous that no

other appropriate remedy is available with which to protect and uphold his constitutional right to due process.  There are several reasons why Mr. Herrera is compelled to take this step after waiting over a year since issuance of the Indictment for the Government to disclose fully material exculpatory and impeachment evidence to which Mr. Herrera is unequivocally entitled. Ultimately, and as exhibited from even the wholly deficient discovery produced to date by the Government, it has become clear that – from the very inception of this matter – the Government has directly engaged in an extraordinary campaign against Mr. Herrera that has violated fundamental fairness and is altogether shocking to the universal sense of justice.  Put simply, Mr. Herrera has been the victim of several violations of his Due Process rights.

First, the discovery provided to date demonstrates that the Government – through the FBI – purposely commandeered OCIF, an independent administrative and regulatory agency, in order to engineer a fictitious "examination" and "audit" of the Bank, in a concerted effort to obtain purported evidence and generate unfounded criminal charges against Mr. Herrera and others. Essentially, OCIF's *actual* function – to supervise and regulate Puerto Rico's financial sector in order to genuinely evaluate and improve the internal processes of financial institutions such as the Bank – was utterly coopted by the Government, with each of OCIF's purported "examinations" or "audits" of the Bank serving as mere pretext in furtherance of the Government's criminal investigation.  So too did the Government coopt *the near entirety* of OCIF management and staff involved in such purported audits or examinations of the Bank, in order to gather "evidence" from, covertly record, or otherwise surreptitiously interfere with the Bank and its representatives, all under the guise of *bona fide* regulatory evaluation and compliance. Indeed, the evidence produced to date indicates that *at least ten current and former OCIF officials* were active informants or were otherwise working on behalf of the FBI during the same period in which they were ostensibly

carrying out their independent regulatory duties – a figure all the more outrageous when considering that, at any given time, *OCIF had only nine examiners on its staff*. By engaging in such misconduct, the Government impermissibly utilized OCIF as a "stalking horse" to – behind the façade of a legitimate *civil* and *regulatory* process – conduct a *criminal* investigation into the operations of the Bank and Mr. Herrera, and thereby knowingly circumvented the legal requirements and restrains imposed upon criminal investigations in violation of Mr. Herrera's Due Process rights.

Second, the Government has time and again disregarded Mr. Herrera's constitutional rights afforded under the Fourth Amendment. The most recent discovery provided to date (which contains core Rule 16 discovery materials, including recordings of Mr. Herrera, the other defendants, and/or meetings involving the Bank and its internal counsel, made by the FBI or its many informants), which has been long withheld without explanation by the Government, demonstrates that the Government employed improper techniques in its quest to harm Mr. Herrera and the Bank, including directing surreptitious recordings of Mr. Herrera – a party known to be represented by counsel – via confidential informants for purposes of eliciting admissions from Mr. Herrera. In the first instance, such conduct constitutes a clear violation of ethical rules – *i.e.*, that an attorney (or an agent acting on their behalf) may not communicate with a party known to be represented by counsel. Even more egregiously, the Government's subsequent conduct in the execution and review of search warrant returns violated Mr. Herrera's rights under the Fourth Amendment, when the Government accessed and reviewed such privileged records *before* employing a filter team to appropriately analyze these materials, and then improperly relied upon such privileged information in order to secure warrants and obtain additional evidence to procure Mr. Herrera's indictment.

Third, the Government compounded the above violations by providing false or misleading testimony to the Grand Jury.  More specifically, the Government intentionally misled or otherwise failed to disclose material information to the Grand Jury, including but not necessarily limited to information undermining the credibility of witnesses or the investigation as a whole, as well as the fact that purported evidence was procured and testimony was offered by confidential informants and/or key witnesses in exchange for promises of leniency to those individuals, *each of whom were involved in actual criminal conduct without any involvement whatsoever of the Bank or Mr. Herrera*.  In so doing, the Government substantially and unreasonably influenced the Grand Jury's decision to indict Mr. Herrera, and thereby infringed upon his constitutional right to be indicted only by an informed and independent Grand Jury.

Finally, the Government continues to withhold exculpatory and impeachment evidence from the defense, including avoiding disclosing key aspects of its interactions with OCIF.  For example, the Government has thus far refused to produce records that may be in the possession of OCIF, based upon the fiction that – despite a clear record to the contrary – the Government and OCIF were operating independently during the investigation of the Bank and Mr. Herrera.  *See* Exhibit A. (Government Response Letter, dated April 28, 2023) at p. 2 ("The United States has no obligation to provide statements made . . . to investigative and regulatory agencies in Puerto Rico, including the Office of the Commissioner for Financial Institutions and the Puerto Rico Department of Justice, as they are not part of the investigative team.").  The Government's position beggars belief, and it is instead clear that such evidence relating to OCIF would corroborate the Government's and the FBI's treatment of OCIF as a stalking horse, while directly contradicting the specious grounds upon which the Government argues that its investigation of Mr. Herrera for

his alleged conduct at the Bank is somehow unrelated to the corruption investigation of Mr. Herrera leading to the instant Indictment.

Since the very outset of its "investigation" of Mr. Herrera, the Government has engaged in repeated acts of misconduct which – taken together – have infected every aspect of this matter and have violated Mr. Herrera's constitutional rights.  Above all else, it is the responsibility of the Government to promote confidence in the administration of justice – its ultimate interest is not simply to win a case at all costs, but to ensure that justice shall be done.  To that end, while the prosecution "may strike hard blows, he is not at liberty to strike foul ones."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  Here, the record in this case – rife with flagrant and repeated instances of intentional Governmental misconduct – demonstrates that these foundational principles were not followed.  Such shocking instances of the Government's constitutional transgressions necessitate the strictest censure by this Court, and dismissal of the Indictment.

## BACKGROUND

Beginning in or around late 2015, OCIF commenced the first of a protracted and increasingly unreasonable series of what its officials characterized as "routine examinations" or "audits" of the Bank and its operations that continued essentially unabated until the end of 2021. Throughout the entirety of this process – and despite the onerous and unduly invasive nature of OCIF's examinations – the Bank, its representatives, and Mr. Herrera nonetheless remained fully cooperative and compliant, seeking to adopt a genuinely collaborative posture with OCIF to address its multitude of demands.  However, at no point in this purported examination process was OCIF acting in good faith.  Instead, and unbeknownst to the Bank or Mr. Herrera, OCIF and its representatives had long since been coopted by the FBI, and the multi-year examinations of the Bank were never anything more than mere window-dressing for a surreptitious and unlawful criminal investigation conducted by the Government.  As detailed below, the Government's

conduct – through OCIF as its willing catspaw – was a substantial departure from the proper administration of justice, and constituted an egregious affront to the constitutional rights of Mr. Herrera.

**A.      A Years-Long "Examination" Process is Commenced Against the Bank**

On or about October 1, 2015, OCIF issued and the Bank entered into a consent order (the "2015 Consent Order") which required the Bank to submit certain materials to OCIF, such as a new capital plan, new by-laws, compliance reports, and quarterly progress reports regarding the Bank's performance.  Within an accelerated period of two months, the Bank had complied with substantially all – if not the entirety – of the requirements imposed by the 2015 Consent Order. Nonetheless, and contrary to the agreement between OCIF and the Bank that the 2015 Consent Order was to be lifted upon completion of its terms, OCIF reneged on its agreement with the then ███████████████████████████████████████████████████████ who in furtherance of the FBI's investigation of Mr. Herrera became a registered FBI informant – notifying the Bank that OCIF would not lift the 2015 Consent Order until the agency had finalized a "full examination" of the Bank.   And, although ██████ assured the Bank that such a purported examination would conclude in or around the first quarter of 2017, OCIF did not even *commence* this examination process until January 2017.

The basis for OCIF's purposeful delay is as straightforward as it is reprehensible.  Although couched as an initial period of examination, in stark reality, OCIF had at the very outset of this process fallen under the control of the FBI.  Indeed, on October 21, 2015, *less than 20 days* after OCIF had issued the 2015 Consent Order, then ██████████████████████████████ ████████████████████████████ who *also* became an FBI informant in furtherance of the FBI's investigation of Mr. Herrera – referred the Bank to the FBI without any supporting justification, and despite having separately entered into a consent decree with the Bank

that had allegedly resolved OCIF's investigation.  Moreover, in or around July 2016, the FBI conducted an interview of ▆▆▆ who – without providing *any* concrete evidence or support – raised absurd "concerns" regarding Mr. Herrera, including but not limited to: (i) that ▆▆▆ had read news articles that indicated that Mr. Herrera was barred from entering Venezuela (if anything, a positive quality to possess); and (ii) that ▆▆▆ believed that Mr. Herrera was on the INTERPOL List under a pseudonym, Julio Martin Kuster (a claim that even the FBI dismissed as a falsehood). *See* Exhibit B. DOJ-0000098303 (FBI Complaint Form & Summary of FBI Interview of ▆▆▆1 ▆▆▆, dated October 24, 2017) at pp. 2-4.  Nonetheless, and although the representations of ▆▆▆ were entirely without merit, his alliance and coordination with the FBI at the very least demonstrates that neither he nor OCIF as a whole were following the actual facts or objective results of the purported examination process involving the Bank, but were instead seeking – alongside the Government – to damage the Bank and Mr. Herrera in any manner possible.[1]

To wit, there is perhaps no clearer evidence during this period of the duplicitous motives of OCIF's management – including through FBI-directed informants such as ▆▆▆ – than in its efforts to intentionally pressure and subvert Principal Examiner Karly Padro ("Padro") into improperly altering the conclusions of her report regarding the legitimate operations of the Bank. As background, while ▆▆▆ were covertly working with the FBI, OCIF had ordered a "new" examination of the Bank, which was initiated in or around January 2017 and overseen by Principal Examiner Padro.  As before, the Bank, its representatives, and Mr. Herrera fully complied with this latest examination, including supplying all requested information

---

[1] Egregiously, the FBI was well aware that if OCIF ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ That the FBI – and OCIF at the FBI's behest – conducted a sham investigation and audit of the Bank and Mr. Herrera knowing that such grave consequences could befall Mr. Herrera is an affront to justice.  *See* Exhibit C. DOJ-0000507943 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ dated August 3, 2022) at p. 17.

and documents for review by OCIF. And yet, although this examination purportedly concluded in or around May 2017, OCIF continued to refrain throughout the year from releasing *any* actual examination report – much less lift the still active 2015 Consent Order. The sheer length of time that had transpired since the conclusion of the 2017 examination – let alone since the imposition of the 2015 Consent Order – was extraordinary in every respect and serves only to further evidence that OCIF was intentionally delaying this process for ulterior purposes.

