**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **CRIMINAL NO. 22-342 (RAM)** |
| **[1] WANDA VÁZQUEZ GARCED,**<br>**[2] JULIO M. HERRERA VELUTINI,**<br>**[3] MARK T. ROSSINI,**<br>**Defendants.** | |

**THE UNITED STATES' RESPONSE TO DEFENDANT JULIO HERRERA**
**VELUTINI'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT**
**MISCONDUCT (ECF NO. 262)**

## I. INTRODUCTION

Since at least 2016, Julio Herrera-Velutini ("Herrera") has mounted a campaign against government regulation, oversight, and now criminal prosecution in which he has cast himself as the victim and various public servants as villains in a narrative completely divorced from reality. He has attempted to intimidate regulators, threatened a civilian witness who cooperated with the government, sued former employees who provided information to the Government (and in one case, a witness's attorney), and now, accuses the prosecution team of outrageous misconduct in its prosecution of him for bribery. While Herrera is certainly not the first defendant to follow the adage that "if the law and the facts are against you, pound the table," the aggressively caustic tone of his motion makes its lack of factual and legal support all the more jarring.

As detailed below, there was nothing improper regarding FBI's investigation into Bancredito International Bank and Trust ("Bancredito"), or the subsequent bribery investigation that is the subject of the current Indictment. The FBI did not direct OCIF to conduct an audit or criminal investigation, but merely collected information and evidence from OCIF personnel regarding the activity of Herrera and Bancredito, just as FBI personnel would do from witnesses

and others with information regarding criminal activity. As the Court will see, practically every expert, auditor, and/or regulator, who reviewed Bancredito's financial condition, knew that the bank was far below board. Law enforcement was no different, and FBI had been investigating potential money laundering offenses by the bank based on concerns from regulators well before the facts of this case. But when allegations of bribery surfaced from witnesses – who had no affiliation with OCIF – the FBI followed those investigative leads and conducted operations within the confines of the law that ultimately uncovered a scheme by Herrera to pay two different sitting governors for favors related to the ousting of OCIF's Commissioner and the insertion of someone hand-picked by him.

The outrageous government misconduct defense has never succeeded in the First Circuit. *United States v. Anzalone*, 923 F.3d 1, 6 (1st Cir. 2019). The First Circuit has refused to apply the doctrine in cases involving government representatives engaging in criminal conduct, sexual exploitation, physical abuse, and distribution of child pornography. Despite this high standard, Herrera seeks relief by:

- referring to public servants working for Puerto Rico's financial regulator as "deceitful" (p. 10), "reprehensible" (Def. Mot., ECF No. 262, p. 15), and "disingenuous," to support an argument that, even if true, would not be government misconduct;

- citing to and quoting cases about government agents "becom(ing) a lawbreaker" and "commit[ting] crimes" in a manner that "breeds contempt" and "invites anarchy" (*Id.*) based on covert contact with represented parties, when Supreme Court precedent allows such contact pre-indictment during an ongoing investigation, as does Department of Justice guidelines; and

   Herrera's bases for relief fail individually and collectively.

First, even if the Court accepted Herrera's conspiratorial "stalking horse" theory, such conduct would not constitute outrageous government misconduct. Moreover, a common-sense interpretation of the facts Herrera recites – and those that he kept from the Court – demonstrate

that the OCIF employees' concerns of suspicious banking practices were well-founded.  These honest concerns, along with Herrera's intimidation tactics, explain why so many of OCIF's examiners reported to the FBI.  Herrera wants the Court to believe that the FBI pushed the OCIF employees' conduct in the examination of Bancredito, when the reality is that it was largely Bancredito's conduct in the examination that pushed OCIF's employees to the FBI.  Notably, since Herrera filed his Motion, Bancredito has acknowledged willfully violating the Bank Secrecy Act between October 2015 and May 2022 by failing to timely report suspicious transactions to FinCEN; failing to establish a due diligence program for foreign correspondent accounts; and failing to implement and maintain an Anti-Money Laundering program. It further agreed to pay a $15 million civil money monetary penalty.[1]  This vindicates the concerns of the OCIF examiners and undermines the "scorched Earth" tenor of Herrera's Motion.

Second, the Government did not violate Herrera's constitutional rights by covertly recording witnesses, even if they were represented.  Courts have repeatedly held that a defendant is not "a represented party" until the initiation of criminal proceedings.  Moreover, the recording of Herrera has nothing to do with the charged bribery schemes; in fact, it related to uncharged conduct that took place before Wanda Vazquez was Governor.  Nor did the Government commit outrageous misconduct because the attorney representing Herrera's co-conspirator – which Bancredito approved of and paid for – once represented Bancredito (not Herrera) in a civil matter.

Third, Supreme Court precedent forecloses Herrera's request for dismissal based on his perceived deficiencies in the government's grand jury presentation.

---

[1] *See* Bancredito/FinCEN Consent Order dated September 15, 2023 available at: https://www.fincen.gov/sites/default/files/shared/Bancredito_Consent_FINAL_091523_508C.pdf (Attached as Gov. Ex. 1).

Finally, the *Brady* violations typically occur when the Government fails to disclose exculpatory evidence prior to trial. Because the trial has not occurred, and Herrera has not yet been prejudiced, no *Brady* violation has occurred.   Nor has Herrera specified any supposedly exculpatory information that the Government has failed to produce.   In fact, Herrera's motion relies entirely on documents provided by the Government through discovery when there is not even a trial date set yet, clearly undermining his critique of the Government's fidelity to its Brady, Giglio, and Rule 16 obligations.

The Government respectfully requests that the Court deny Herrera's Motion .

## II.   <u>BACKGROUND</u>

As explained in the legal discussion below, even if the Court were to accept all of the facts alleged by Herrera at face value, they do not constitute outrageous government misconduct.  With regard to Herrera's dispute with OCIF, this Court need not and should not decide on who is right and wrong between OCIF and Herrera. The dispute is already the subject of a federal civil action.[2] But given the allegations Herrera has made regarding misconduct by OCIF personnel, and in turn by the FBI personnel who received information from OCIF, the Government starts by providing the Court with information that Herrera either held back from the Court or glossed over in his motion.  Herrera's Motion cherry picked from discovery what he believes supports his "stalking horse" argument, but it never mentions the discovery documenting the significant concerns of OCIF examiners that Bancredito, at the very least, failed to implement sufficient anti-money laundering practices. Multiple OCIF witnesses reported undercapitalization, insufficient documentation and accounting for large transactions, failure to file Suspicious Activity Reports, and indications of hawala and money laundering at Bancredito. They also reported intimidation

---

[2]  *See Bancredito Holding Corp. v. Zequira*, et al, 22-cv-1644 (PAD).

tactics by Herrera and Bancredito.  To provide the Court with a more complete picture of the Bancredito-OCIF dispute, the Government provides below a brief description of the irregularities and red flags that multiple OCIF examiners witnessed at Bancredito and reported to the FBI.

**A.      OCIF's concerns over Bancredito's documentation of major financial transactions.**

Herrera alleges that OCIF's "reprehensible" behavior began in 2015 when , referred the Bank to the FBI in 2015 "without any supporting justification." (Def. Mot., p. 7).[3]

When █████ reported to the FBI, he provided a detailed, six-page letter, outlining numerous instances in which Bancredito issued lines of credit with insufficient documentation of the borrower's business or even place of incorporation. Moreover, █████ expressed concern that Bancredito had only $6,100,000 in capital, yet issued letters of credit in excess of two hundred million dollars. (Gov. Ex. 2).