Indeed, the available evidence demonstrates that – following her examination – *Padro was directly pressured by OCIF management to materially alter the conclusions of her report on the Bank*. Specifically, on November 9, 2017, Padro sent an email to ███ and another OCIF supervisor – ██████████████████ – in which Padro stated that she had learned only the day prior that OCIF management "had a change of mind" in relation to certain "subjects related to the Bancredito exam," and that such subjects "at no time were part of my [2017 examination]," that there was "no legal basis" for the examination to include such subjects, and that the Bank had "shown improvement in many areas." The entirety of Padro's email is illustrative of OCIF's disingenuous approach in the examination of the Bank:

> *Yesterday **I became aware the office had a change of mind in relation to the following subjects related to the Bancredito exam**: an apparent infringement of short sales, a cease and desist in fiduciary activities, a 4 rating for Management and a continuance of MOU. These four matters **at no time were a part of my EBI evaluation** as (1) **there was no legal basis to make a decision** in relation to them and (2) **the institution has shown improvement in many areas**. At the request of* ████████████ *and the settlement of the Deposits Institutions Auxiliary Official* ████████ *and the Examinations Supervisor* ████████, *I was encouraged to change my conclusions in the Examination Report, even though I was not in agreement and after having attempted to defend my position in relation to these matters on many occasions. I changed the tone of the exam, I included new subjects as loosely guided by* ████, *and I drafted a MOU when a Board Resolution had already been prepared.*
>
> *It now seems that the office does not believe that the results I was asked to change can prevail and that the exam will terminate as it was originally submitted on 3 April 2017, except some immaterial changes to the regular review process.*

*It is for this reason that I will not form part of a re-review of the Report. I completed my part as usual, and I do not believe it is fair to triple the amount of work I am expected to do in this process.  At the same time **I do not agree to sign the exam**, unless there is a note which exonerates [missing text] from this dilated and irregular process.*

*I do not wish to be controversial, **I simply wish to cast light on the faults that have arisen during this examination review process**, and this serves to improve the Office.*

*See* Exhibit D. DOJ-0000058944 (Certified Translation of Email from Karly Padro to ███, ███████████████, dated November 9, 2017) (emphasis added).

Ultimately, it was only until in or around April 2018 that OCIF formally passed resolutions relating to the 2017 examination of the Bank, and – *some two and a half years after its issuance* – finally deigned to lift the 2015 Consent Order imposed upon the Bank.  Of course, OCIF's – or rather, the FBI's – work was not yet done.  To the contrary, *just one month after lifting the 2015 Consent Order*, in or around May 2018, OCIF commenced a *new* review of the Bank, under the guise of assessing its liquidity function and compliance with the Bank Secrecy Action, 31 U.S.C. 5311 § et seq. ("BSA") regulations.  And, as before, despite the continuing compliance of the Bank, its representatives, and Mr. Herrera throughout this process, OCIF nonetheless initiated *another* full scope examination of the Bank in or around July 2019.  From 2019 onward, OCIF issued *hundreds* of individual requests for information and documentation relating to the operations of the Bank, while consistently ignoring or otherwise failing to address reasonable inquiries from representatives of the Bank in relation to the seemingly endless scope and undefined purpose of this latest "examination."

OCIF's examination of the Bank from 2019 onward was just as irregular as the examinations that had preceded it.  The internal inconsistencies of, and questionable methods employed during, OCIF's examination were legion.  For example, on December 3, 2019, the Bank received an email from OCIF ███████████████ – who *also* became a registered FBI

informant in furtherance of the FBI's investigation of the Bank – which represented that prior submissions by the Bank to OCIF "lacked a lot of information" and on that basis requested logs of In/Out transfers conducted from October 1, 2016 through March 31, 2016. But the Bank clarified shortly thereafter that said logs *had already been fully provided* to OCIF examiner ████████ on September 16, 2019. As another example, when, on February 13, 2020, representatives of the Bank met with then OCIF Commissioner ████████████████████ to express concerns regarding the reasonableness of the expanded OCIF examination, ███████████ expressly represented that the length of the 2019 examination was simply a product of OCIF's lack of internal resources, and that *there was nothing he had seen from the examination that he considered worrisome for the Bank. See* Exhibit E. DOJ-0000094329 (Letter from Bancredito to OCIF, dated February 19, 2020) at p. 1. Nonetheless, OCIF's examination of the Bank continued unabated.[2]

As aforementioned, OCIF's conduct toward the Bank and Mr. Herrera during this period was particularly puzzling, given that – throughout the purported examination and audit process – Mr. Herrera and the Bank were continuously demonstrating an ongoing commitment to compliance, and genuinely endeavoring to foster a collaborative relationship with OCIF. For example, in addition to investing considerable resources in updating its internal compliance monitoring systems, the Bank separately engaged with a number of independent legal counsel and regulatory advisors in order to appropriately manage the examination process and implement updated safeguards, including but not necessarily limited to: Kroll LLC, McConnell Valdés LLC, Crowe LLP, Holland & Knight, and McGuire & McGuire, P.C.

---

[2] Puerto Rico's Government's Ethics Act of 2011 provides that: "No public servant shall carry out any action that may call the impartiality and integrity of the government endeavor into question." 3 L.P.R.A. § 1857a(s).

As detailed below, although confusing at the time, the reason for OCIF's continuing "examinations" and general antagonism toward the Bank was made apparent by discovery finally produced in this case: OCIF's examinations were never genuine, legitimate undertakings,[3] but were instead mere pretext by which the FBI could surreptitiously gather purported evidence and generate at all costs baseless charges against the Bank and Mr. Herrera.

**B.**     **The FBI Uses OCIF as a Stalking Horse**

Put simply, ███ and ████████████ were not remotely the only OCIF officials who reported to, and were directed by, the FBI during this multi-year prolonged period of "examining" the Bank.  To the contrary, the evidence reflects that: (i) *nearly every single* managerial official at OCIF was – at one time or another – an active informant operating under the control of the FBI; and (ii) *nearly every single* continuation of, or development in, the purported examination process of the Bank was precipitated or otherwise guided by the actions of the FBI.

For example, in or around May 2018 – the very same month in which OCIF commenced a new review of the Bank – special agents of the FBI without prior notice contacted one of the Bank's independent directors, ████████████ with a series of inquiries relating to the Bank.  Although Lopez had not been involved with the Bank's day-to-day operations in over four years and indicated her lack of knowledge to the agents, they nonetheless asked her a number of questions, probing everything from the Bank's leadership, to its customers, to acquisition negotiations, to even Mr. Herrera's personal art collection.  As the FBI sought to question Lopez, OCIF was simultaneously conducting the on-site audit of the Bank's liquidity and compliance.  Two days later, Lopez was again contacted by the FBI, who requested that its agents meet with

---

[3] Tellingly, the Conference of State Bank Supervisors rescinded OCIF's accreditation to conduct audits of financial institutions in or around 2022, due to "deficiencies in the agency's bank regulatory and examination program."  *See* Exhibit F. (Centro de Periodismo Investigativo – OCIF Loses Accreditation Article, dated December 1, 2022.)

her in person.  When Lopez did not confirm a meeting date, two FBI special agents appeared

unannounced at Lopez's office in Miami.  After divulging that it had obtained Lopez's contact

information from ▇▇▇▇▇ himself, the special agents launched into a series of inquiries relating to

the organizational structure of the Bank, the involvement of Mr. Herrera and Bank representatives,

Mr. Herrera's personal art collection (again), and whether Mr. Herrera had a house in Miami.

Again, as aforementioned, while the FBI was conducting this bare, perfunctory outreach, OCIF

and its officials were simultaneously collecting records and documentation from the Bank under

the auspices of a renewed examination.  This timing was not mere coincidence – the latter was

feeding the former.

As noted, throughout the relevant period, the FBI was also controlling or otherwise

directing the actions of numerous OCIF officials.  As aforementioned, even the materially deficient

discovery provided by the Government to date indicates that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *OCIF*

*officials* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ were active informants or

were otherwise working on behalf of the FBI during the same period in which they were ostensibly

carrying out their independent regulatory duties.[4]  In addition to ▇▇▇▇▇▇▇▇▇▇▇,

such FBI-controlled OCIF officials included, but were not necessarily limited, to the following:

- ▇▇▇▇▇▇▇▇▇, in addition to reporting to the FBI regarding the Bank in as early
  as April 2018 (less than a year after his appointment), he had multiple interviews with
  the Government, including in or around March 2020, November 2020, and December
  2020.  Notably, during the course of his interview in March 2020, ▇▇▇▇▇▇▇▇
  provided the FBI with a hard drive which he indicated contained letters and email
  communications relating to the Bank.  However, due to the Government's delayed and
  haphazard production, it remains unclear whether the contents of this hard drive have

---

[4] Oddly, the available record indicates that Padro (who had identified a series of irregularities concerning OCIF's
treatment of the Bank) was not an informant of – or even once interviewed by – the FBI.  Given the objections Padro
raised with respect to the 2017 examination of the Bank and the conduct of senior OCIF officials like ▇▇▇▇, it may
reasonably be presumed that an actual, fulsome investigation by the FBI would have included at the very least *some*
questioning of Padro.  In that regard, the record's silence is damning.

ever been produced, even though there is no possible legal basis to withhold such evidence.

- ██████████████████ another OCIF official, provided to the FBI – at its request – nearly 150 documents relating to Mr. Herrera's personal art collection (then displayed at the Bank) between January and March 2020. The available evidence further indicates that ████ extensively reported to the FBI throughout this period, including providing copies of the internal investigation report completed by OCIF in connection to one of its past audits of the Bank. As above, it does not appear that the report of this internal investigation has been produced to date.

- ████████████████████████████████████████████ of OCIF, acted as a confidential informant for the FBI from January 2018 through June 2020. As discussed in greater detail below, ███████████████████ surreptitiously recorded Mr. Herrera and regularly sought to aid the FBI's investigation of Mr. Herrera, even while the Government has asserted in the Indictment that the appointment of its *own informant* as ████████████ was somehow the corrupt object of Mr. Herrera's criminal activity.

  Notably, while ████████████████ was providing the FBI information – including in the form of surreptitious recordings of conversations – *he was simultaneously serving as a member of the Bank's own Compliance Committee.* That ████████████ served as an FBI informant and provided reports following such Compliance Committee meetings, while also ostensibly being relied upon by the Bank and Mr. Herrera to appropriately guide their ongoing compliance efforts with OCIF, raises significant concerns regarding whether ████████████ was genuinely assisting the Bank during the OCIF audit process, or whether he had instead been tasked with purposely misguiding the Bank in furtherance of the FBI's investigation.

  Further, in later televised interviews, ████████████ described the extent to which OCIF acted for the FBI, noting – for instance – that the FBI visited OCIF *nearly every single week* during the period in which he acted as ████. Moreover, although the Government had ████████████ testify ████████████ ████████████ no mention whatsoever was made of ████ history as a confidential informant, including that his status as informant had been terminated in or around June 2020 due to suspected involvement in criminal activity.

- ████, the above-detailed lead BSA Examiner involved in the 2019 examination of the Bank, *also* acted as a registered confidential informant for the FBI from June 2020 onward. Notably, at the direction of the FBI, ████ surreptitiously recorded representatives of the Bank – including ████████████ Ana Faria, and Jesus Mendez – on multiple occasions while engaged in sensitive negotiations with the Bank.[5]

  For example, and at the direction of the FBI, ████ secretly recorded an October 22, 2020

---

[5] 18 U.S.C. § 2511 requires one-party consent. Thus, in Puerto Rico, a person can record a non-consenting party under the direction of a federal law enforcement officer.

meeting with Bank officials, during which audit findings by OCIF were discussed in detail.[6] Shortly thereafter, on November 16, 2020, Tio provided the FBI with an outline of proposed violations found during the ongoing audit of the Bank.[7] ████ sharing of interim work product with the FBI strongly suggests that the FBI was, indeed, providing direction to and oversight of OCIF's "examination" of the Bank.

- ████████████, OCIF's Examiner Supervisor involved in forcing the alteration of Padro's examination report of the Bank, engaged in clear misconduct by destroying records related to the Bank and instructing other OCIF employees to do the same, as she admitted during an interview with the FBI in or around June 2022.[8] This destruction of evidence included demanding that OCIF employees delete their emails as soon as she had been made aware of the appointment of ████████████, who – as noted – was an active FBI informant. ████ separately confirmed this egregious conduct in his own interviews with the FBI.[9] And yet, despite receiving multiple direct admissions that OCIF had *destroyed evidence* relating to its "examination" of the Bank, there is no indication whatsoever that the FBI inquired or sought to investigate this document destruction, much less seek to recover any such materials, which would have been highly relevant to Mr. Herrera's defense.