Then, in July 2016, ████████ a supervisor at OCIF, expressed similar concerns. He reported to the FBI that Bancredito issued credit without the capital to back it up, maintained poor accounting for its lending, and offered lines of credit for art being sold at lesser value, a sign of potential hawala or money laundering (more on this below). █████ felt that "Herrera was using the bank as his personal checking account" (Herrera's Motion, Exh. B, p. 4).

**B.       OCIF's concerns over hawala and money laundering at Bancredito.**

At least four regulators at OCIF also reported direct signs of money laundering.  For example:

- The Government interviewed  in June 2022 as part of its bribery investigation. █████ explained during the interview that he saw

---

[3] The FBI referral was certainly justified. "Prior to 2016, Bancredito did not file a single SAR on any transaction, despite moving large amounts of money internationally on behalf of high-risk customers, including those located in Venezuela." FinCEN/Bancredito Consent Order, p. 9.

evidence of hawala,[4] in that Herrera accepted works of art to repay lines of credit.  He
believed Herrera laundered money for at least one client. (Gov Ex. 3, p. 2);

- ███████████████████████████████████████████████████████████████
  ███████████████████████████. He, too, told the FBI that he recognized the art transactions as
  evidence of money laundering. (Gov Ex. 4, p. 4);

- The Government interviewed ██████████, an Examiner Supervisor at OCIF, in
  June 2022.  She reported finding 152 banking transactions where Bancredito failed to
  file a Suspicious Activity Report as required by law. (Gov Exh. __, P. __); and

- Foreshadowing the bribery of the governors, ████ reported that an OCIF employee
  told him that "the president of BIC [Frances Diaz] informed the examiner that if the
  examiner provided a good report on BIC that the president would provide a good report
  on behalf of the examiner."  (Herrera's Motion, Exh. B., pp. 5-6).

Given this reporting, the FBI opened an investigation into potential money laundering at

Bancredito over two years before the bribery schemes charged in the Indictment. Although this

investigation never led to any charges, the fact that the Government did not criminally charge

Herrera or Bancredito for its banking activity does not mean that OCIF's concerns were

unfounded.  In fact, these suspicions would prove to form the basis, at least in part, for the $15

million dollar penalty levied by FinCEN in September of 2023. In the consent order, FinCEN

found that "Bancredito failed to take prompt or effective action to remediate or terminate violations

identified by OCIF…[t]he Bank delayed filing SARs on suspicious transactions that OCIF

identified, and when it did file SARs on those transactions, it did so by including misleading

surplusage." FinCEN/Bancredito Consent Order, pp. 22-23.

---

[4] In financial transactions between wealthier individuals and entities, a hawala system is a form of
remittance that transfers funds from one location to another in a manner not recorded as an increase in the
recipient country's foreign assets or in the remitting country's liabilities, making the funds harder to trace.
*See generally*, International Monetary Fund's *Finance and Development*, "Hawala", December 2002
(https://www.imf.org/external/pubs/ft/fandd/2002/12/elqorchi.htm).

**C.**     **The intimidation of OCIF personnel by Bancredito.**

Bancredito did not stand out among the OCIF examiners solely because of its banking

practices.  Multiple persons at OCIF also reported what they perceived to be Bancredito's hostility,

or outright bullying, in response to the OCIF examination:

- ████████ compared Bancredito's examination to those of other banks, and explained that "normally a bank's management is cooperative and commits fully to cooperating," but with Bancredito, she had "never experienced that level of hostility before." (Herrera's Motion, Exh. H, p. 3).  She explained that of all the banks, only Bancredito disagreed with every finding by OCIF.   She said that she "never felt that she would lose her job other than with regard to this particular examination [of Bancredito]." (*Id.*, p. 7).

- ███ reported to the FBI that "OCIF management [was] scared to make a determination on the Bancredito audit out of fear of being sued" (Herrera's Motion, Exh. H) on November 16, 2020.

- ██████ told the FBI that, at one point, he be became so concerned over Bancredito that he reported to an agent with U.S. Department of Homeland Security that he "felt threatened and that his life was at risk for doing his job correctly." (Exh __).[5]  He also told the FBI that his examiners felt "like they were being watched."  (Govt Exh. ___ ██████ Int May 2022)).  Remarkably, the Government's investigation has confirmed that at least one examiner was being watched; Herrera appears to have paid for an investigative service to follow and surveil ██████ (See Gov Ex. 5, Investigative Surveillance Report prepared by Velazquez Global Consulting Group,  which contains a detailed report of Acosta's movement from November 20-24, 2020). This report was recovered from Herrera's iCloud and produced in discovery as DOJ-0000558161)

Herrera accuses the OCIF examiners of lying about his intimidation tactics, yet allegations

of intimidation also come from the top executive within his own bank. His President and CEO of

Bancredito, ████████████████████████ about what she experienced when Herrera

began to suspect she was cooperating with law enforcement. ████████████████████████

████████████████████████████████████████████████████████

---

[5] To be clear, the Government has not uncovered any evidence suggesting that Herrera or anyone else at Bancredito engaged or threatened to engage in acts of violence.  But the Government has no reason to question ██████s concern was sincere, even if unfounded.



.”   In an interview with the Government in ███████████████ reported that after her first meeting with her criminal defense attorney, ████████████, Herrera demanded to know what they discussed.  When ██████ would not tell him, Herrera told her that "if he didn't hear anything in the next few weeks, he was going to go to Puerto Rico with a team of lawyers and leave her kicking and screaming if he had to." (Gov Ex. 6, ███████████████████ Notably, Herrera has since sued ████████████████), who he now knows to be a cooperating witness in this case.[6]

In September 2020, after learning of Herrera's potential bribery of Governor Vazquez, it the FBI opened the bribery investigation, which led to the Indictment. At trial, the jury will not be asked to determine whether Bancredito met or failed to meet its regulatory requirements.  But the public servants at OCIF would likely disagree with the decidedly self-serving version of the facts Herrera provided to this Court.  And their fears of retribution proved prescient, as Herrera has sued OCIF, threatened legal action against Bancredito's receiver,[7] and has sued ████████████████████ ███████████████████.

### III.   DISCUSSION

#### A.   The Legal Standard for Dismissal for Outrageous Government Misconduct

The First Circuit has recognized that "[i]n limited circumstances, courts may dismiss criminal charges in response to outrageous government misconduct." *United States v. Djokich*,

---

[6] *See Bancredito Holding Corporation v. DMRA Law LLC, et al*., 23-cv-1238 (CVR).