- ████████████████████████ the OCIF Commissioner since in or around January 2021, *also* acted as an informant for the FBI, and – despite supervising OCIF's allegedly independent investigation of the Bank – frequently providing information to the FBI relating to the ongoing examination of the Bank, as well as surreptitiously recording a conversation in furtherance of the FBI's investigation of the Bank, during which she effectively read from a script prepared by the FBI.[10]

Notably, during the course of those interviews with the FBI, ████████████ *herself* admitted that it was unclear why OCIF was focusing so heavily on the Bank, and that the repeated examinations of the Bank were atypical of OCIF's ordinary practices.[11]

## C.    The Government is Actively Concealing its Use of OCIF as a Stalking Horse by Refusing to Produce Relevant Discovery

To date, the Government has baselessly refused to provide discovery concerning its interactions with (and control over) OCIF, claiming instead that OCIF was somehow not part of

---

[6] *See* Exhibit G. DOJ-0000100190 (Summary of FBI Interview of ████████ dated January 28, 2021.)
[7] *See* Exhibit H. DOJ-0000100061 █████████████
[8] *See* Exhibit I. DOJ-0000073165 (Summary of FBI Interview of ████████████ dated July 1, 2022.)
[9] Exhibit J. DOJ-0000075173 (Summary of FBI Interview of ████████ dated June 27, 2022) at p. 4.
[10] *See* Exhibit K. DOJ-0000075168 (Summary of FBI Interview of ████████████ dated June 27, 2022.)
[11] *See id.* at p. 3 ("████████ does not know why ████████████ examined BANCREDITO three times, but that focus took away the focus from other institutions that should have been examined as well. BANCREDITO is important, but ████████ does not know why there was so much emphasis put on BANCREDITO by ████████

the prosecution team and that the Government's investigation of the Bank and Mr. Herrera for alleged federal crimes was unrelated to the Government's investigation and prosecution of the Bank and Mr. Herrera for alleged corruption. *See* Exhibit A.  Yet, as detailed at length above, it is irrefutable that OCIF acted on the Government's behalf, driving the investigation, stonewalling Mr. Herrera and the Bank at the insistence of the Government, gathering evidence, sharing resources, and with its employees even acting as informants and recording confidential conversations between the regulator and employees of the Bank in an attempt to further the criminal investigation.  The Government's extensive (and near complete) use of OCIF officials as witnesses and confidential sources belies its attempt to distance itself from the agency.

The Government cannot avoid its discovery and disclosure obligations by asserting that the investigation of Mr. Herrera and the Bank – in which OCIF, its leadership, and its employees worked as agents of the Government – was nonetheless a "separate investigation" from the investigation leading to the current charges against Mr. Herrera.  The charges against Mr. Herrera arise directly out of the joint FBI-OCIF investigation of Mr. Herrera and the Bank, which was ongoing throughout the period covered by the charges.  Moreover, the charges all relate to purported official action that was allegedly sought to address the various concerns and issues brought about by "examinations" or "audits" of the Bank, that are now known to have simply served as cover for what the Government disingenuously asserts was an "unrelated" FBI-OCIF investigation.  And, the Government employed the *very same* OCIF informants and witnesses in furtherance of the criminal charges as it has done in the allegedly "unrelated" investigation of Mr. Herrera and the Bank.

Most crucially, FBI records produced in discovery reflect that the investigation of Mr. Herrera and the Bank for alleged conduct in connection with the operation of the Bank was

16

officially merged – *at the request of the FBI itself* - with the investigation into the corruption allegations in 2021, well before the Indictment was issued.[12]

Based upon the foregoing, which – again – reflects only a sample of the degree of overlap between OCIF and the FBI, it is uncontestable that the two agencies were so connected, so inescapably intertwined, that it is nearly impossible to determine where the regulatory arm of OCIF ended and the criminal arm of the FBI began.  Ultimately, the sheer number of OCIF officials who acted at the direction of the FBI – ███████████████████████████████ – along with the seemingly never-ending "examination" process the Bank was subjected to at the hands of other OCIF employees who themselves acted as FBI informants, leads to the inescapable conclusion that the FBI elected to commandeer OCIF as a stalking horse to pursue a criminal investigation into Mr. Herrera and the Bank.

**D.    The Government Knowingly Omits Key Facts and/or Provides False or Misleading Information to the Reviewing Court and the Grand Jury**

Finally, and as aforementioned, the Government brought charges against Mr. Herrera after an extraordinary and belabored expenditure of investigative resources by territorial and federal agencies over the course of seven years, coopting the entirety of a local regulatory agency while needlessly deploying dozens of informants and undertaking undercover operations around the world, all in search of – and, when that search ultimately failed, all to generate – a non-existent crime.

In particular, a number of individuals who were the objects or counterparties of alleged bribery schemes were government informants at the time of the investigation, including an individual whose alleged appointment was the object of the scheme with which Mr. Herrera,

---

[12] *See* Exhibit L. DOJ-0000068479 (FBI Approval Request to Consolidate Evidence with OCIF Investigation and Formally Closing OCIF Investigation, dated July 7, 2021.)

former Governor Wanda Vazquez Garced ("Governor Vazquez"), and alleged co-conspirator Mark Rossini ("Rossini") are charged.

For instance, ██████████████████ – an individual directly involved in, if not the driving impetus behind, certain dealings with the campaign of Governor Vazquez – was, despite his own history of alleged criminal conduct, █████████████ tasked with developing evidence against Mr. Herrera.   Separately, the alleged counterparty to the purported scheme ████████████████████████████████████████ – was also a government informant who actively sought out representatives of the Bank in order to intervene in the Bank's operations, including ousting independent counsel who the Bank had sought to retain for purposes of negotiating with OCIF, all as part of a concerted effort to further the Government's scheme to generate charges – at any and all costs – against Mr. Herrera.   As set forth in greater detail below, ██████ was wholly unreliable and utterly discredited – among other misconduct, he destroyed evidence and offered to cooperate only selectively (and then violated his agreement to do even that) – but his misconduct did not deter the Government from proceeding to charge Mr. Herrera, who has never met nor spoken to ██████ in his life, with serious crimes based on ██████ words and actions.

Yet none of this was disclosed either to the courts reviewing search warrants seeking evidence concerning the alleged schemes, █████████████████████████████████ ████████████████   Crucially, a number of these purported witnesses entered into cooperation agreements and other arrangements for leniency with the Government after they were confronted with their own misdeeds, and in exchange for their testimony before the Grand Jury. Such testimony was paramount in advancing the Government's tenuous case, and substantially influenced the Grand Jury's decision to ultimately indict Mr. Herrera.

18



1.    ███████

███████████████ has been relied upon substantially by the Government as a key, cooperating witness with respect to supporting the allegations in the Indictment relating to both: (i) the purported bribery scheme involving former Governor Vazquez's primary campaign in 2020 (the "Vazquez Scheme")[13]; and (ii) the purported bribery scheme involving alleged campaign contributions to current Governor Pierluisi (the "Pierluisi Scheme").[14]

---

[13] Mr. Herrera's independent bases for seeking dismissal of Counts One, Three, and Four of the Indictment are articulated in Governor Vazquez's Motion to Dismiss and Memorandum of Law in Support thereof (Dkt. Nos. 193 and 193-1), which Mr. Herrera formally joined (Dkt. No. 198), and to which Mr. Herrera incorporates by reference herein.

[14] Mr. Herrera's independent bases for seeking dismissal of Counts Five through Seven of the Indictment are articulated in his Motion to Dismiss and Memorandum of Law in Support thereof (Dkt. No. 224), which Mr. Herrera incorporates by reference herein.

For example, and as detailed in an FBI summary of a meeting held between ███████████ in or around May 2021, in response to inquiries from ██████ as to whether Mr. Herrera was aware of any Suspicious Activity Reporting System (SARS) documents filed with the Financial Crimes Enforcement Network (FinCEN) in relation to Mr. Herrera's businesses, ████ responds "*no; he cannot know.*"[15]  Indeed, when ██████ thereafter inquiries whether Mr. Herrera knew of some 22 SARS that had been issued in relation to his businesses, ████ responds that "[*Herrera] has no idea how many there are . . . [and that]* **she lied to Herrera** *because she cannot tell him anything.*"[16] (emphasis added).

---

[15] *See* Exhibit M. DOJ-0000075240 (FBI Summary Translation, dated May 27, 2021) at p. 3.
[16] *Id.* at 4-5.

[REDACTED]

[REDACTED]

Indeed, the very circumstances surrounding [REDACTED] entering into her Plea Agreement are equally confounding and no less egregious.  To wit, in negotiating the terms of her cooperation with the Government, [REDACTED] retained as her personal counsel Maria Dominguez ("Dominguez") – *one of the Bank's longtime corporate attorneys who not only engaged in privileged communications concerning Government investigations with Mr. Herrera as Chairman of the Bank, but who also had previously sent a letter of representation to the FBI and had separate discussions with Assistant U.S. Attorney Scott Anderson, in which Dominguez expressly directed that any Government inquiries of the Bank should be routed through counsel*. It is unclear how or why the Government, which was therefore clearly on notice that Dominguez was the Bank's longtime counsel and was actively involved in the Government's investigation, allowed this misconduct to occur.  This blatant violation of internal Bank controls and professional misconduct is not just ethically troubling, it fundamentally affects the integrity of the criminal prosecution as a whole.

[REDACTED]

[REDACTED] a political consultant, is also heavily relied upon by the Government as a key, cooperating witness with respect to supporting the allegations in the Indictment relating to both the alleged Vazquez Scheme and Pierluisi Scheme.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]



a political consultant, is separately relied upon by the Government as a key, cooperating witness with respect to supporting the allegations in the Indictment relating to the alleged Vazquez Scheme.

At the outset,

---

[17] *See* Exhibit N. DOJ-0000069072 (Summary of FBI Interview of ▮▮▮▮, dated September 23, 2021.)
[18] *See* Exhibit O. DOJ-0000074282 (Summary of FBI Interview of ▮▮▮▮, dated September 14, 2021.)



[19]

And yet, despite ample evidence that ███████ was a serial fraudster, the Government provided him with a deferred prosecution in exchange for his continuing cooperation.[20]  That the Government provided ███████ with a deferred prosecution agreement for minor criminal offenses in exchange for his testimony, despite his active involvement in a laundry list of serious criminal conduct, directly contravenes guidance established in Section 9-27.430 of the Government's Justice Manual, Selecting Plea Agreement Charges, which explicitly states that "[i]f a prosecution is to be concluded pursuant to a plea agreement, *the defendant should be required to plead to* a charge or charges . . . [t]hat ordinarily include *the most serious readily provable offense* consistent with the nature and extent of his/her criminal conduct." (emphasis added).

Finally, and in perhaps an even more flagrant act of misconduct, the Government *also*

---

[19] *See* Exhibit P. DOJ-0000068493 (Summary of FBI Interview of ███████████, dated July 14, 2021) at pp. 1-2,

[20] At present, ██████ appears to lead several nonprofit organizations that are soliciting donations from governmental and private sources that, most likely, are entirely unaware of his criminality thanks to the Government's largesse.