[7] "Bancredito Holding Corporation threatens legal action amid million-dollar fine imposed by FinCEN." The Weekly Journal, September 18, 2023, available at: https://www.theweeklyjournal.com/top-stories/bancr-dito-holding-corporation-threatens-legal-action-amid-million-dollar-fine-imposed-by-fincen/article_2fe0a1d4-54ad-11ee-af8f-4b1fb24040b3.html

693 F.3d 37, 43 (1st Cir. 2012). This has been described as conduct that "encroaches on a defendant's due process rights by violating fundamental fairness and that shocks ... the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432 (1973) (internal quotes and brackets omitted). The First Circuit has described the outrageous government misconduct doctrine as "moribund," *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993), and noted that it "has never succeeded in our Circuit." *United States v. Anzalone*, 923 F.3d 1, 6 (1st Cir. 2019) (emphasis added). This is in part because "[t]he law frowns on the exoneration of a defendant for reasons unrelated to his guilt or innocence," and thus "the power to dismiss charges based solely on government misconduct must be used sparingly." *Id.* (quoting *United States v. Guzmán*, 282 F.3d 56, 59 (1st Cir. 2002)).

The First Circuit's consistent refusal to apply the doctrine, no matter the allegations, demonstrates just how incredibly egregious conduct would have to be to warrant dismissal. For example, the First Circuit has noted that "almost no court" has found dismissal appropriate in cases where there was "over-involvement of government agents in the commission of a crime," "sexual relations between defendants and government agents," and alleged "physical[] and psychological[] abuse[]" of defendants. *United States v. Therrien*, 847 F.3d 9, 15-16 (1st Cir. 2017); *see Anzalone*, 923 F.3d at 5-6 (finding no government misconduct where Government agents operated a child pornography website for two weeks); *United States v. Nunez*, 146 F.3d 36, 38-39 (1st Cir. 1998) (finding no government misconduct where government agents assisted defendant in acquiring materials to build pipe bombs that were then sold to the agents).

Outside the First Circuit, courts have declined to dismiss for outrageous government misconduct where government agents engaged in all of the following: using false identities, *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir. 1984); supplying contraband at issue in the

offense, *Hampton v. United States*, 425 U.S. 484, 489 (1976); committing equally serious offenses

as the defendant, *United States v. Stenberg*, 803 F.2d 422, 430 (9th Cir. 1986); introducing drugs

into a prison to identify a distribution network, *United States v. Wiley*, 794 F.2d 514, 515 (9th Cir.

1986); assisting and encouraging escape attempts, *United States v. Williams*, 791 F.2d 1383, 1386

(9th Cir.), *cert. denied*, 479 U.S. 869 (1986); and utilizing a heroin-using prostitute, whose

activities were under investigation and who engaged in regular intercourse with the defendant, as

an informant. *United States v. Simpson*, 813 F.2d 1462, 1465-71 (9th Cir. 1987).

In all of the following cases <u>cited by Herrera</u>, the reviewing courts <u>declined</u> dismissal for

outrageous government misconduct:

- *United States v. Russell*, 411 U.S. 423, 431–32 (1973) – providing the defendant with an ingredient for use in illegal narcotics manufacturing;

- *United States v. Luisi*, 482 F.3d 43, 58-59 (1st Cir. 2007) – inducing the defendant to commit drug crimes and, when he resisted, persuading his La Cosa Nostra boss to order him to engage in the charged drug transactions;

- *United States v. Bradley*, 820 F.2d 3, 5-7 (1st Cir. 1987) – threatening defendant's co-defendant into convincing defendant to participate in drug crimes;

- *United States v. Owen*, 580 F.2d 365, 367-68 (9th Cir. 1978) – interfering with the attorney-client relationship by promising a plea bargain if defendant supplied incriminating information against one of his defense attorneys;

- *United States v. Tobias*, 662 F.2d 381, 383-87 (5th Cir. 1981) – establishing a chemical supply company and shipping chemicals and a formula for PCP to the defendant;

- *United States v. McCord*, 509 F.2d 334, 349-51 (D.C. Cir. 1974) - using perjured testimony to induce defendant to plead guilty and remain silent about the involvement of government officials in authorizing the Watergate break-in;

- *United States v. Djokich*, 718 F. Supp. 2d 173, 174-75 (D. Mass. 2010), *aff'd*, 693 F.3d 37 (1st Cir. 2012) – attempting to manufacture federal jurisdiction by introducing defendants to a purported American hitman and suggesting that the kidnapping location be changed from the Bahamas to Florida;

- *United States v. Guzman*, 282 F.3d 56, 57-59 (1st Cir. 2002) - cuffing a barefoot defendant and placing him on his knees on cement in the sun for more than an hour.

Essentially, the doctrine exists almost entirely in the abstract, and "courts have rejected its application with almost monotonous regularity." *Santana*, 6 F.3d at 4 (1st Cir. 1993) (reversing the district court and finding that government's conduct in supplying and failing to recover over 13 grams of 92% pure heroin to gain confidence of drug traffickers was not outrageous); *see also United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) ("[W}e agree with the First Circuit that the doctrine . . . is moribund." 'Stillborn' might be a better term, for it never had any life." (internal quotes and citations omitted)).

No misconduct has occurred.  Herrera argues four bases for dismissal based on outrageous government misconduct: 1) the use of OCIF as a "stalking horse for its own criminal investigation," 2) the repeated contacting of represented parties and disregard of attorney-client privilege, 3) misleading the grand jury, and 4) withholding exculpatory and/or impeachment information.  None of what he alleges, separately or collectively, is supported by the facts or the law. And none of it comes remotely close to outrageous government misconduct.

**B.    Herrera's "Stalking Horse" argument does not establish outrageous government misconduct**

Herrera first argues that starting around 2015, the FBI used OCIF as a "stalking horse."   In presenting himself as targeted without reason in a years-long conspiracy between OCIF and the FBI, Herrera displays no interest in providing a credible narrative regarding outrageous government misconduct, much less misconduct that relates to the charged bribery-related offenses. He never even attempts any explanation for how OCIF could help the FBI develop evidence in 2015 for bribery occurring in 2020 and 2021.   Nonetheless, even if the Court suspends disbelief

11

and accepts his allegation as true, OCIF providing information to the FBI would not be outrageous government misconduct.

### 1.  The Government did not direct OCIF's examination.

As a threshold matter, the FBI did not direct OCIF's examination.  OCIF initiated its own examinations of Bancredito 2010, 2012, 2014 years before they involved the FBI. When members of OCIF began reporting concerns of money laundering to the FBI, as outlined above, the FBI investigated the matter.  Ultimately, the investigation did not lead to charges related to money laundering, or the bank's failure to implement an anti-money laundering program, which completely undermines Herrera's theory that the FBI and OCIF somehow colluded against him. Under Herrera's self-serving rationale, the FBI would have acted appropriately by failing to investigate a referral from Puerto Rico's chief financial regulator.

### 2.  Even if the Court accepts the facts as alleged by Herrera, they do not demonstrate outrageous government misconduct.

The First Circuit has never affirmed the outrageous government misconduct doctrine on any basis, much less on the basis of over-involvement of law enforcement.  *See Anzalone*, 923 F.3d at 6.  Moreover, it has specifically noted that "almost no court" has found dismissal appropriate in cases where there was "over-involvement of government agents in the commission of a crime." *United States v. Therrien*, 847 F.3d 9, 15-16 (1st Cir. 2017).