███████████████████████████████████████. In reality, during the course of a two-hour and seventeen-minute recorded meeting, and despite ████ increasingly desperate efforts, ████ fails entirely to elicit any damaging or otherwise self-implicating admissions from Rossini – who again and again and again (no less than fifteen times) categorically denies the existence of *any* conspiracy between the parties or that *any* bribery scheme was remotely contemplated by the parties.[21] To the contrary, Rossini – not knowing, of course, that the Government was listening – practically begs ████ to "tell the truth" to the FBI on the basis that neither he nor Mr. Herrera had done anything wrong. ████████████████████████████

████ was deployed in an attempt to inculpate Mr. Herrera in criminal activity in this case. Crucially, ████ had direct dealings with Governor Vasquez and her staff and engaged in communications with ████ and Governor Vasquez about the creation of a pro-Vasquez Super PAC that led to the filing of charges against Mr. Herrera per the alleged Vazquez Scheme.

---

[21] *See* CHS Recording, dated November 16, 2021. DOJ-0000432209; 0000432211-13; 0000432215; 0000432217.
[22] *See* Exhibit Q. DOJ-00000508121 ████████████ dated August 3, 2022) at p. 33.
[23] No less damning is the fact that the Government only produced this recording on or about May 26, 2023, upon express request from Mr. Herrera's counsel in or around February 2023, and only after disclosing that it had – for months – simply sat upon this material evidence. There is no question that this evidence should have been disclosed long ago, and – as there is no discernable reason for the delay in this production – this inevitably leads to the conclusion that such exculpatory material was intentionally withheld by the Government for as long as possible. *See United States v. Ullah*, No. 04-CR-30A(F), 2005 WL 629487, at *9 (W.D.N.Y. Mar. 17, 2005), *aff'd in relevant part*, No. 04-CR-30A, 2006 WL 1994678 (W.D.N.Y. July 14, 2006) (reminding the Government of its "duty to timely provide" "all *Brady* exculpatory and *Giglio* impeachment materials" as failure to provide such information may "requir[e] a reversal of any conviction obtained").

And yet, ████ *himself* denied that anything wrong or illegal had occurred in connection with those discussions when questioned during regular debriefings with the FBI. Nonetheless, and despite its own informant asserting that there was no *quid pro quo* arrangement, the FBI's references to ████ in search warrants misleadingly indicated that he was assisting the investigation and had proven to be reliable.[24] In so doing, the Government failed in its duty of candor to the court, and presented misleading information in seeking to secure a warrant against Mr. Herrera, in clear violation of his Fourth Amendment rights.

Moreover, such reliance on ████ by the Government is all the more troubling given that the Government was aware that ████████████████████████████████████ ████████████████████████████████████ ████████████████████████, reflecting yet additional misconduct by the Government and its favored informants.

████ ████████████

████, a confidential informant masquerading as a person with access ████████ ████ is undoubtedly the Government's "star" witness with respect to the alleged Pierluisi Scheme, despite not having directly testified before the Grand Jury.[25]

The Government has avoided putting ████ on the stand for good reason. He is, without hyperbole, a "nightmare" witness bearing an egregiously long and still continuing history of

---

[24] *Compare* DOJ- 0000062906 – January 13, 2021 Affidavit in Support of Applications for Four Search Warrants, No. 18-mc-412 (FAB)

making false statements and engaging in criminal activity, including but not limited to bank fraud and embezzlement of public funds.  Although such criminal conduct – once exposed – served as the impetus for his cooperation with the Government, ██████ never once abated in his duplicitousness.  Rather, since becoming an informant for the Government, ██████ repeatedly took independent steps to undermine or otherwise subvert the Government's investigation for the benefit of himself and his close associates, including but not necessarily limited to: ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ – if not utterly integral – to the Government's claims, including most notably Governor Pierluisi himself.  And, as with ██████, the Government nonetheless chose to provide ██████ an opportunity to enter into a plea agreement for minor criminal offenses in exchange for testimony, despite his extensive history of criminal conduct.  *See* Section 9-27.430 of the Government's Justice Manual, Selecting Plea Agreement Charges (explaining that "pursuant to a plea agreement, the defendant should be required to plead to . . . the most serious readily provable offense").[26]

Ultimately, that ██████ engaged repeatedly in this conduct, yet remains a lynchpin of the Government's claims, calls into question the *entirety* of the allegations raised in the Indictment.

████████████████████████████████████████████ –

---

[26] That the Government permitted ██████ to enter into a plea agreement – ████████████████ ███████████ Governor Pierluisi – also contravenes Section 9-27.420 of the Government's Justice Manual, Plea Agreements – Considerations to be Weighed, which provides that "the attorney for the government should not enter into a plea agreement with a defendant who admits his/her guilt but disputes an essential element of the government's case."  Here, and as detailed further in Mr. Herrera's Motion to Dismiss Counts Five through Seven of the Indictment, the actual, contemporaneous knowledge, understanding, and involvement of Governor Pierluisi – as a public official – is essential for any claim(s) arising under alleged public official bribery.

███████████████████████████████████

███████████████████████████████████

████████████████████████████

**LEGAL STANDARD**

A.    <u>**Dismissal for Outrageous Governmental Misconduct**</u>

Federal courts draw their power to dismiss an indictment from two sources – the United States Constitution, and from the court's own supervisory powers.  In the first instance, a district court may dismiss an indictment where the "conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Russell*, 411 U.S. at 431–32.  In such circumstances, the Government's misconduct is so pervasive that it constitutes a violation "of that fundamental fairness, shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." *See United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993).  Ultimately, "[w]hether the conduct in question is so outrageous as to constitute a Fifth Amendment violation involves a consideration of the 'totality of the circumstances with no single factor controlling.'" *United States v. Santopietro*, 809 F. Supp. 1008, 1015 (D. Conn. 1992) (quoting *United States v. Tobias,* 662 F.2d 381, 387 (5th Cir. 1981).

Second, a district court may exercise its supervisory power "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (citation omitted).  Stemming from such inherent supervisory powers, "[t]he outrageous government misconduct doctrine allows a court, in the most extreme of circumstances, to dismiss a criminal indictment as a sanction for appalling government misconduct." *United States v. Colburn*, 546 F. Supp. 3d 22,

28 (D. Mass. 2021) (citing *United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002)); *see also United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) ("Under its inherent supervisory powers, a federal court is empowered to dismiss an indictment on the basis of governmental misconduct."). Such a determination is the court's alone, as "[o]utrageous government conduct is an issue of law, and it is the province of the district court—and not the jury—to rule on a defendant's motion to dismiss on that ground." *United States v. Djokich*, 718 F. Supp. 2d 173, 174 (D. Mass. 2010), *aff'd*, 693 F.3d 37 (1st Cir. 2012) (quoting *United States v. Luisi*, 482 F.3d 43, 58 (1st Cir. 2007)).

To be clear, "[a] defendant's claim of outrageous government misconduct faces a demanding standard, permitting the dismissal of criminal charges only in those very rare instances when the government's misconduct is so appalling and egregious as to violate due process by shocking the universal sense of justice." *United States v. Therrien*, 847 F.3d 9, 14 (1st Cir. 2017) (internal citations and quotations omitted).  Nonetheless, federal courts recognize that they are to "review these claims holistically, evaluating the totality of the relevant circumstances while recognizing that outrageousness, by its nature, requires an *ad hoc* determination that cannot usefully be broken down into a series of discrete components." *Id.* (quoting *Santana*, 6 F.3d at 6–7) (internal quotations omitted).  To that end, and "[b]ecause the due process test is an objective one," "[e]ven a willing defendant may claim a violation of due process.  The focus [] is not on the propensities and predisposition of a specific defendant, but on whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." *United States v. Towne*, 705 F. Supp. 2d 125, 137 (D. Mass. 2010) (internal quotations omitted) (citing *United States v. Bradley*, 820 F.2d 3, 7 (1st Cir. 1987); *Russell*, 411 U.S. at 441).

28

Ultimately then, "serious prosecutorial misconduct may so pollute a criminal prosecution as to require dismissal of the indictment or a new trial, without regard to prejudice to the accused." *United States v. McCord*, 509 F.2d 334, 349 (D.C. Cir. 1974).  In such circumstances, "dismissal is used as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature" *Owen*, 580 F.2d at 367 (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)). "This is so because the principle is not one of fairness to the defendant alone but rather, in Justice Brandeis' words, is one designed to 'maintain respect for law . . . to promote confidence in the administration of justice . . . to preserve the judicial process from contamination. . . . Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution." *McCord*, 509 F.2d at 350 (quoting *Olmstead v. United States*, 277 U.S. 438, 484–85) (1928) (Brandeis, J., dissenting).

## ARGUMENT

**A.  The Court Should Dismiss the Indictment Based Upon the Government's Wanton and Extensive Violations of Mr. Herrera's Due Process Rights**

### 1.  The Government Engaged in Egregious Misconduct by Using OCIF as a Stalking Horse for its Own Criminal Investigation

From the very inception of this matter, the Government engaged in egregious misconduct violative of Mr. Herrera's Due Process rights by commandeering OCIF to serve as a "stalking horse" by which to obtain purported evidence from the Bank and Mr. Herrera that it would otherwise not be entitled to as part of a criminal investigation.  While a civil enforcement agency and criminal prosecutors may "cooperate and share information," the "Due Process Clause of the

Fifth Amendment imposes some limits on that cooperation [m]ost significantly, the Government exceeds those limits if it conducts a civil investigation solely for the purpose of advancing a criminal case." *United States v. Rhodes*, No. 18-CR-887, 2019 WL 3162221, at *1 (S.D.N.Y. July 16, 2019); *see also United States v. Kordel*, 397 U.S. 1, 11–12 (1970) (noting that "where the Government has brought a civil action solely to obtain evidence for its criminal prosecution . . . that might suggest the unconstitutionality or even the impropriety of [a] criminal prosecution.") As detailed above, almost immediately upon OCIF ordering an "examination" of the Bank in or around late 2015, the FBI actively sought to intervene in and coopt this ostensibly regulatory investigation, and only increased the sheer degree of its oversight and control of OCIF as such "examinations" continued over the years. In so doing, the FBI enlisted and directed as informants nearly the *entiret*y of OCIF's officials supervising the audit of the Bank, as well as three separate Commissioners of OCIF. Moreover, the FBI's extensive control over this examination process continued despite *repeated* instances in which OCIF officials – including ███████████ ████████████████████████ – privately acknowledged that the Bank was complying with OCIF's regulatory guidelines and was actively improving its operations in response to the examinations. Given such findings, coupled with the Bank's continuing cooperation and responsiveness throughout the multi-year examination process, there was simply no legitimate reason for OCIF to have continued to independently audit and/or re-examine the Bank. Instead, the only conclusion that can be drawn from this never-ending cycle of examination is that OCIF's investigation had long since been coopted by the FBI, "solely to obtain evidence for [the] criminal prosecution" of Mr. Herrera. *See Kordel*, 397 U.S. at 11–12; *see also United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316–17 (1978) (finding that IRS must issue civil summonses in good faith, and not act as "an information-gathering agency for other departments, including the

Department of Justice"); *United States v. Stringer*, 535 F.3d 929, 939 (9th Cir. 2008) (holding no bad faith where evidence showed SEC conducted "a bona fide civil investigation" "pursuant to the SEC's own civil enforcement jurisdiction" and not solely to obtain evidence for a subsequent criminal investigation).