The examples of alleged Government overreach that the First Circuit has found insufficiently egregious demonstrate why the doctrine remains "moribund."   In *United States v. Nunez*, it declined to find outrageous government misconduct where the Government allegedly preyed on the defendant's drug addiction by offering narcotics in exchange for pipe bombs, then paid for the bomb's raw materials. 146 F.3d 36, 37-38 (1st Cir. 1998).  The First Circuit also

rejected its application where a cooperating witness embedded within the notorious La Costra Nostra crime family persuaded the defendant's superior to order him to distribute cocaine. *United States v. Luisi*, 482 F.3d 43, 45-48 (1st Cir. 2007) (vacating on other grounds). Even though the witness acting at the Government's behest in *Luisi* knew that the order "would contain an implied threat of death, physical harm, or serious retribution if [the defendant] failed to comply," the Court still held this "fell <u>well short</u> of shocking the universal sense of justice. *Id.* at 57 and 59 (emphasis added). And the Government's initiation of a drug transaction, arranging of the cocaine's importation from Colombia, and delivery to various individuals (including the defendant) also fell short of outrageous government misconduct. *United States v. Matiz*, 14 F.3d 79, 82 (1st Cir. 1994); *see also United States v. Panitz*, 907 F.2d 1267, 1272 (1st Cir. 1990) (holding DEA's use of government resources to smuggle and transport drugs, use of informants as go-betweens, and use of constables to act as gang members "[did not come close to . . . implicat[ing] the Due Process Clause."); *United States v. Johnson*, 565 F.2d 179, 181, 182 (1st Cir.1977) (affirming conviction where defendant sold cocaine in response to agent's demands and threats persisting over a period of months), *cert. denied*, 434 U.S. 1075 (1978).

Herrera alleges that "discovery provided to date <u>demonstrates</u> that the Government – through the FBI – purposely commandeered OCIF, an independent administrative and regulatory agency, in order to engineer a fictitious 'examination' and 'audit' of the Bank, in a concerted effort to obtain purported evidence and generate unfounded criminal charges against Mr. Herrera and others." (Def. Mot., ECF No. 262, p. 11) (quotations in original; underline added for emphasis). Yet stripped of its italicized and emboldened hyperbole, here is what Herrera's motion offers as actual evidence of the FBI "commandeering OCIF," followed by the Government's response:

- Less than 20 days after OCIF had issued the 2015 Consent Order, then █████████████ ████████████████████████████████ in furtherance of the FBI's investigation

of Mr. Herrera, referred the Bank to the FBI "without any supporting justification," and despite having separately entered into a consent decree with the Bank.  pp. 15-16 → *There is nothing improper about the FBI accepting a referral.*

- In July 2016, the FBI conducted an interview of ████, who – "without providing any concrete evidence or support" – raised "absurd concerns" regarding Mr. Herrera, including but not limited to: (i) that ████ had read news articles that indicated that Mr. Herrera was barred from entering Venezuela (if anything, a positive quality to possess); and (ii) that ████ believed that Mr. Herrera was on the INTERPOL List under a pseudonym, Julio Martin Kuster (a claim that even the FBI dismissed as a falsehood). P. 16 → *It is not improper for the FBI to interview a witness.  And as Herrera points out, the FBI vetted an alleged falsehood.*

- "[I]n or around May 2018 – the very same month in which OCIF commenced a new review of the Bank – special agents of the FBI without prior notice contacted one of the Bank's independent directors, Thais Lopez ("Lopez"), with a series of inquiries relating to the Bank . . .  As the FBI sought to question Lopez, OCIF was simultaneously conducting the on-site audit of the Bank's liquidity and compliance," which, Herrera alleges, "was not mere coincident – the latter was feeding the former." p. 20-21 → *It is not improper to interview a witness even when a regulator is conducting an audit, and even if it did so after receiving information from the regulator.*

- The FBI interviewed ████████████████, who provided a hard drive of communications from OCIF. At the start of the meeting, ████ provided the FBI with a hard drive containing communications and "important information."[8] → *This interview occurred eight days after Governor Vazquez's Chief of Staff unexpectedly demanded ████s resignation.  Even then, ████ already suspected it had to do with Bancredito. ████ would have been derelict in his responsibility to the public to not report this.  And the FBI would be derelict in its duty to no accept "important information."*

- On January 17, 2020, ████████ provided documents related to Mr. Herrera's art collection.  → *It is not improper for the FBI to interview a witness and accept evidence from him.*

- ████████████████████████████████████████  He also made a surreptitious recording of Herrera in 2018, while he served as compliance officer for Bancredito. He later claimed on television interviews that the FBI would visit OCIF nearly every week.  → *The Government addresses this further below; in short, it is not improper for the Government to do a surreptitious recording, and in any event, he made the recording two years before the crimes alleged in the Indictment*

---

[8] The FBI subsequently obtained a search warrant for this hard drive.  However, the Government has asked the counsel for OCIF to review the contents to ensure there are not any documents within its contents that contain privileged information.   The Government intends to turn its non-privileged contents over to the defendants.

- ████████████████ BSA Examiner in 2019, ████████████████
  ███████████ To that end, he made a covert recording in November of 2020 with
  representatives of Bancredito. → *Herrera has not, and cannot, cite a single case stating
  that the FBI engages in misconduct when it surreptitiously records a witness.*

- ██████████, an Examiner Supervisor at OCIF, interviewed with the FBI in June 2022,
  in which she admitted that she destroyed records related to the Bank and instructed other
  OCIF employees to do the same. And ████████████████████████
  ██████████, provided the FBI with information and made recordings. → *At
  this point, the Government was investigating Herrera for the bribery of two governors.
  It appropriately conducted interviews of OCIF employees. The Government not only
  interviewed these OCIF witnesses about Herrera's bribery, but also, roughly, two dozen
  other witnesses.  And it will continue to interview anyone who may have pertinent
  information.*

None of this is misconduct, much less outrageous. Even when the witnesses' stories are "absurd,"
the purpose of investigating is to determine whether allegations are legitimate or unfounded.

It is also not improper for the FBI to make covert recordings, as it did with ██████ in
2018.  Herrera says that ██████ s status as a confidential informant raises the question as to
whether he "had instead been tasked with purposely misguiding the Bank in furtherance of the
investigation."  First, claims of outrageous government misconduct cannot be speculative, but
rather, "rooted in the record" *Santana*, 6 F.3d at 6.  Herrera never even attempts to explain how
██████ could had been "tasked" to "misguide the Bank" in furtherance of a bribery
investigation, two years before Governors Vazquez ██████ took office. Second, it is not
misconduct for Government agents to engage in deceit or set up the conditions for a willing
defendant to commit a crime. *See, e.g., Panitz*, 907 F.2d at 1272 (1st Cir. 1990) ("[W]e have yet
to review a situation where official conduct crossed the constitutional line; rather, an unbroken
string of First Circuit cases has repulsed attempts to win dismissal of criminal charges on such a
theory." (collecting cases)); *McCord*, 509 F.2d at 349-51 (using perjured testimony to induce
defendant to plead guilty).