The Government's conduct in the instant matter draws parallels to *United States v. Parrot*, where the court dismissed the indictment against all defendants due to material delay on the part of the Government, which was aggravated by the Government's bad faith in bringing "a parallel civil proceeding and avail[ing] itself of civil discovery devices to obtain evidence for subsequent criminal prosecution." 248 F. Supp. 196, 202 (D.D.C. 1965); *see also United States v. Tison*, 780 F.2d 1569, 1573 (11th Cir. 1986) ("[I]t is improper for the Government to institute a civil action to generate discovery for a criminal case"). Here, without having covertly commandeered the OCIF investigation as a "stalking horse," the FBI would not have been able to obtain and use for its criminal action – among other crucial materials – records and correspondence of the Bank produced to OCIF during the course of auditing, draft internal investigation reports and examination findings relating to Bank operations and compliance measures, surreptitious recordings of OCIF employees and Bank representatives, and interviews from OCIF officials acting as cooperating informants under the guise of regulatory administrators. Simply put, the Government, surreptitiously and in bad faith, used OCIF "to avail itself of civil discovery devices and obtain evidence for [its] subsequent criminal prosecution," in stark violation of Mr. Herrera's constitutional rights. *See Parrott*, 248 F. Supp. at 202; *see also Kordel*, 397 U.S. at 11–12.

Moreover, a crucial inquiry for the Court is whether the civil and criminal investigations are "inescapably intertwined" such that the commingling "negate[s] the existence of parallel investigations". *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1140 (N.D. Ala. 2005)

(dismissing three perjury counts where the Government's use of the defendant's prior civil SEC deposition testimony "depart[ed] from the proper administration of justice" "[b]ecause the Government manipulated the simultaneous investigations for its own purposes").  Here, it is simply uncontestable that – throughout the entirety of the relevant period – OCIF and the FBI were so "inescapably intertwined" that there were no independent, "parallel investigations" distinct between the two, but there was instead simply *one and only* investigation, with its sole purpose to generate criminal charges against Mr. Herrera and the Bank.  *See id.*

Indeed, as early as October 2015, ████████████ had criminally referred the Bank to the FBI.  By July 2016, the FBI was conducting formal interviews of ████ .  By January 2017, OCIF was, without explanation, conducting a brand "new" investigation of the Bank that coincided with the increasing oversight and involvement of the FBI.  By November 2017, OCIF's Principal Examiner ████, who was overseeing this latest examination, complained *in writing* that she felt pressured by OCIF to materially alter the conclusions of her report on the Bank and manufacture alleged bases to continue audits of the Bank.  By January 2018, ██████████████, ████████████████████████████████████, secretly recording conversations with Bank representatives – as well as Mr. Herrera – at the direction of the FBI.  Crucially, despite reporting to the FBI after every meeting with the Compliance Committee, not once did ████████████ ever report a single instance of any issue or violation.  By January 2020, ████ was providing the FBI with internal investigation reports and – in what was clearly irrelevant to any genuine oversight of OCIF – hundreds of documents relating to Mr. Herrera's personal art collection.  By March 2020, ██████████, who was already reporting to the FBI on a regular basis, provided the FBI with a hard drive containing letters and email communications relating to the Bank.  By June 2020, ██ was

surreptitiously recording representatives of the Bank at the FBI's direction, while ultimately sharing with the FBI interim work product for its likely review and direction.  And by January 2021, ████████████ was acting as a confidential informant for the FBI, providing information relating to the ongoing examination of the Bank while also surreptitiously recording conversations with representatives of the Bank.

Again, these are just *some* of the examples of OCIF officials – *including no less than* ████ ████████████ reporting directly to, and being managed by, the FBI.  Quite simply, such conduct "negate[s] the existence of parallel investigations," and instead demonstrates that – at the very outset – OCIF had been coopted to serve as a mere "information-gathering agency," *see*, *LaSalle Nat'l Bank,* 437 U.S. at 316–17, with the FBI "manipulat[ing] the simultaneous investigations for its own purposes."  *See Scrushy*, 366 F. Supp. 2d at 1140; *Kordel*, 397 U.S. at 11–12.  As such, it comes as no surprise that – by July 2021 – the FBI had itself dropped all pretenses that it was conducting an investigation independent and distinct from OCIF, and instead formally closed its corresponding OCIF investigation for purposes of consolidation with the FBI investigation "as a means of administrative efficiency."  *See* Exhibit L.

At all times, Mr. Herrera was entitled to constitutionally mandated protections and safeguards during the course of criminal investigation by the Government.  That the Government instead actively endeavored to bypass these safeguards by surreptitiously coopting and controlling OCIF's civil investigation constituted an act of grave and egregious misconduct violative of Mr. Herrera's Due Process rights, and thereby warranting dismissal of the Indictment.

### 2.     The Government Engaged in Egregious Misconduct by Repeatedly Contacting Represented Parties and Knowingly Disregarding Attorney-Client Privilege

Separately, the Government violated well-established ethical obligations and its own internal policy commitments in its repeated efforts to contact, influence, or otherwise implicate

Mr. Herrera through the use of cooperating witnesses – despite knowing he was represented by counsel.  *See, e.g.*, Section 9-13.200 of the Government's Justice Manual, Communications with Represented Persons – Issues for Consideration (citing Rule 4.2 of the Model Rules of Professional Conduct).  In addition to this significant ethics violation, the Government – blatantly disregarding the Due Process rights afforded to Mr. Herrera and his co-defendants – also reviewed and relied upon such privileged materials in order to secure further search warrants and obtain additional evidence with which to procure Mr. Herrera's indictment.  *See United States v. Marshank*, 777 F. Supp. 1507, 1523 (N.D. Cal. 1991) ("[B]ecause the *Russell* doctrine is grounded in the due process clause of the Fifth Amendment, it may be applied in cases where government interference in an attorney-client relationship is so shocking to 'the universal sense of justice' that it violates due process.") (citing *United States v. Ofshe,* 817 F.2d 1508, 1516 (11th Cir. 1987)).

> i.      ***The Government Repeatedly Endeavors to Contact and Gather Information from Parties Knowingly Represented by Counsel***

As aforementioned, on or about May 17, 2018, the FBI visited and interviewed Lopez – then an independent director of the Bank – and raised a series of inquiries relating to the Bank, its activities, and its representatives.  Shortly thereafter, on or about May 22, 2018, Dominguez and Ruben Mendez Benabe – both attorneys with McConnell Valdes LLC, and counsel for the Bank – sent a letter of representation to the FBI, expressly directing that any future inquiries of Bank employees should be routed through counsel.[27]  On or about June 7, 2018, Dominguez spoke with Assistant U.S. Attorney Scott Anderson, who confirmed to Dominguez that his Office had received her letter of representation from the FBI, and that he had instructed the agents not to contact Lopez or any other employee of the Bank.[28]  And yet, *less than one month later*, on or about June 15,

---

[27] *See* Exhibit R. DOJ-0000098566 (McConnell Valdes LLC Letter to FBI re Communication with Represented Parties, dated May 22, 2018.)

[28] *See id.*

2018, the FBI – in complete disregard of this clear directive, and without internal authorization – directed ████████████ to record Mr. Herrera during a board meeting of the Bank, which ██████████████ was attending as a member of the Bank's own Compliance Committee.[29] Ultimately, the FBI Special Agent responsible for directing ███████████ to surreptitiously record Mr. Herrera – Special Agent Ronald Daniels – was subsequently removed from the Government's investigation, on information and belief due to his misconduct in this and other matters related to the case. Nonetheless, the damage to Mr. Herrera's legal rights had already been done, and the belated removal of Special Agent Daniels in no way excused or otherwise mitigated the Government's violations of professional ethics and internal protocols.

Indeed, the subsequent conduct of the Government serves only to demonstrate that it apparently learned nothing from the above violations. After all, the Government would later fail to question, and instead choose to ignore entirely, the clear privilege and conflicts issues implicated when it was Dominguez who – *despite being counsel to the Bank and having had privileged communications involving Mr. Herrera, as Chairman of the Bank* – negotiated with the Government for purposes of arranging ██████ plea agreement and testimony against her own client. Additionally, and as aforementioned, in or around November 2021, the Government *also* directed ██████ to covertly audio-video record alleged co-conspirator Rossini, *who was himself represented by counsel during this period*. Although Rossini categorically denied that any *quid pro quo* agreements were entered into or otherwise contemplated by himself, Mr. Herrera, and Governor Vazquez, such a meeting should never have taken place, and the Government's directing of ██████ to surreptitiously extract an admission from Rossini – as a represented individual – amounted to a clear deprivation of Rossini's (and Mr. Herrera's) constitutional rights.

---

[29] *See* Exhibit S. DOJ-0000098595 (FBI Directive to ██████ to Record Mr. Herrera, dated June 15, 2018.)

Ultimately, that the Government deployed as its "alter egos" a series of confidential informants to elicit – through surreptitious recordings – admissions or otherwise gather evidence from Mr. Herrera and other individuals knowingly represented by counsel constituted an egregious attempt to circumvent both longstanding ethics rules and Due Process protections, and warrants the strongest censure by this Court.  *See United States v. Hammad*, 858 F.2d 834, 836 (2d Cir. 1988) (finding that the Government "violated [its] ethical obligations by communicating directly with [the defendant] after learning that he had retained counsel" via an informant who served as "the alter ego of the prosecutor."); *United States v. Pierce*, 893 F.2d 669, 673 (5th Cir. 1990) (Fourth Amendment standards apply to search conducted by private party acting as agent or instrument of the government) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)); *Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir. 1989) (where government coerces, dominates or directs the actions of a private person, a search may implicate the Fourth Amendment); *Speeht v. Jensen*, 832 F.2d 1516, 1523 (10th Cir. 1987) (constitutional violation when government official facilitates or encourages an unreasonable search performed by a private person).

### ii.    *The Government Repeatedly Utilizes Privileged Materials in Seeking to Obtain Additional Evidence Against Mr. Herrera*

Further proof of the Government's lack of regard for Mr. Herrera's constitutional rights is its extensive use of unfiltered search warrant returns containing privileged material to obtain additional evidence and procure Mr. Herrera's indictment, in further violation of the protections afforded to Mr. Herrera pursuant to the Fourth Amendment.

In a November 2022 filing, the Government resisted Mr. Herrera's motion to have the Court supervise its review of search warrant returns on the claimed grounds that a skilled and independent filter team had been reviewing search warrant returns since March 2022 to make sure

that privilege was properly protected.[30]   However, in its submission, the Government briefly acknowledged that search warrant returns had been accessed by investigating agents *prior to the involvement of a filter team*, but the Government sought to allay the Court's concerns by representing that: (i) it had conducted what it characterized as an "informal filter review" prior to accessing those materials; and (ii) the search warrant returns covered time periods during which the "investigation was covert" and there was no "indication that Defendants engaged with defense counsel related to the offense conduct."  (*See* Government Filter Team Response at 5).

     And yet, subsequent discovery productions and ongoing investigation by the defense have revealed that the Government's efforts to excuse its agents' access to privileged communications well before the prosecution team sought filter review was premised on the same falsehoods that has led it to resist production of discovery related to OCIF: that the Government's investigation of Mr. Herrera for corruption offenses was somehow unrelated to the Government's investigation of Mr. Herrera and the Bank that piggybacked on OCIF's regulatory review.  As summarized above, that contention has been disproven by the FBI's own records, which unequivocally demonstrate that the supposedly separate investigations were treated as one investigation by the FBI – *i.e.*, by both the Government's extensive use of OCIF informants and the OCIF investigation to build the current case against Mr. Herrera, and by the mere fact that the allegations in the Indictment are explicitly premised on Mr. Herrera's (counseled) response to OCIF's endless regulatory scrutiny of the Bank.