And putting it all together and assuming the FBI manipulated an OCIF investigation, it still falls well short of outrageous government misconduct.  Indeed, as the First Circuit has noted, in the rare instances where other courts have found conduct to fall within the doctrine's "extremely limited application," the Government has subjected a suspect to "intolerable abuses" in which law enforcement officials became "overinvolved in a felonious adventure" to the point of "create[ing] the crime" or "coer[ing] the defendant's participation." *United States v. Nunez*, 146 F. 3d 36, 38 (1st Cir. 1998) (quoting *Santana*, 6 F.3d at 4)).  Even if the Court accepts that the FBI completely controlled OCIF, the "venture" was a regulatory examination, not sale of drugs, distribution of weapons, release of child pornography, or any other "felonious conduct."  Herrera's argument stands on even weaker footing then the defendants who have previously failed, because the alleged over-involvement with OCIF had nothing to do with the charged bribery.  The Government does not allege in this Indictment that Herrera engaged in money laundering or banking violations, and Herrera does not allege that the Government told Governor Vazquez to demand a bribe or supply Herrera with the money to pay it.  The alleged misconduct does not even relate to the charged offenses.

**3.   The facts, as alleged by Herrera, refute his "stalking horse" theory**.

As an initial matter, Herrera faces six criminal counts, all based on bribery.  He is not charged with anything resulting from OCIF's examination, money laundering, or banking compliance. The earliest misconduct alleged in the indictment is December of 2019. In particular, the first factual allegation of the Indictment is a text sent from Herrera to the president and CEO of his bank, in which he wrote, "I spoke with John last night! Must enter "Fortaleza and support the new governor" and "use a paving roller over OCIF and build new structure that regulates and doesn't persecute banks and changes documents or fabricate documents" against the banking

industry.  Even count five, alleging conspiracy to commit bribery and violate the Bank Secrecy Act, all stems from the alleged bribe paid to Witness 1 to have Public Official A direct and exert influence on OCIF to shut down the examination to avoid the <u>future</u> filing of SARS.

Second, from the start of his brief, Herrera manipulates the facts to suggest that because █████OCIF employees reported to, or interviewed with, the FBI, it reveals that "the multi-year examinations of the Bank were never anything more than mere window-dressing for a surreptitious and unlawful criminal investigation concluded by the Government."  (Def. Mot., ECF No. 262, p. 6).  But at least four of the witnesses, ████████████████████ did not report to or interview with the FBI until <u>after</u> ███████ termination.  In other words, he portrays the investigative steps taken <u>in reaction</u> to the suspected bribery as indictive that OCIF and the FBI have been colluding <u>prior</u> to it.

Herrera also invokes the actions of ████████████ to support his argument, despite the fact that, as outlined in reports provided in discovery, ████████ stymied the FBI during the time period relevant to the indictment.  ████████████████████ reporting not just on Bancredito, but the banking industry in general.  His cooperation came to an abrupt halt when Herrera bribed Vazquez ████████████████.  Ten days after the critical meeting at the ████████████, where Herrera and Governor Vazquez convened for the first time to discuss his funding of her political consultants (Indictment, ECF No. 3, pp. 18-19), ████████ met with the FBI for the last time. He reported that Herrera called him about becoming the ████ ████████████████, but after this meeting, ████████ cut off contact with the FBI as he waited ████████████.  The FBI had to ████████████████████, particularly because he had become non-compliant.

As for those OCIF employees who were interviewed by the FBI before the termination of ███ regarding money laundering concerns, a far more sensible explanation than Herrera's "stalking horse" theory is that the regulators had genuine concerns.   Multiple OCIF regulators identified multiple Bancredito practices to the FBI that they deemed suspicious.  Herrera offers no evidence, other than their interview with the FBI itself, to support his "stalking horse" argument. In other words, Herrera wants to the Court to ignore the most obvious explanation for why OCIF employees provided information about Bancredito and Herrera to the FBI (their criminal conduct) and accept the least obvious explanation (a truth-stranger-than-fiction conspiracy between OCIF and the FBI to randomly target him). To the extent Herrera wants to engage such a conspiratorial defense, he should be forced to do so before a jury.

**C.  Herrera's argument about contact with represented parties and violation of attorney-client privilege does not establish outrageous government misconduct.**

**a.  The Government did not commit outrageous government misconduct by contacting represented parties.**

Herrera alleges that the Government committed outrageous government misconduct by "repeatedly contacting represented parties." (Def. Mot., ECF No. 262, pp. 34-36).  He bases this argument on a clandestine recording made by a cooperating witnesses of Herrera two years before the charged briberies, and of co-defendant Mark Rossini who was recorded more than 10 months prior to when the Indictment was returned. Additionally, Herrera accuses the government of unethical behavior by allowing former counsel for Bancredito to represent the Bank's President, Frances Diaz. The recordings of Herrera and Rossini did not violate Herrera's rights or Department of Justice policy, because they occurred prior to the initiation of criminal proceedings and fell squarely within contact "authorized by law."   Nor did the Government commit outrageous government misconduct by virtue of Bancredito's former counsel representing Diaz.  Assuming

Herrera even has standing to make this argument, and assuming there was even a conflict of interest, there does not appear to be a single reported case finding that a defense counsel's conflict of interest could possibly impute outrageous misconduct to the Government.

###### i. The Government did not commit outrageous government misconduct by covertly recording witnesses.

The right to counsel attaches only after the initiation of adversarial judicial proceedings. *Rothgery v. Gillespie Cty.* 554 U.S. 191, 213 (2008) (right to counsel attaches at "criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction"); *Brewer v. Williams*, 430 U.S. 387, 404 (1977), 430 U.S. at 401 (right to counsel attached at interrogation after arraignment because adversarial proceedings had begun). And courts have repeatedly held that pre-indictment contact of a represented party is "authorized by law" because a criminal suspect does not become a "party" until after formal legal or adversarial proceedings commence. *See United States v. Balter*, 91 F.3d 427, 435-36 (3d Cir. 1996) (Alito, J.) (expressing "no doubt" that the "authorized by law" rule permitted pre-indictment contact of a represented party). Every Circuit to consider the "authorized by law" exception has expressly approved of it. *See, e.g., United States v. Binday*, 804 F.3d 558, 594 (2d Cir. 2015), *overruled on other grounds by Ciminelli v. United States*, 143 S. Ct. 1121 (2023); *United States v. Plumley*, 207 F.3d 1086, 1094-95 (8th Cir. 2000); *United States v. Ford*, 176 F.3d 376, 382 (6th Cir. 1999); *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995); *United States v. Powe*, 9 F.3d 68, 69 (9th Cir. 1993); *United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir. 1993); *United States v. Ryans*, 903 F.2d 731, 739-40 (10th Cir. 1990); *United States v. Worthington*, 1990 WL 116618, at 3,4 (4th Cir. 1990); *United States v. Sutton*, 801 F.2d 1346, 1366 (D.C. Cir. 1986).[9]

---

[9] *See also United States v. Grass*, 239 F. Supp. 2d 535, 542 (M.D. Pa. 2003) ("[B]ecause AUSA [ ]'s conduct did not violate Defendants' constitutional rights, in addition to the fact that there is a significant body of caselaw indicating that such conduct is not prohibited by the no-contact rule, it must be that his

For this reason, neither the Department of Justice nor the American Bar Association prohibit covert and overt contact with a represented party prior to criminal proceedings. The provision of the Justice Manual cited by Herrera, and the McDade Amendment, state that Department attorneys are governed by "the relevant rule of professional conduct that deals with communications with represented persons." *See* JM 9-13.200 ("Communications with Represented Persons"); 28 U.S.C. § 530B. The Justice Manual directs that in determining which rule applies, prosecutors should be guided by 28 C.F.R. Part 77 (1999). That provision of the Code of Federal Regulations provides that "[a] government attorney shall, in all cases, comply with the rules of ethical conduct of the court before which a particular case is pending." While it's not clear that the First Circuit or this District has considered the "authorized by law" pre-indictment exception to the no-contact rule, this District follows the American Bar Association's Model Rules of Professional Conduct, which allows for the exception. *See* Local Rules Dist. P.R. R. 7(b); Model Code of Prof'l Conduct R. 4.2 cmt. 2 (2020) ("Communications authorized by law may also include investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings). Moreover, the "authorized by law" rule appears to be approved by every Circuit to consider it. *Balter*, 91 F.3d at 436 (noting that every court of appeals to consider the issue has held that the rule prohibiting contact of represented parties does not apply to pre-indictment criminal investigations).