     Ongoing review has revealed that Government made extensive use of search warrant returns containing privileged communications as a sword against Mr. Herrera, and is now using

---

[30] *See* United States' Consolidated Response to Defendants' Motions Regarding Use of a Filter Team, dated November 11, 2022 (Dkt.Nos. 110, 114, and 128), 22 Cr. 00342 (RAM) (Dkt. No. 135)  (the "Government Filter Team Response")).

the existence of that same privilege as a shield to prevent Mr. Herrera from accessing exculpatory and impeachment information. ██████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████.)

A full review of search warrant affidavits produced to date has revealed that several affidavits for search warrants seeking Mr. Herrera's potentially privileged communications have not yet been produced *more than a year after the Indictment was returned*.  Nonetheless, the table below reflects that the Government extensively relied on potentially privileged communications belonging to Mr. Herrera and other defendants to obtain search warrants and elicit evidence from witnesses in furtherance of the investigation of Mr. Herrera:

| Bates Number | Document Date | Document Description | Source of Potentially Privileged Communications | How Search Warrant Material Was Used |
|---|---|---|---|---|
| DOJ-0000062906 | 1/13/2021 | Vazquez iCloud Search Warrant | iCloud backups for Rossini and Herrera | Extensive use in support of search warrant for Vazquez Apple account |
| DOJ-0000066075 | 4/7/2021 | ████ Yahoo! Search Warrant | iCloud backups for Rossini, Herrera and Vazquez; Herrera Yahoo! Account; Rossini Gmail account | Extensive use in support of search warrant for ████ Yahoo! account |

| DOJ-0000066689 | 4/15/2021 | ████ Gmail Search Warrant | iCloud backups for Rossini, Herrera, Vasquez; Herrera Yahoo! Account; Rossini Gmail account | Extensive use in support of search warrant for ████ Gmail account |
|---|---|---|---|---|
| DOJ-0000068308 | 6/11/2021 | ████ ! Search Warrant | Herrera Yahoo! account | Used emails obtained from Herrera Yahoo! Search Warrant concerning meetings with 2016 gubernatorial candidates in Puerto Rico in support of search warrant related to a PAC supporting Ricky Rosello |
| DOJ-0000068361 | 6/11/2021 | ████ Google Search Warrant | Herrera Yahoo! account | Used emails obtained from Herrera Yahoo! Search Warrant concerning meetings with 2016 gubernatorial candidates in Puerto Rico in support of search warrant related to a PAC supporting Ricky Rosello |
| DOJ-0000068816 | 9/2/2021 | ████ cell phone Search Warrant | iCloud backups for Rossini, Herrera, and Vasquez Yahoo! Accounts | Extensive use in support of search warrant for ████ cell phone |
| DOJ-0000068916 | 9/2/2021 | ████ cell phone Search Warrant | iCloud backups for Rossini, Herrera, and Vasquez Yahoo! Accounts | Extensive use in support of search warrant for Blakeman cell phone |
| DOJ-0000074433 | 12/8/2021 | Rossini 302 | iCloud backups for either Rossini or Herrera or both | Agents showed Rossini WhatsApp messages exchanged between him and Herrera |

| DOJ-0000074421 | 12/8/2021 | ███ Proffer | iCloud backup for either Rossini or Herrera or both | The Government showed ██ WhatsApp messages between Herrera and Rossini |
|---|---|---|---|---|
| DOJ-0000074441 | 12/16/2021 | ███ Proffer | iCloud backup and Yahoo! account for Herrera and/or ███ Phone Search Warrant | The Government showed ██ texts and emails between herself and Herrera. ██ was also shown a three-person text thread and herself, Herrera and Rossini. |
| DOJ-0000074490 | 1/12/2022 | Wanda Vazquez cell phone Search Warrant | iCloud backups for Rossini, Herrera, and Vasquez Yahoo! Accounts | Extensive use in support of search warrant for Vasquez cell phone |
| DOJ-0000070205 | 1/12/2022 | ███ cell phone Search Warrant | iCloud backups for Rossini, Herrera, and Vasquez Yahoo! Accounts | Extensive use in support of search warrant for ███ ███ cell phone |
| DOJ-0000070356 | 1/12/2022 | ███ phone Search Warrant | iCloud backups for Rossini, Herrera, and Vasquez Yahoo! Accounts | Extensive use in support of search warrant for ███ ███ cell phone |
| DOJ-0000074746 | 1/19/2022 | ███ 302 | Herrera Yahoo! Account | The government showed ██ an email from him to Herrera dated February 29, 2020. ██ did not recall sending the email. This email was also used as Exhibit VR-2 in ███ (DOJ-75716 and DOJ-75490). |

| | | | | |
|---|---|---|---|---|
| DOJ-0000070838 | 1/28/2022 | Herrera cell phone Search Warrant | iCloud backup for Rossini and Herrera Yahoo! accounts | Extensive use in support of search warrant for Herrera person and cell phone |
| DOJ-0000071068 | 2/18/2022 | Herrera cell phone Search Warrant | iCloud backup for Rossini and Herrera Yahoo! accounts | Extensive use in support of search warrant for Herrera person and cell phone |
| DOJ-0000071247 | 3/7/2022 | Vazquez 302 | iCloud backup for Vazquez | Agents showed Governor Vazquez three text message conversations, two of which were with █████ and one of which was with █████ █████ |
| DOJ-0000074990 | 3/17/2022 | █████ Proffer | iCloud backup for either Rossini or Herrera or both | The Government showed █████ WhatsApp messages between Herrera and Rossini (Exhibit 38). |
| DOJ-0000190738 | 6/14/2022 | █████ Proffer | iCloud backup for Herrera | The Government showed █████ WhatsApp messages between Herrera and Governor Pierluisi. |
| DOJ-0000075124 | 6/16/2022 | █████ 302 | iCloud backup for Rossini | The government appears to have showed █████ WhatsApp messages and emails from Rossini to him and various CT Group managers. |

Notwithstanding the above, and after having extensively used these potentially privileged search warrant materials over the course of years in an effort to secure an indictment against Mr. Herrera, the Government is now using the existence of privilege to refuse to produce materials that are critical to Mr. Herrera's defense.  As of more than a year after the Indictment, Mr. Herrera has yet to receive *a single search warrant return* from any phone or account other than his own, allegedly on the grounds that the filter team's review of all other materials is ongoing, despite that review commencing in or around March 2022.  The Government should not be permitted to disregard the privilege for its own convenience over the course of its years-long investigation but now use the same privilege to force Mr. Herrera to wait for years to receive evidence critical to his defense.

This Court should not countenance the Government's years-long failure to properly respect Mr. Herrera's rights arising under the Fourth Amendment, as well as the protections afforded to him under the attorney-client privilege.  The prosecution team's full access throughout the investigation to potentially privileged communications concerning OCIF's regulatory investigation of the Bank, and the FBI's inquiries concerning the Bank, violated Mr. Herrera's rights and serves as yet another basis for dismissal of the Indictment.

### 3. The Government Engaged in Egregious Misconduct by Knowingly Presenting Misleading Testimony to the Grand Jury

Crucially, a court may dismiss an indictment where it finds constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding. "Constitutional error is found where the 'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice to the defendant." *United States v. Isgro*, 974 F.2d 1091, 1094 (9th Cir. 1992) (quoting *United States v. Larrazolo*, 869 F.2d 1354, 1357–58 (9th Cir. 1989).  Moreover, such constitutional

error may also be found "if [the] defendant can show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." *Id.*

To be clear, this is not simply a matter of the Government failing to provide exculpatory or impeachment evidence to the Grand Jury – Mr. Herrera acknowledges that the law does not impose an affirmative duty on the Government to present such evidence to a grand jury. *See United States v. Williams*, 504 U.S. 36, 51–52 (1992). Here, however, the Government engaged in a deliberate misleading of the Grand Jury, which compromised the independence and integrity of the Grand Jury proceedings and substantially influenced their ultimate determination to indict Mr. Herrera.





Exhibit T. DOJ-0000075717 ███████████████████████ dated March 1, 2022) at 16:6 – 17:25.)

The Government's objective from the above line of inquiry is as obvious as it is misleading

█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████



---

[31] *See* Exhibit M at pp. 3–5.



█████████. The following constitutes only a brief selection of excerpts from the recorded meeting between ██████ and Rossini on or about November 16, 2021, which utterly contradict the narrative put forth by the Government:

- <u>DOJ-0000432211</u> [9:12] – After ██████ informs Rossini that the FBI had questioned him, and had repeatedly referenced "*bribes*," Rossini adamantly responds that "*no one got bribed.*"

- <u>DOJ-0000432212</u> [0:37] – Rossini further tells ██████, "*the issue is, no money went to Wanda [Vasquez], that I have any knowledge of. I think there was no bribery to her. No money went to the PAC, to donate to the campaign. The money was merely done to set up the PAC, but then it never went anywhere.*"

- <u>DOJ-0000432212</u> [5:23] – After ██████s asks whether Rossini thinks there may have been a *quid pro quo* during the meeting between "*the governor, ██████, Mr. Herrera] and you,*" Rossini categorically denies any such arrangement, expressly stating "*no one would be so stupid to do that.*"

- <u>DOJ-0000432212</u> [18:24] – After ██████ asks whether the Super PAC's support was promised to Governor Vazquez "*if she did something,*" Rossini denies any such arrangement, and instead simply informs ██████ that "*she gets the support of the PAC if she won the primary.*"

- <u>DOJ-0000432215</u> [13:02] – After ██████ asks Rossini "*if there a way to throw [Mr. Herrera] under the bus,*" Rossini responds, "*no, because we did nothing wrong, there is no one bribing. No one bribed Wanda, no one bribed anybody, no one bribed a soul. So where it is, where is the crime?*"

- <u>DOJ-0000432217</u> [10:01] – Rossini again tells ██████, "*I did not pay a bribe to her and neither did Julio and there was no* quid pro quo *on my part or his part that I am aware of, and that's it.*"

- <u>DOJ-0000432217</u> [2:32] – At the close of the meeting, Rossini assures ██████ "*we're okay . . . It is all going to be good. The reason why it is going to be good is that no one did anything wrong or illegal. Ok?*"



In fact, in SA Waltz's own FBI interview of ████ on or about February 16, 2022, he reports that ████ had engaged in the following conduct while acting as a confidential informant:

- Use of "Burner" Device

  - o  "*After the FBI executed a search warrant and seized* ████ *] cell phone, CHS purchased a second phone.*"[32]

---

[32] Exhibit U. DOJ-0000188799 (FBI CHS Reporting Document, dated February 16, 2022) at p. 2.