---

conduct was 'authorized by law.'"); *United States v. Joseph Binder Schweizer Emblem Co.*, 167 F. Supp. 2d 862, 866 (E.D.N.C. 2001) ("[N]o rule of professional conduct precludes pre-indictment contacts between the government and a represented party in a non-custodial setting especially in a case such as the one before the court in which the party connoted to the government that she was not represented by counsel."); *In re Disciplinary Proceedings Regarding Doe*, 876 F. Supp. 265, 268-69 (M.D. Fla. 1993) (collecting cases).

The "authorized by law" rule is not an obscure legal concept.  Herrera bluntly accuses the Government of an ethical violation based on a superficial reading of a Justice Manual provision that ignores the CFR the provision references, the ABA's Model Rules, and applicable case law. More pertinently, the recording of Herrera occurred before Wanda Vazquez was even Governor. It's irrelevant to the charges, and the Government does not currently intend to use the recording at trial in its case in chief.  As for the recordings of Rossini, which the FBI clandestinely recorded nearly a year before the Indictment, Herrera clearly does not have standing to challenge this recording, and much like the rest of his motion makes the conclusory statement that Rossini was represented by counsel at the time,[10] but doesn't even claim that the government was aware of this. Even assuming arguendo, Rossini was represented, this, too, falls within under the "authorized by law" doctrine.  The mere fact that a person has retained legal counsel does not paralyze the government's ability to covertly or overtly collect evidence of criminal activity, including via surreptitious recordings.

In short, in the most aggressive manner, Herrera asks this Court for a remedy never applied before by the First Circuit, for conduct approved under the law, to remedy the recording of a conversation that took place before either of the two governors that he is accused of bribing took office, and a recording of a target 11 months prior to Indictment. His argument has no merit.

> **ii.    The Government did not commit outrageous government misconduct because Frances Diaz's attorney once represented Bancredito.**

In the context of alleged violations of attorney-client privilege, the First Circuit has stated that the remedy of dismissal is "reserved for extremely limited circumstances."  *United States v.*

---

[10] As to the contents of the Rossini recording, Herrera claims that the recordings "are bereft of any *actual* evidence or admissions from Rossini." (Def. Mot. p. 55). To the contrary, Rossini states on one recording with Waters: "if they [the prosecutors] had nothing else better to do that day, they could charge me with some sort of conspiracy to violate financial/campaign finance laws w/Julio to set up the PAC." DOJ-0000432174 [1:27:22].

*Edgar*, 82 F.3d 499, 506 (1st Cir. 1996) (declining to vacate conviction when government subpoenaed defendant's former attorney to testify to the grand jury); *see also United States v. Rogers*, 751 F.2d 1074, 1070 (9th Cir. 1985) (rejecting dismissal as remedy where prejudice can be neutralized by excluding at trial the wrongfully obtained confidential communications obtained from defendant's attorney).

Even where the Government <u>compelled</u> testimony of the <u>defendant</u>'s attorney on matters <u>pertinent</u> to the criminal prosecution, the First Circuit has rejected dismissal as a remedy, finding no prejudice. *See Edgar*, 82 F.3d at 509. In *Edgar*, the Government compelled the grand jury and trial testimony of the attorney who represented the defendant in relation to an auto insurance claim that formed the basis for a mail fraud charge. *Id.* at 501. Assuming without deciding that the defendant's due process rights had been violated, the Court nonetheless held that conduct neither warranted suppression of evidence or dismissal, noting that the attorney never testified to communications related to an evidentiarily critical tax return. *Id.* at 509. It also found that "no Sixth Amendment right to counsel is even implicated here, as the attorney called to the grand jury was not criminal defense counsel." *Id.* at 507; *see also Rogers*, 751 F.2d at 1077-78.

As an initial matter, Maria Dominguez never represented Herrera in his individual capacity, but rather, represented Bancredito and that representation had concluded.

Assuming Herrera somehow can be deemed to be protected by the privilege, unlike in *Edgar*, Dominguez is not a fact witness. The Government has never interviewed her about her clients' statements, much less compelled her testimony. And as the publicly disclosed communications reveal, that legal advice pertained to the civil matter of Bancredito's regulatory examination, not the criminal matter of Herrera's bribery. *See Bancredito Holding Corporation v. DMRA Law, LLC, et al.*, 3:23-cv-01238, EFC No. 1, p. 7 (D.P.R., May 11, 2023). Moreover,

22

unlike the defendant in *Edgar*, who was unaware of the grand jury testimony, and the attorney in *Edgar*, who asserted attorney-client privilege, Bancredito not only knew of Dominguez's criminal representation of Diaz, but it paid for it.[11]  Indeed, it does not appear that Herrera even objected to this representation until Diaz would not share with him what she and Dominguez discussed, at which point he threatened to sue her.   It is ironic that he now alleges the Government has infringed on an attorney-client relationship he never individually had with Dominguez, after trying to coerce Diaz to disclose her privileged communications.

**b.    The Government did not utilize privileged material to obtain additional evidence against Herrera.**

Herrera accuses the Government of "repeatedly utilizing privileged materials in seeking to obtain additional evidence against Mr. Herrera."  He provides no examples of actual privileged materials and rehashes the exact same argument he made in support of a Special Master. (ECF No. 114.)

Specifically, Herrera asserts the following:

> "[A] Grand Jury transcript only belatedly produced in discovery confirms that the Government relied extensively on potentially privileged search warrant returns in support of the Indictment even as its filter team allegedly was commencing its review of the same materials – supposedly to protect the Defendants' right to counsel even though that right had already been violated by the Government's practices. (See Exhibit C – Waltz Tr. at p. 18 (acknowledging that to obtain communications related to the investigation, "[i]n this particular case, what we primarily did was through search warrants of cloud storage. Things such as, like, iCloud or Google.").)

He then includes a table listing all the search warrant affidavits that referred to communications between the conspirators, arguing the government similarly used these "potentially privileged communications" to build its probable cause.

---

[11] Gov Ex. 7 (Emails to Bancredito Counsel)

First, the insinuation that the Government use of search warrant returns was only recently revealed in a "belated"[12] production of the case agent's grand jury transcript is bewildering. As Herrera is aware from the last time the parties litigated this issue, the Government did not implement a formal filter review until March of 2022.   Before that point, the Government discovered communications that it used during the investigation. This was "confirmed" by the Indictment itself, which references the communications repeatedly.