- <u>Destruction of Evidence</u>

  - o "█████ ] *recalls deleting text messages [he] had with* ████████ ."[33]

  - o "█████ ] *had deleted text messages with* ████████ *, specifically, text messages* █████ ] *sent to* █████ *to arrange a meeting with* ████ *on December 13, 2021.*"[34]

- "Tipping Off" Subjects of Investigation

  - o "*Prior to* ████ *meeting with* █████ *on December 13, 2021,* █████ ] *requested bank statements [] for the foundations from* ████ *from their inception through December 31, 2020.* ████ *subsequently emailed those statements to* ████ ] *glanced over the statements after* ████ *sent them to* ████ ]*, then met with the FBI in Puerto Rico. When meeting with the FBI, the FBI asked* ████ ] *to ask* ████ *about a particular $300,000 transaction in the statements.* ████ *got concerned because* ████ ] *had always known* ████ *to be an honest person.* ████ *had never interacted with* ████ *with respect to finances though.*

    *After meeting with the FBI,* ████ *sent* ████ *a text message.* ████ *and* ████ *were already supposed to meet at 6:30 pm at Comedor, but* ████ *sent* ████ *a text message requesting to meet at 6:15 pm at Gusto's Coffee or somewhere nearby* ████ *'s building. When* ████ ] *arrived,* ████ *came downstairs.* ████ *didn't speak to him.* ████ ] **took a piece of paper and wrote that the Federal Election Commission [FEC] is reviewing this very closely.** ████ ] **told** ████ **to be prepared to address the $300,000 transaction . . .**

    *Prior to the first meeting with* ████████ ] *sent* ████ *a message via either text message or WhatsApp asking to meet ten to fifteen minutes [before] the two were to meet at Comedor.* ████ *is almost sure it was a WhatsApp message.* ████ *didn't ask why and simply said, 'Okay, I'll meet you downstairs.'* ████ *came to through the back door of a restaurant called Pure.* ████ **wrote a note on a piece of paper that said, 'I can't talk to you, the [feds or FEC] are monitoring this very closely, be prepared to explain the $300,000 wire.'** ████ *was sitting at the restaurant.* ████ *ordered a bottle of water and asked the waiter to give* ████ *a piece of paper and a pen.* ████ **gave the paper to** ████ **when** ████ **got there.** ████ **read it and seemed shocked. The note said, 'I can't talk. FEC are monitoring this. Meet me at 6:30 pm at Comedor and be prepared to address the $300,000 wire in December'** . . . ████ **threw the note away.** ████ **was concerned that** ████ **would incriminate himself on the recording.** ████ **wanted to protect** ████ ."[35]

[33] *Id.*

[34] *Id.*

[35] *Id.* at pp. 2–3 (emphasis added.)

- <u>Refusal to Cooperate Against Relevant Parties</u>

  - ▇▇▇▇▇▇▇ *has had several unrecorded meetings and telephone calls with [Governor] Pierluisi because* ▇▇▇▇▇ *refuses to record [Governor] Pierluisi.*"[36]

Such conduct by ▇▇▇▇ – as reported by SA Waltz himself – in no way evidences an individual who "cooperated" in the Government's investigation. To the contrary, it directly implicates the integrity of the Government's investigation, as well as the honesty and credibility of ▇▇▇ as *the* central witness to the alleged Pierluisi Scheme. ▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See United States v. Hogan*, 712 F.2d 757, 761–62 (2d Cir. 1983) (affirming dismissal of indictment upon finding that the defendants "were prejudiced by the misstatements of important facts and the grand jury's independent role was impaired.").

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[36] *Id.* at p. 2.





Exhibit V. DOJ-0000075830 ███████████████████████ dated
March 30, 2022) at 7:5–14.

███ Indeed, in separate evidence produced by the Government, including ███████ interviews
with the FBI in or around September 2021, ████████ expressly divulged to the Government not
simply that he was "in love with [████]," but that he was motivated by the desire to "protect her"
in relation to the alleged conspiracy. *See* Exhibit N.  Similarly absent from ██████████████
████████████████████████████ – stemming from this relationship – ████████ had
requested a psychologist from the FBI due to "emotional issues he was facing due to his
involvement in the case, as well as other situations he [was] facing in his personal life." *See* Exhibit
O.  These admissions – which directly implicate the underlying motivations of ████████████,

along with ███████ mental state and capacity for truthfulness – constituted material information that should have been disclosed in full to the Grand Jury. *See United States v. Samango*, 607 F.2d 877, 881–82 (9th Cir. 1979) (finding error where "the prosecutor knew but did not warn the grand jury of [a witness's] doubtful credibility" and recognizing that "[i]f evidence exists . . . which casts serious doubt on the credibility of testimony which the jurors are asked to rely upon in finding an indictment, the prosecutor has an ethical duty to bring it to their attention.").

Ultimately, while each of the above-detailed instances of mischaracterization or outright deception before the Grand Jury may – standing alone – be arguably excused as unintentional error on the part of the Government, when taken together there is simply no reasonable excuse for the Government's gamesmanship. *See id.* at 884 ("The cumulative effect of the above errors and indiscretions, none of which alone might have been enough to tip the scales, operated to the defendants' prejudice by producing a biased grand jury."); *see also United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1432 (D. Md. 1986) ("The critical fact is that there was a considerable amount of false, wrong testimony. At issue here are not merely a few, isolated incidents that can be shrugged aside due to the passage of time and length of the hearings. The Court can easily understand innocent misrecollection. But the effect of this testimony and the obvious prejudice which resulted cannot be so easily dismissed."). "The prosecutor may not circumvent this safeguard by overreaching conduct that deprives the grand jury of autonomous and unbiased judgment. If the grand jury is to accomplish either of its functions—independent determination of probable cause that a crime has been committed and protection of citizens against unfounded prosecutions—limits must be set on the manipulation of grand juries by overzealous prosecutors." *United States v. Cobb*, No. 2:14-CR-194, 2015 WL 556327, at *4 (D. Nev. Feb. 9, 2015). Here, there were no limits to the Government's willingness to mislead the Grand Jury regarding its

witnesses or the "evidence" they presented.  The Government's intentional misconduct before the Grand Jury served only to purposely bias its judgment to the prejudice of Mr. Herrera, and lead to the issuance of an Indictment poisoned by deception.  On this basis alone, the Indictment should be dismissed.  *See Williams*, 504 U.S. at 46 (recognizing that an indictment may be dismissed for misconduct before the grand jury where such misconduct impacted the "integrity of the grand jury's functions.") (internal citations omitted).

### 4.    The Government Engaged in Egregious Misconduct by Withholding Exculpatory and/or Impeachment Evidence from the Defense

Coinciding with its willful refusal to disclose material information to the Grand Jury, so too has the Government engaged in a continuing pattern of delaying or outright denying the legitimate and long outstanding Rule 16 discovery requests of Mr. Herrera.  In so doing, the Government has sought to hide behind the fiction that it is not required to produce material exculpatory evidence that may be in the possession of OCIF.  *See* Exhibit A at p. 2 ("The United States has no obligation to provide statements made . . . to investigative and regulatory agencies in Puerto Rico, including the Office of the Commissioner for Financial Institutions and the Puerto Rico Department of Justice, as they are not part of the investigative team.")  The Government's disingenuous position is belied both by the contemporaneous facts and by the law.

As set forth in the *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, the Government is required to provide the defense with any evidence favorable to the accused where the evidence is material to guilt or punishment.  Favorable evidence includes not just evidence that tends to exculpate the defendant, but also evidence that is useful to impeach the credibility of a government witness.  As such, the Government is required to disclose all information concerning deals or other agreements made between the Government and confidential informants or witnesses, as well as any leniencies or benefits a witness has

received or expects to receive in exchange for testimony. *See United States v. Dvorin*, 817 F.3d 438, 451 (5th Cir. 2016) (finding that failure to disclose that testifying witness received "promises from the Government in exchange for [his] testimony" was a violation of *Brady* and *Giglio*); *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (recognizing that, under *Brady* and *Giglio*, "[i]t is well established that an express agreement between the prosecution and a witness is possible impeachment material that must be turned over" and even the "existence of a less formal, unwritten or tacit agreement is also subject to [the] disclosure mandate"); *Tuesta-Toro v. United States*, No. 99-1371, 2000 WL 1160442, at *4 (1st Cir. 2000) (recognizing the requirement to disclose any promise of leniency in exchange for testimony); *see also United States v. Yarborough*, No. 06-CR-190(A), 2007 WL 962926, at *15 (W.D.N.Y. Mar. 28, 2007) (providing that "[f]ailure of the government to reveal evidence of an understanding in return for the witness's testimony will violate due process" and mandating disclosure of plea agreements between the Government and its witnesses).

Moreover, the Government has an obligation to produce information in its custody, possession, and control, which extends to and encompasses information in the possession of government agents. *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (explaining that "[i]n order to comply with *Brady*," "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."). As such, Government prosecutors have an affirmative duty to search the files "maintained by branches of government closely aligned with the prosecution." *U.S. v. Brooks*, 966 F.2d 1500, 1503–04 (D.C. Cir. 1992) (citations omitted); *see also Carey v. Duckworth*, 738 F.2d 875, 877–78 (7th Cir. 1984) (holding that "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case"); *U.S. v. Risha*, 445 F.3d

298, 306 (3d Cir. 2006) ("In sum, a *Brady* violation may be found despite a prosecutor's ignorance of impeachment evidence. This may be especially true when the withheld evidence is under the control of a state instrumentality closely aligned with the prosecution.") (citations omitted); *United States v. Diaz-Lopez*, No. 21-CR-157 (RAM), 2022 U.S. Dist. LEXIS 104042, at *12 (D.P.R. Apr. 5, 2022) (finding that substantial early assistance in an investigation from a state agency raises *Brady* and *Giglio* obligations and ordering the Government "to search for and produce all *Brady* and *Giglio* material").[37]

Here, it is apparent that the Government has ignored such obligations, and has forgotten the disastrous and long-lasting impact of the flagrant prosecutorial failings and misconduct that occurred in *United States v. Stevens*, No. 08-CR-231 EGS, 2009 WL 6525926, at *1 (D.D.C. Apr. 7, 2009). There, the late Senator Theodore Stevens was indicted on charges of making false statements by allegedly failing to properly report renovations to his vacation home as gifts. Critically, the prosecution intentionally withheld material exculpatory evidence involving Senator Stevens and the prosecution's key witness, Bill Allen, an oil executive. That is, among other things, the prosecution ***deliberately failed to disclose to the defense and the jury*** that Senator Stevens had genuinely endeavored to have Mr. Allen send him a bill for the vacation home renovations, including expressly requesting that Mr. Allen, "***Send me a bill. We have to do this ethically***."[38] As a result of the prosecution's misconduct, Senator Stevens was tried and found guilty of making false statements, and thereafter lost his bid for reelection.

---

[37] Similarly, Section 9-5.002 of the Government's Justice Manual, Criminal Discovery advises that an obligation to produce may arise when: (1) the state or local agents are working on behalf of the prosecutor or are under the prosecutor's control; (2) when state and federal governments are part of a team, are participating in a joint investigation, or are sharing resources; and (3) when the prosecutor has ready access to the evidence. The Justice Manual further guides prosecutors "to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes."

[38] This is not all the prosecution knowingly withheld from the jury. Mr. Allen had given no less than 55 pretrial interviews with the government and at no point during any of these pretrial interviews did Mr. Allen characterize Senator Stevens' note to Mr. Allen as some sort of fabrication or cover story. Instead, it was only on the eve of the

Of course, Senator Steven's conviction was ultimately dismissed with prejudice following the appointment of a special investigator to review the possibility of criminal contempt charges against the offending federal prosecutors.  Indeed, in the 500-page Report of Special Counsel Henry Schuelke III, it was determined that "*[t]he investigation and prosecution of U.S. Sen. Ted Stevens were permeated by the systematic concealment of significant exculpatory evidence which would have independently corroborated Sen. Stevens' defense and his testimony, and seriously damaged the testimony and credibility of the government's key witness.*"  *See* Report to the Honorable Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's April 7, 2009 Order, Executive Summary, available at https://www.nacdl.org/getattachment/044ac64b-6a61-427d-bfbc-87fc9cd2eaf5/stevens_report-final.pdf (last visited Aug. 18, 2023).

Nonetheless, and despite such findings of rampant and intentional governmental misconduct, including "evidence of willful nondisclosures of *Brady* and *Giglio* material on three occasions," Special Counsel Schuelke could not ultimately recommend that the prosecutors be charged with criminal contempt due to the absence of any operative *Brady* orders specifically requiring the prosecutors to make *Brady* disclosures.  *Id.* at 513 ("Were there clear, specific and unequivocal order of the Court which commanded the disclosure of this information, we are satisfied that a criminal contempt prosecution would lie.").  Unsurprisingly, Congress – in awe of what had occurred to one of its own – enacted the Due Process Protections Act, S. 1380, Pub. L. No. 116-182("DPPA") which amends the Federal Rules of Criminal Procedure to mandate the entry of an order requiring *Brady* disclosures in every federal criminal case.  *See* Fed. R. Crim.