Second, as he did in his motion for a special master, Herrera's motion to dismiss equates the full search warrant returns as "potentially privileged material," irrespective of whether they actually involve an attorney, much less protected communications.   But as the Government noted the last time Herrera made a blanket assertion of privilege, attorney-client privilege must be narrowly construed because it limits potentially relevant evidence, *see Cavallaro v. United States*, 284 F.3d 236, 246 (1st Cir. 2002); *In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001), and therefore, "the party seeking to validate claim of privilege must do so, document-by-document."  *In Re Grand Jury*, 662 F.3d 65, 68 (1st Cir. 2011).  The Court has ruled on this issue: Herrera successfully removed the filter review from the offices prosecuting this case, and now, using filter terms he's provided, another section of the Department of Justice is ensuring that potentially privileged material is removed.

Herrera also obfuscates one of the Government's arguments related to the search warrants: that there is virtually no risk of privileged material even within the filter team's possession that gets into defense strategy regarding the charged crimes, because all of the search warrants were issued before the subjects knew they were being investigated for bribery. Herrera alleges that it is

---

[12] Less importantly, the production was not belated.  To produce every witness's grand jury testimony, including the case agents, before a trial date has even been set is exceptionally uncommon.

a falsehood to say that "the Government's investigation of corruption offenses was somehow unrelated to the Government's investigation of the Bank that piggyback on OCIF's regulatory review." Obviously, ending the OCIF examination was Herrera's motive for the bribery. But that does not mean that communications between Bancredito or Herrera and their counsel relating to a civil regulatory matter relate to an individual criminal defense against bribery of two governors.

## D.   Herrera's argument regarding the grand jury presentation does not establish outrageous government misconduct.

Herrera acknowledges that the law does not require the Government to present exculpatory or impeachment material to the grand jury. He nonetheless argues that the Government provided "misleading" testimony to the grand jury based specifically on what he perceives as insufficient presentation of exculpatory and impeachment information.

The Government is not constitutionally obligated to present exculpatory evidence to the grand jury. *United States v. Williams*, 504 U.S. 36 (1992). The Supreme Court specifically held that federal courts supervisory powers do not include dismissal of an otherwise valid indictment where the prosecutor failed to introduce substantial exculpatory evidence to a grand jury. *Id.*, *see also, United States v. Casas*, 425 F.3d 23, 28 (1st Cir. 2005); *United States v. Jarrett*, 447 F.3d 520, 529 (7th Cir. 2006) ("[A] court may not dismiss an otherwise valid indictment because the government failed to disclose substantial exculpatory evidence to the grand jury."); *United States v. Angel*, 355 F.3d 462, 475 (6th Cir. 2004) (the government has "no judicially enforceable duty to provide the grand jury with exculpatory evidence."). Department policy requires prosecutors to disclose "substantial evidence" known to the prosecutor if that evidence *negates the guilt* of the subject of the investigation." JM 9-11.233 (emphasis added). But there is simply no legal precedent or Department guidance that states that prosecutors must present every avenue of impeachment for every potential trial witness to the grand jury.

Nevertheless, the Government repeatedly introduced evidence to the grand jury that diminished its own witnesses' credibility or was favorable to the defense.   As Herrera points out, for █████████████,[13] the testimony begins with the entering into the record that they had cooperation agreements with the government. The Government even went as far as to specifically elicit testimony about the defendants or their conduct that may be favorable to the defense, even in instances where such testimony will likely be inadmissible at trial, ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

Herrera's motion highlights the Government's efforts to test the strength of its case by presenting the grand jury with its vulnerabilities. Herrera may believe that the Government insufficiently demonstrated impeachment material, but it was not legally required to provide any.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[13] Herrera takes issue with the Waters' plea arrangement.  It is run-of-the-mill for defendants to attack the purported leniency of plea agreements in criminal trials.  It is not, as the defense team knows, a basis for dismissing an indictment.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

And Herrera asserts that the Government should have introduced through a ████████ ██████████████, that Rossini denied the bribery. ████████ made two recordings of Rossini at the FBI's direction in the fall of 2021, and as part of the ruse, he told Rossini that he had been approached by the FBI and asked him about a quid pro quo.  Herrera correctly points out that had Rossini admitted to paying a bribe during the recording in Madrid, it would have been a "smoking gun."  But that doesn't mean the opposite is true.  A self-serving denial – particularly one nearly a year and a half after the crime – is not exculpatory.  *See United States v. Bruce*, 984 F.3d 884 (9th Cir. Jan. 12, 2012) ("[T]here is no doubt that self-serving exculpatory acts performed substantially after a defendant's wrongdoing is discovered are of minimal probative value as to his state of mind at the time of the alleged crime." (internal quotations omitted)); *United States v. Marshall*, 28 F.3d 1217 (7th Cir. 1994) (finding no *Brady* violation based on nondisclosure of postal carrier's self-serving statement to a fellow carrier in which he said he opened the letter by mistake; *United States v. Hills*, 27 F.4th 1155, 1186 (6th Cir.) ("The fact that Hills said to 'do it legally' did not negate other evidence of the defendants' corrupt intent or that they each knowingly joined the conspiracy to obstruct the FBI's investigation."), *cert. denied sub nom. Alqsous v. United States*, 143 S. Ct. 305, 214 L. Ed. 2d 134 (2022); *United States v. Reyes*, 239 F.3d 722, 743 (5th Cir. 2001); cf. *United States v. Connolly*, 2019 U.S. Dist. LEXIS 79580, *8-11 (S.D.N.Y. May 2, 2019) (the Government was under no obligation to present evidence to the grand jury that put a "favorable gloss" on defendant's conduct). Rossini had every reason to tell someone who was in contact with law enforcement that there was no bribery, particularly given the savvy that comes with nearly 30

27

years as an FBI agent and private consultant in investigations. Moreover, as discussed above, *infra*, n. 11, Rossini does in fact make an admission that he and Herrera could be charged with conspiracy "if they [the prosecutors] didn't have anything better to do that day."

### E.   Herrera's argument regarding discovery does not establish outrageous government misconduct.

Finally, Herrera alleges *Brady* violations by the United States for its failure to disclose material that that government does not have in its possession.  This argument, too, is heavy on accusatory language—especially given that neither of the parties know whether the information is exculpatory given that only OCIF has it—and light on any analysis of the issue at hand: whether OCIF, an independent state regulator, is within the scope of the prosecution team such that the Government is responsible for obtaining and producing internal OCIF documents in discovery.[14] Herrera never offers this analysis.

Relying on *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) and the case of former Senator Ted Stevens, Herrera urges the Court to presume that the Government here has violated *Brady* and *Giglio* based on the Government's position that OCIF is not a part of the prosecution team (which also presumes OCIF is in the possession of evidence that would exculpate Herrera of bribery charges) and dismiss the indictment. *Chapman* and *Stevens* provide little guidance here as both cases involved rulings from the district courts that occurred during trial (*Chapman*) or post-trial (*Stevens*). In this case, the parties have not even scheduled a trial date and the defendant could not have possibly been prejudiced by the government's failure to provide information it does not have in its possession at this stage of the proceedings.