---

trial that Mr. Allen suggested that the note was a cover story.  The prosecution, however, gave the jury the impression that Mr. Allen "had been telling authorities all along that Stevens had cooked up a cover story about wanting to pay all the bills."  *See* Carrie Johnson, *Report: Prosecutors Hid Evidence in Ted Stevens Case,* NPR, March 15, 2012. available at https://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case (last visited Aug. 18, 2023.)

Pro. 5(f) (requiring all federal district court judges, during the initial appearance in every criminal case, to: "issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under *Brady* . . . and its progeny, and the possible consequences of violating such order under applicable law.").

As such, not only did the Government's conduct here fly in the face of well-established precedent, but its conduct is *also* in direct contravention of this Court's Order reminding the Government of its continuing obligations to disclose material exculpatory evidence. *See* Order, dated Sept. 7, 2022, "Rule 5(f) Order for Disclosure of Exculpatory Evidence" (Dkt. No. 85.) To be sure, the Court expressly noted that the Government was "reminded of its continuous obligation to disclose **all material exculpatory evidence** in accordance with *Brady* . . . and its progeny" *Id.* (emphasis in original) (citing Due Process Protection Act, S. 1380, Pub. L. No. 116-182). So too did the Court warn the Government ***in this very case*** that "the failure to comply with disclosures may result in sanctions, disciplinary proceedings, the exclusion of evidence and the reversal of a conviction." *Id.*

Ultimately, the Government's efforts to avoid its obligations to produce material, exculpatory evidence to Mr. Herrera by distancing itself from OCIF under the meritless characterization that it had engaged in a "separate" investigation should not be countenanced. To the contrary, and taking into consideration its separate – and no less egregious – misconduct before the Grand Jury, as well as its attempts to contact Mr. Herrera via cooperating witnesses who served as "alter egos" to the prosecution, the Government should not be permitted to continue so polluted a prosecution, and should instead be discouraged from any future deliberate impropriety through dismissal of the Indictment. *See Chapman*, 524 F.3d at 1079, 1087 (affirming dismissal of the indictment where prosecution "did not even bother to introduce" evidence required under

*Brady/Giglio* including "rap sheets, plea agreements, cooperation agreements . . . related to numerous government witnesses."); *Stevens*, 2009 WL 6525926, at *1 (where the government failed to provide "information that the government was constitutionally required to provide to the defense at trial," "[d]espite repeated defense requests and the Court's repeated admonitions to provide exculpatory information," the indictment would be dismissed with prejudice); *McCord*, 509 F.2d at 349; *Owen*, 580 F.2d at 367. That the Government continues to buck long-standing legal precedent, including *Stevens*, constitutional protections, as well as this Court's Order, warrants no less than full dismissal of the Indictment.

**B.**     **The Court Should Dismiss the Indictment Pursuant to Its Own Supervisory Powers**

In addition to dismissal predicated upon the aforementioned violations of Mr. Herrera's Constitutional rights, the Court may separately invoke its own supervisory power to dismiss the Indictment in order to remedy the violations to Mr. Herrera's Fourth and Fifth Amendment rights, to preserve judicial integrity, and to deter future misconduct by the Government. *See, e.g.*, *Chapman*, 524 F.3d at 1085; *Marshank*, 777 F. Supp. at 1529.

For the reasons detailed at length above, each of the Government's independent acts of misconduct warrants dismissal pursuant to the Court's supervisory power. *First*, the Government engaged in egregious misconduct by commandeering OCIF as a "stalking horse" in furtherance of its own criminal investigation. *See United States v. Anzalone*, 923 F.3d 1, 6 (1st Cir. 2019) (recognizing that "the outrageous government conduct defense may be viable where law enforcement personnel become so overinvolved in a felonious venture that they can fairly be said either to have created the crime or to have coerced the defendant's participation in it."). *Second*, the Government engaged in egregious misconduct by repeatedly contacting represented parties – including Mr. Herrera – and knowingly disregarding the protections mandated by the attorney-client privilege. *See United States v. Levy*, 577 F.2d 200, 210 (3d Cir. 1978) (where privileged

attorney-client communications have been disclosed to the government, dismissal of the indictment is the only appropriate remedy). *Third*, the Government engaged in egregious misconduct by knowingly presenting misleading or otherwise false testimony to the Grand Jury. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (holding that federal courts may invoke their supervisory authority to dismiss an indictment where government misconduct has "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations."); *Williams*, 504 U.S. at 46 ("[T]he supervisory power can be used to dismiss an indictment because of misconduct before the grand jury."). *Fourth*, and finally, the Government engaged in egregious misconduct by continuing to withhold exculpatory and/or impeaching evidence from the defense. *See Chapman*, 524 F.3d at 1085, 1090 (finding that sanctions are "necessary to punish prosecutors who fail to fulfill their duty to win fairly, staying well within the rules," and thereby upholding the district court's dismissal of the case where the "government egregiously failed to meet its constitutional obligations under *Brady* and *Giglio*."); *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993) (holding that the government's failure to disclose an agreement made in exchange for statements introduced at trial warranted dismissal of the indictment with prejudice); *United States v. Lyons*, 352 F. Supp. 2d 1231, 1250–52 (M.D. Fla. 2004) (dismissing several counts of the case as a result of prosecutorial misconduct stemming from discovery violations).

Taken together, the Government's actions from the inception of this case until the present evidence a systematic and pervasive history of prosecutorial misconduct that has infected every aspect of its investigation into and prosecution of Mr. Herrera. "Whether or not there is prejudice, the supervisory power to have any significance must be applicable to cases of repeated, flagrant governmental misconduct," and "[r]epeated instances of deliberate and flagrant misconduct justify

dismissal of the indictment." *Omni Int'l Corp.*, 634 F. Supp. at 1438. Therefore, and as articulated

by the district court in *Omni* – where Government misconduct was found to have permeated "the

preindictment stage, the discovery stage, and in hearings before [the] Court":

> In light of the Supreme Court's general statements concerning the purpose
> for which the supervisory power was created and that Court's sensitivity to
> the need to invoke the doctrine to promote fairness and assure justice, the
> supervisory power must be utilized in this case. Court decisions emphasize
> the unifying premise in all of the supervisory power cases—that although
> the doctrine operates to vindicate a defendant's rights in an individual case,
> it is designed and invoked primarily to preserve the integrity of the judicial
> system.

*Id.*

## C.     An Evidentiary Hearing Regarding the Suppression of Evidence Would Be Insufficient to Redress the Pervasive and Incurable Harms to Mr. Herrera's Due Process Rights

Mr. Herrera acknowledges that the Supreme Court has observed that – traditionally –

suppression of evidence, and not dismissal of the indictment, is the appropriate remedy when

evidence is discovered in violation of the Fifth Amendment. *See United States v. Morrison*, 449

U.S. 361, 365–66 & n.3 (1981); *see also United States v. Rogers*, 751 F.2d 1074, 1078 (9th Cir.

1985).

However, so too did the *Morrison* Court recognize that such constitutional violations

require a remedy which is tailored to the injury suffered by the defendant. *Morrison*, 449 U.S. at

364. To that end, while suppression may be an appropriate remedy where the court is capable of

identifying the evidence obtained in violation of the defendant's constitutional rights, where – as

here – the Government's misconduct infected every part of the investigation and prosecution of

Mr. Herrera, a different remedy altogether is required. *See Levy*, 577 F.2d at 208. Instead,

"dismissal of the indictment is appropriate where continuing prejudice from the constitutional

violation cannot be remedied by suppression of the evidence." *Marshank*, 777 F. Supp. at 1521–

22.  Such is the case here, where "the fruit of the prosecutor's transgression is the indictment itself," and – as such – "it is simply impossible to excise the taint of the government's constitutional transgressions from the prosecution of the defendant." *Id.* at 1522.

Therefore, Mr. Herrera "should not be forced to conduct lengthy hearings to learn the basic essential facts needed as a predicate to a pretrial motion . . . [and the Court] should not be forced to question whether government witnesses are testifying truthfully and fully." *Omni Int'l Corp.*, 634 F. Supp. at 1440.  As the Government's conduct here was "patently egregious and cannot be tolerated or condoned," then "[t]he indictment must be dismissed as a prophylactic sanction for the consistent course of entrenched and flagrant misconduct." *Id.*

## CONCLUSION

Based upon the foregoing, it is clear that the Government has repeatedly demonstrated a complete disregard for the constitutionally-mandated protections and safeguards afforded to defendants such as Mr. Herrera.  There is no doubt that the Indictment here was procured by unlawful means, and that the Government has continued unabated in its misconduct – including improperly utilizing OCIF as a "stalking horse" in order to conduct a criminal investigation of Mr. Herrera and the operations of the Bank, flagrantly violating ethical obligations and internal policies by attempting to circumvent protections afforded to individuals with known legal representation, knowingly supporting the proffering of misleading testimony to the Grand Jury, and continuously failing to disclose material impeachment and exculpatory evidence to the defense.

The cumulative effect of the Government's litany of misconduct constitutes an outrageous violation of Mr. Herrera's constitutional rights, and stands as nothing less than a wanton usurpation of the universal sense of justice.  Faced with such misconduct, which has polluted every facet of the investigation into, and prosecution of, Mr. Herrera, this Court should take the only step that remains available to both adequately ensure that the public's interests in the integrity of the justice

system is protected, while actively discouraging the Government from undertaking any such impropriety in the future, and dismiss the Indictment.

**WHEREFORE,** the defendant, Mr. Herrera, respectfully requests that this Honorable Court dismiss the Indictment against him.

Respectfully submitted in San Juan, Puerto Rico, on this 22nd day of August, 2023.

**KASOWITZ BENSON TORRES LLP**

/s/ *Marc E. Kasowitz*
Marc E. Kasowitz (admitted *pro hac vice*)
Jason M. Short (admitted *pro hac vice*)
1633 Broadway
New York, NY 10019
mkasowitz@kasowitz.com
jshort@kasowitz.com
Telephone: (212) 506-1700

Robin Rathmell (admitted *pro hac vice*)
1401 New York Avenue NW
Suite 401
Washington, D.C. 20005
rrathmell@kasowitz.com
Telephone: (202) 760-3410

**DLA Piper (Puerto Rico) LLC**

/s/ *Sonia I. Torres-Pabón*
Sonia I. Torres-Pabón, Esq.
USDC-PR No. 209310
500 Calle de la Tanca, Ste. 401
Sonia.torres@us.dlapiper.com
San Juan, PR 00901-1969
Tel: 787-945-9101

**The LS Law Firm**

/s/ *Lilly Ann Sanchez*
Lilly Ann Sanchez, Esq.
Fla. Bar No. 195677
One Biscayne Tower, Suite 2530
2 South Biscayne Blvd.
Miami, Florida 33131

Email: lsanchez@thelsfirm.com
Telephone: (305) 503-5503
Facsimile: (305) 503-6801

**CERTIFICATE OF SERVICE**

It is hereby certified that on this same date the present motion was filed with the Clerk of the Court through the CM/ECF electronic system which will notify and provide copies to all parties of record.

In San Juan, Puerto Rico on this 22nd day of August, 2023.

*/s/ Sonia I. Torres-Pabón*
SONIA I. TORRES-PABÓN