---

[14] The Government has provided voluminous discovery to Herrera to date, including: (1) the FBI electronic case file for his case, (2) the FBI electronic case file for ███████' case, (3) the FBI electronic case file for the money laundering investigation into Bancredito, (4) all grand jury transcripts and exhibits; and (5) grand jury returns for both the bribery investigation and the money laundering investigation.

1. **OCIF is not part of the Prosecution team.  And even if it was, Herrera has not identified what evidence he seeks or why it is relevant to this case.**

"While a prosecutor must disclose information maintained by government agents even if the prosecutor herself does not possess the information, this duty does not extend to information possessed by government agents not working with the prosecution." *United States v. Rivera-Rodriguez*, 617 F.3d 581, 595 (1st Cir. 2010) (internal citations omitted); *see also United States v. Díaz-López*, 2022 U.S. Dist. LEXIS 104042 (D.P.R., April 5, 2022).  "Materials in the possession of state agencies are generally not in the government's possession, custody, or control, and therefore need not be disclosed." *United States v. Cadden*, 2015 U.S. Dist. LEXIS 197114, *12-14 (D. Mass., July 13, 2015) (evidence not in possession of prosecution team when it did not have access to state agency's files) *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) (same, for files within possession of California Department of Corrections).

Some factors considered by courts in determining whether the prosecution team includes an outside agency are whether that agency participated in witness interviews, assisted in presenting the case to the grand jury, reviewed documents gathered by the government, played a role in the development of the prosecution strategy, or accompanied the prosecution team to court proceedings.  *See United States v. Middendorf*, 18-CR-36 (JPO), 2018 U.S. Dist. LEXIS 139980, 2018 WL 3956494, (S.D.N.Y. Aug. 17, 2018).   Even in cases where the prosecution team and the outside agency conducted some investigative steps jointly, courts have declined to find that the agency became part of the prosecution team for discovery purposes. *United States v. Collins*, 409 F. Supp. 3d 228 (S.D.N.Y., Sept. 6, 2019) (finding no joint investigation where prosecutors shared evidence gathered from search warrants with SEC, and 16 interviews were conducted jointly by prosecutors and SEC); *United States v. Avenatti*, 2022 U.S. Dist. LEXIS 28472, at *32 (S.D.N.Y.,

Feb. 15, 2022) (same, where between two U.S. Attorney's Offices that conducted the two a total of five joint interviews were conducted with two witnesses).

The Government did not conduct interviews <u>with</u> OCIF personnel; it conducted interviews <u>of</u> OCIF personnel. OCIF had no role in presenting the case to the grand jury, document review, or development of prosecution strategy. The Government issued subpoenas to OCIF to obtain documents, like with any other outside entity. Herrera points to the FBI's use of individual confidential sources within OCIF when it investigated Bancredito for money laundering, but he offers no case law to support that this would turn OCIF, as a body, into part of the prosecution team for discovery purposes. Tellingly, Herrera offers no legal analysis on this issue at all, nor does he specify what evidence he needs from OCIF.

Discovery becomes weaponized when it becomes less about seeking discovery to mount a defense, and more about mounting a defense by seeking discovery. Herrera knows that nothing in OCIF's files could exculpate his bribing of two governors. This is not about needing discovery; it's about creating a discovery dispute.

2. **Herrera's pre-trial *Brady* claim is without legal merit.**

Herrera's *Brady* argument fails because OCIF is not part of the prosecution team, and even if it was, a *Brady* violation cannot occur at this stage. "In *Strickler*, the Supreme Court, noting that the term '*Brady* violation' is often loosely used, said that '[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the States, either willfully or inadvertently; and prejudiced must have ensued.'" *United States v. Josleyn*, 206 F.3d 144 (1st Cir. 2000) (quoting *Strickler v. Greene*, 527 U.S. 263 (1999)). Two of these components are missing completely.

First, as discussed above, there is absolutely no evidence that OCIF can be considered part of the prosecution team. Second, and as important, Herrera cannot establish any prejudice for a failure to disclose *Brady* material when a trial date has not even been scheduled by the Court. "*Brady* violations are generally raised and adjudicated post-trial, upon the revelation by the government or discovery by the defense of information favorable to the accused that should have been disclosed before trial. Only after trial has conclude and a complete trial record exists may a court analyze whether information the government has not produced constitutes a *Brady* violation." *United States v. W.R. Grace*, 401 F. Supp 2d 1069, 1077 (D. Mont. 2005). "Indeed, it is not possible to apply the materiality standard in *Kyles* before the outcome of the trial is known." *United States v. McVeigh*, 954 F.Supp 1441, 1450 (D. Colo. 1997).

Notwithstanding the above, the United States has provided all information in its possession that the Herrera has requested. In the same motion that he contends "discovery provided to date demonstrates that the Government – through the FBI – purposely commandeered OCIF," Def. Mot. p. 11, he contradictorily argues "[t]o date, the Government has baselessly refused to provide discovery concerning its interactions with (and control over) OCIF." Def. Mot. p.23. Herrera supports his motion with numerous exhibits, every one of which was provided by the Government as part of discovery. The Government provided the FBI file from the money laundering investigation, despite the fact it never led to any charges, the entire FBI file from the bribery investigation, and every document it received from OCIF in response to the government's grand jury subpoena. What the Government is not required to do is conduct a fishing expedition on the defendant's behalf in the files of a state agency.

The defendant has not provided any facts that would establish that OCIF and the government were involved in a joint investigation into the bribery scheme for which Herrera is

charged.  It is well established that "*Brady* obligations extend only to materials within prosecutor's possession, custody or control, or, in appropriate cases, that of the Department of Justice, perhaps another Executive Branch, or a comparable state authority involved in the federal prosecution." *United States v. Collins*, 409 F.Supp.3d 228 (S.D.N.Y. 2019).

### 3.  Herrera knows that OCIF is not part of the prosecution team.

Notably, OCIF and Herrera appear to be involved in simultaneous litigation regarding the disclosure of information before the Court. (*See e.g.*, ECF No. 185, 188, 204, 217, 218, 227, 231, etc.) Tellingly, Herrera initiated this litigation and did so without including the United States as a selected party. Accordingly, the Government does not have access to these pleadings, which begs the question – how can Herrera accuse OCIF and the United States of being involved in a joint investigation while simultaneously asking the Court to exclude the United States from litigation presumably aimed at requiring OCIF to provide information to the defense.

### III.   CONCLUSION

Despite Herrera's willingness to threaten and sue OCIF, its examiners would not be intimidated and continued to do their job.   When he realized this, he sought to go above OCIF by bribing two governors. Meanwhile, when the regulators became concerned that his bank's behavior may have ripened to criminal, they reported to the FBI.  Herrera asks the Court to bless his action and condemn theirs.  His motion should be denied.

## Certificate of Service

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will notify all counsel of record.

**RESPECTFULLY SUBMITTED**, this 22nd day of September, 2023.

COREY R. AMUNDSON
Chief, Public Integrity Section
U.S Department of Justice

*/s/ Nicholas W. Cannon*
Nicholas W. Cannon (G01814)
Ryan R. Crosswell (G03502)
Trial Attorneys
Department of Justice
Public Integrity Section
1301 New York Ave., NW - 10th Floor
Washington, D.C. 20530
(202) 514-8187
Nicholas.Cannon2@usdoj.gov