# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JULIO M. HERRERA-VELUTINI,<br><br>Defendant. | CRIMINAL NO. 22-342 (SCC) |

## REPLY TO THE UNITED STATES' RESPONSE TO DEFENDANT'S
## MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT MISCONDUCT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

   A.   The FBI used OCIF as a Stalking Horse ............................................................ 2

   B.   The FinCEN Consent Order ............................................................................... 3

   C.   The Government Misrepresented the Nature and Scope of Maria Dominguez's Representation of the Bank ................................................................................ 5

ARGUMENT ........................................................................................................................ 7

I.     GOVERNMENT MISCONDUCT IN THE FIRST CIRCUIT HAS NEVER RISEN TO THE LEVEL THAT EXISTS HERE ............................................................. 7

II.    THE GOVERNMENT'S CRIMINAL INVESTIGATION OF MR. HERRERA RELIED UPON WRONGFULLY COOPTING OCIF AS A "STALKING HORSE" .................... 8

III.   THE GOVERNMENT IMPROPERLY PURSUED MR. HERRERA BY ANY MEANS NECESSARY ................................................................................................. 10

IV.   THE GOVERNMENT REPEATEDLY MISLED THE GRAND JURY ...................... 13

V.    THE GOVERNMENT WAS OBLIGATED TO PRODUCE EXCULPATORY MATERIAL IN OCIF'S POSSESSION ......................................................... 16

CONCLUSION.................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Casey v. Duckworth*,
  738 F.2d 875 (7th Cir. 1984) ...............................................................................17

*Hampton v. United States*,
  425 U.S. 484 (1976)..............................................................................................8

*Kyles v. Whitley*,
  514 U.S. 419 (1995)............................................................................................15

*Miramar Const. Co. v. Home Depot, Inc.*,
  167 F. Supp. 2d 182 (D.P.R. 2001)....................................................................12

*Rivera v. Kmart Corp.*,
  190 F.R.D. 298 (D.P.R. 2000) ............................................................................12

*Strickler v. Greene*,
  527 U.S. 263 (1999)............................................................................................16

*United States v. Anzalone*,
  922 F.3d 1 (1st Cir. 2019)....................................................................................8

*United States v. Bradley*,
  820 F.2d 3 (1st Cir. 1987)....................................................................................8

*United States v. Bundy*,
  968 F.3d 1019 (9th Cir. 2020) ............................................................................17

*United States v. Carona*, No. SA CR 06-224-AG,
  2008 WL 1970218 (C.D. Cal. May 2, 2008), *aff'd*, 630 F.3d 917 (9th Cir. 2011),
  and *aff'd*, 660 F.3d 360 (9th Cir. 2011)..............................................................11

*United States v. Chapman*,
  524 F.3d 1073 (9th Cir. 2008) ............................................................................16

*United States v. Djokich*,
  718 F. Supp. 2d 173 (D. Mass 2010), *aff'd*, 693 F.3d 37 (1st Cir. 2012)................8

*United States v. Guzman*,
  282 F.3d 56 (1st Cir. 2002)..................................................................................8

*United States v. Hammad*,
  858 F.2d 834 (2d Cir. 1988).................................................................................10

*United States v. Isgro*,
    974 F.2d 1091 (9th Cir. 1992) .......................................................................12

*United States v. Kordel*,
    397 U.S. 1 (1970) ..........................................................................................9

*United States v. Luisi*,
    482 F.3d 43 (1st Cir. 2007) ...........................................................................8

*United States v. Marcello*,
    731 F.2d 1354 (9th Cir. 1984) .......................................................................8

*United States v. Omni Int'l Corp.*,
    634 F. Supp. 1414 (D. Md. 1986) ................................................................14

*United States v. Pierce*,
    893 F.2d 669 (5th Cir. 1990) .......................................................................11

*United States v. Rhodes*,
    No. 18-CR-887 (JMF), 2019 WL 3162221 (S.D.N.Y. July 16, 2019) .................9

*United States v. Roberts*,
    481 F. Supp. 1385 (C.D. Cal. 1980) ............................................................16

*United States v. Russell*,
    411 U.S. 423 (1973) ......................................................................................8

*United States v. Samango*,
    607 F.2d 877 (9th Cir. 1979) .......................................................................14

*United States v. Santana*,
    6 F.3d 1 (1st Cir. 1993) .................................................................................8

*United States. v. Scrushy*,
    366 F. Supp. 2d 1134 (N.D. Ala. 2005) ....................................................9, 10

*United States v. Serubo*,
    604 F.2d 807 (3d Cir. 1979) ......................................................................1, 15

*United States v. Simpson*,
    813 F.2d 1462 (9th Cir. 1987) .......................................................................8

*United States v. Smith*,
    77 F.3d 511 (D.C. Cir. 1996) .......................................................................14

*United States v. Teyibo*,
    877 F. Supp. 846 (S.D.N.Y. 1995) .................................................................9

*United States v. Therrien*,
  847 F.3d 9 (1st Cir. 2017) ................................................................8

*United States v. Tobias*,
  662 F.2d 381 (5th Cir. 1981) .............................................................8

*United States v. Wiley*,
  794 F.2d 514 (9th Cir. 1986) .............................................................8

*Upjohn Co. v. United States*,
  449 U.S. 383 (1981) ...........................................................................12

**Other Authorities**

Fourth Amendment .................................................................................11

Fifth Amendment .....................................................................................7

COMES NOW, Defendant Julio M. Herrera-Velutini ("Mr. Herrera"), by and through his undersigned attorneys, respectfully submits this reply to the United States' Response to Mr. Herrera's Motion to Dismiss for Outrageous Government Misconduct (ECF No. 301, the "Response" or "Resp.").[1]

## INTRODUCTION

*Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and **the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened***.

*United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979) (emphasis added).

Contrary to the Government's representations, this Court is called upon not to protect Mr. Herrera against **perceived unfairness**, but to instead protect Mr. Herrera against **undeniable unfairness** imposed by the Government over the course of six years.  Indeed, as the Third Circuit in *Serubo* so aptly explained: the "dismissal of an indictment" is "the only effective way to encourage compliance with the[ ] ethical standards" that govern a prosecutor's conduct and "to protect defendants from abuse of the grand jury process" and repeated instances of flagrant Government misconduct.  *Id.*  On the facts here, the only appropriate remedy is dismissal of the Indictment.

The record is clear.  For the last six years, the Government targeted Mr. Herrera and sought out opportunities to entrap him.  Time and again these efforts were thwarted because there was simply nothing to find.  And so, the Government strategically inserted deceitful informants, violated Mr. Herrera's right to counsel, improperly harnessed OCIF's regulatory authority, and failed to properly disclose these issues to the Grand Jury all in its attempt to revive its criminal

---

[1] "Motion" or "Mot" refers to Mr. Herrera's Motion to Dismiss the Indictment for Outrageous Government Misconduct (ECF No. 262).

investigation against Mr. Herrera.  That is the antithesis of how our government is allowed to investigate and build cases.  On the record before this Court, there can be little doubt that, but for this illegal investigatory scheme, Mr. Herrera would never have been indicted.

Notwithstanding the Government's rhetoric in its Response, the Government has yet to meaningfully deny any of the specific instances of misconduct outlined by Mr. Herrera or their cumulative effect on eroding the integrity of the investigation and prosecution of this case.  The Government's attempts to either mischaracterize, misconstrue, or completely disregard Mr. Herrera's arguments and requests for relief are as transparent as they are disingenuous. Indeed, in further support of the arguments raised herein, and for the convenience of the Court, Mr. Herrera includes as **Exhibit 1** to this Reply a detailed chart addressing the multiple misrepresentations and mischaracterizations proffered by the Government in its Response.

Ultimately, and as explained in further detail below, the Government's conduct throughout this matter not only produced tainted "evidence" and prejudiced the Grand Jury against Mr. Herrera, but also infringed on Mr. Herrera's constitutional rights. When viewed cumulatively, these repeated instances of outrageous government misconduct militate in favor of dismissing the Indictment.

## **BACKGROUND**

At the outset, it is ironic that the Government would seek to characterize Mr. Herrera's well-founded Motion as "a narrative completely divorced from reality." (Resp. at 1.)  To the contrary, it is the Government's Response, rife with factual inconsistencies, that ignores or otherwise obfuscates the reality that Mr. Herrera is the victim of profound government misconduct.

### A.  **The FBI used OCIF as a Stalking Horse**

The Government's contention that it "merely collected information and evidence from OCIF" (Resp. at 1) in furtherance of its criminal investigation is belied by the discovery produced

in this case.  Instead, the lengthy list of OCIF employees who were recruited by the FBI to serve as registered informants or tasked in furthering the criminal investigation against Mr. Herrera – including before the time period of the charged Indictment – demonstrates that the FBI used OCIF as a "stalking horse."  As described in the Motion, and further below – among others, █████ ████████████████████████████████ served as an FBI informant while *simultaneously* taking part in privileged and confidential internal compliance committee meetings at Bancrédito International Bank & Trust Corporation (the "Bank").  Meanwhile, ███████, an OCIF official supervising multiple examinations and audits of the Bank – including the audit in which OCIF Principal Examiner ███████ reported that ████ and other OCIF managers intervened to alter the conclusions of her examination of the Bank – ████████████████████████████ *i.e.*, *before* the conduct alleged in the Indictment.  So too was ██████, who served as the ██ ███ examiner for OCIF's audit of the Bank, and ██████████████████████████████ ████████████████during this period.

The Government's attempts to gloss over the extraordinarily interwoven relationship between the FBI and OCIF, in which it becomes utterly impossible to determine where one entity's actions begin and the other ends, is underscored by the dearth of the Government's case law. Indeed, the Government fails to point to a *single* case where supervisory officials of the supposedly independent civil agency (here, OCIF) registered as government informants recruited by, and charged with reporting to, and following the instructions of, a government entity (here, the FBI).

## B.  **The FinCEN Consent Order**

That the Government fails to recognize the profound issues arising from the improper overlap of the Government and OCIF is further illustrated by the Government's heavy reliance in its Response on the FinCEN Consent Order issued on September 15, 2023 (the "Consent Order"). After all, this Consent Order was agreed to by a receiver – Driven Administrative Services, LLC

(the "Receiver") – that was *installed by OCIF* and *that reports to OCIF*, an agency *that has followed Government directives at every step*.

At the outset, Mr. Herrera and Bancredito Holding Corporation – the entity which wholly owns the Bank – were intentionally excluded from settlement negotiations between the Receiver and FinCEN, despite Mr. Herrera's continued ownership of the Bank and numerous representations to the Receiver and FinCEN that he and Bancredito Holding Corporation have the right to participate in negotiations. Thus, it is wholly unsurprising, and should have no evidentiary value whatsoever, that OCIF's chosen Receiver and FinCEN have reached a collusive settlement with each other.

Regardless, the Consent Order, and the Government's Response, also fails to address that the Bank, under Mr. Herrera's stewardship, demonstrated a commitment to compliance from the very outset of OCIF's purported regulatory investigation. Indeed, the Bank improved continuously from 2015 to the date of OCIF's eventual settlement with Mr. Herrera in 2021. Mr. Herrera, in coordination with Bank management and numerous well-respected, independent professional advisors, worked diligently to enhance the Bank's BSA/AML compliance program—and succeeded in doing so.

For example, the FBI's own informant into the Bank – ███████████████ – informed the FBI on April 16, 2018 that:

> Velutini has invested significant amounts of money for Bancredito's BSA and AML systems. Bancredito has also hired Kroll as an outside auditor. [The] current compliance officer for Bancredito . . . previously worked for Santander's compliance department . . . Bancredito's most recent Office of the Commissioner of Financial Institutions (OCIF) audit was positive.

(Exhibit ("Ex.") 2 (DOJ-0000098549)).

Similarly, in a May 2018 BSA/AML audit of the Bank conducted by Crowe Horvath, it was determined that the Bank had such a strong compliance culture and practice that many of its practices qualified as "best practices."  (Ex. 3 (DOJ-0000089222)).  Further, on November 14, 2018, the Bank hosted a BSA/AML compliance conference that reflected its commitment to best practices, and which was well-attended by both Federal and Commonwealth regulators.  (*See* Ex. 4 (DOJ-0000098698)).  Moreover, the accounting firm BDO in its 2020 audit of the Bank found full compliance by the Bank with the International Banking Center Act.  (*See* Ex. 5 (DOJ-0000091650)).

These and numerous other records obtained by the Government over the course of its investigation, including those procured by OCIF employees acting as FBI informants, reflect that Mr. Herrera and the Bank acted in good faith to implement best practices, identified and used experts to address deficiencies, and worked in earnest with OCIF to resolve any alleged concerns relating to the proper administration of the Bank.  As such, the Government's questionable reliance upon the Consent Order as proof of Mr. Herrera's culpability has no evidentiary or factual basis.

## C. __The Government Misrepresented the Nature and Scope of Maria Dominguez's Representation of the Bank__

Lastly, the Government's characterization of Maria Dominguez's role in this matter is false and misleading.  Contrary to the Government's assertions, Dominguez's representation of the Bank was not limited to "a civil matter."  (*See* Resp. at 3.)  Rather, and as the Government is clearly aware, Dominguez's role was significantly greater, as demonstrated by a letter she sent to the FBI on May 22, 2018, which stated, in relevant part:

> Please be advised that the undersigned counsel represent [*sic*] Bancredito International Bank (Bancredito), an International Banking Entity (IBE), established in 2008 under the laws of the Commonwealth of Puerto Rico. Bancredito is regulated by the Office of the Commissioner of Financial Institutions of Puerto Rico (OCIF). The undersigned counsel also represents

the members of Bancredito's Board of Directors and Bancredito's employees.

(Ex. 6 (DOJ-0000098566)).

This letter unambiguously conveyed that Dominguez represented the Bank in the Government's criminal investigation, of which the Bank had become aware of only after the FBI's interview of Thais Lopez, an independent director of the entity.   The letter also plainly demonstrates that Dominguez represented not only the Bank but also the members of its Board of Directors, *a group that included Mr. Herrera as the Bank's chairman*.

Additionally, and as the Government well knows, Dominguez also later represented the Bank in its dispute with OCIF, a fact that Dominguez appears to have acknowledged during ███████████ first proffer on ████████████. (*See* Ex. 7 DOJ-0000443381).   But while the Government alleges that Dominguez's representation of Bancredito "had concluded," it offers nothing to support this assertion, nor does it specify a date when the representation ended.  Rather, emails produced by the Government show that ████, in her capacity as president and CEO of the Bank, corresponded with Dominguez regarding OCIF's examination of the Bank at least as late as June 1, 2021, and there is no evidence that the Bank's engagement of Dominguez as counsel was terminated before she represented ████ as part of the Government's criminal investigation. (Ex. 8 (DOJ-0000332951)).

Lastly, and contrary to the Government's assertion that Dominguez never spoke to the Government "about her client's [Mr. Herrera's] statements," (Resp. at 22), notes of ████ proffer with the Government on ████████████ show that Dominguez *did*, in fact, discuss Mr. Herrera's statements with the Government.  (*See* Ex. 7 (DOJ-0000443381)).   During that proffer, Dominguez gave the Government details of her recent conversations with Mr. Herrera, who had every reason to believe that such conversations were privileged.   Thus, Dominguez's role far exceeded that of

representing the Bank on a lone "civil matter," and – in purposely overlooking the actual extent of her ongoing legal representation of the Bank and Mr. Herrera as its Chairman – the Government countenanced violations of privilege that should have been afforded to Mr. Herrera.

For all of these reasons, and as more fully set forth below and in Mr. Herrera's Motion, we ask this Court to dismiss the Indictment against Mr. Herrera or, in the alternative, order an evidentiary hearing to uncover the full scope and details of the Government's misconduct.

## ARGUMENT

### I.   GOVERNMENT MISCONDUCT IN THE FIRST CIRCUIT HAS NEVER RISEN TO THE LEVEL THAT EXISTS HERE

In his Motion, Mr. Herrera explained that courts have the power to dismiss an indictment on the basis of government misconduct so outrageous and so pervasive that it constitutes a violation of the defendant's Fifth Amendment right to due process.  (*See* Mot. at 27–29.)  And Mr. Herrera further demonstrated how the Government's misconduct here – which occurred over an <u>unprecedented</u> period of six years – rose to such a level.  (*See* Mot. at 29–33.)  As discussed *supra* and in the Motion, this case is replete with instances of government misconduct dating back to 2015, when the Government inserted itself into a purely regulatory process involving the Bank and OCIF and coopted OCIF to target Mr. Herrera.  From that moment forward, the Government – and OCIF acting as a "stalking horse" on the Government's behalf – employed subversive investigatory tactics, and engaged in a pattern of misrepresentation, in an effort to ensnare Mr. Herrera.

As demonstrated in Mr. Hererra's opening Motion, between 2015 and 2021, the Government (i) commandeered OCIF as a stalking horse for its criminal investigation (*see* Mot. 29–33; *infra* Section II), (ii) repeatedly disregarded the attorney-client relationship by contacting individuals represented by counsel (*see* Mot. 33–42; *infra* Section III), (iii) misled the grand jury

(*see* Mot. 42–53; *infra* Section IV), and (iv) withheld exculpatory evidence in discovery (*see* Mot. 53–58; *infra* Section IV.).

In seeking to refute these contentions, the Government asserts that the Court should not grant dismissal for outrageous conduct here because the First Circuit has never done so before. (*See* Resp. at 8–11.)  But that argument is entirely circular.  Fortunately, the absence of a particular decision does not foreclose this Court (or any court) from finding that prosecutorial misconduct occurred here.  In fact, accepting the Government's position would erase the last remaining checks on proper prosecutorial conduct.  Indeed, neither we nor the Government could identify a single First Circuit case involving government misconduct lasting more than seven months, ***and the misconduct here occurred over half a decade***.[2]  We respectfully submit that this is one of those rare cases where the outrageous conduct at issue warrants dismissal.

## II.    THE GOVERNMENT'S CRIMINAL INVESTIGATION OF MR. HERRERA RELIED UPON WRONGFULLY COOPTING OCIF AS A "STALKING HORSE"

In his Motion, Mr. Herrera established that the Government commandeered OCIF to serve as a "stalking horse" to obtain— from the Bank and Mr. Herrera— information that it would otherwise not be entitled to as part of a criminal investigation.  It is well-established that although a civil enforcement agency and criminal prosecutors may "cooperate and share information," the Government may not "conduct[ ] a civil investigation solely for the purpose of advancing a

---

[2] *See United States v. Guzman*, 282 F.3d 56 (1st Cir. 2002) (misconduct occurred over a few hours); *Hampton v. United States*, 425 U.S. 484 (1976) (misconduct involved two isolated incidents over two days); *United States v. Bradley*, 820 F.2d 3 (1st Cir. 1987) (misconduct occurred over one week); *United States v. Anzalone*, 922 F.3d 1 (1st Cir. 2019) (FBI operated a child pornography website for a two-week period); *United States v. Marcello*, 731 F.2d 1354 (9th Cir. 1984) (misconduct occurred over a one-month period); *United States v. Tobias*, 662 F.2d 381 (5th Cir. 1981) (misconduct occurred over less than two months); *United States v. Russell*, 411 U.S. 423 (1973) (misconduct occurred over two months); *United States v. Wiley*, 794 F.2d 514 (9th Cir. 1986) (same); *United States v. Djokich*, 718 F. Supp. 2d 173 (D. Mass 2010), *aff'd*, 693 F.3d 37 (1st Cir. 2012) (misconduct occurred over approximately five months); *United States v. Luisi*, 482 F.3d 43 (1st Cir. 2007) (misconduct occurred over five months); *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987) (same); *United States v. Therrien*, 847 F.3d 9 (1st Cir. 2017) (misconduct occurred over approximately seven months); *United States v. Santana*, 6 F.3d 1 (1st Cir. 1993) (same).

criminal case." *United States v. Rhodes*, No. 18-CR-887 (JMF), 2019 WL 3162221, at *1 (S.D.N.Y. July 16, 2019); *see also United States v. Kordel*, 397 U.S. 1, 11–12 (1970).  As previously set forth in Mr. Herrera's Motion, the FBI actively sought to coopt OCIF's civil investigation for the sole purpose of advancing its criminal case against Mr. Herrera, by, among other things, enlisting and directing as informants nearly *all* OCIF officials who supervised the Bank's examinations and audits, as well as three separate OCIF Commissioners.  (*See* Mot. 29–33.)  Moreover, this activity continued for several years, despite OCIF officials repeatedly acknowledging that the Bank was complying with its regulatory guidelines, thereby proving that the purported civil investigation only continued to exist in order to further the potential criminal case against Mr. Herrera.

    The Government failed to refute this showing in its Response.  In fact, the Government failed to grasp the central point of the law and of Mr. Herrera's argument.  While the Government focused on whether "OCIF provid[ed] information to the FBI" (Resp. at 11–12), the relevant question here is whether the Government unlawfully controlled OCIF's civil investigation (*i.e.*, transformed OCIF into its de facto agent) to aid and revive its criminal investigation.  If so, such conduct would warrant dismissal of the Indictment.[3]

    Such is the case here.  There is no question that OCIF's civil investigation "improperly merged" with the Government's criminal investigation by 2015, which is what matters, not whether, as the Government suggests, OCIF initiated investigations of the Bank on its own accord

---

[3] *See United States. v. Scrushy*, 366 F. Supp. 2d 1134, 1140 (N.D. Ala. 2005) (dismissing indictment upon finding that regulatory investigation was directed by prosecutors seeking evidence and that criminal investigation was intentionally concealed); *United States v. Kordel*, 397 U.S. 1, 12–13 (1970) (suggesting that it is unconstitutional or improper when the government brings a civil action solely to obtain evidence for its criminal prosecution and fails to advise the defendant in its civil proceeding that is contemplates his criminal prosecution); *United States v. Teyibo*, 877 F. Supp. 846, 856 (S.D.N.Y. 1995) (concluding that such problematic cases include those in which "the Government pursued a civil action solely to obtain evidence for a criminal prosecution" or where there are "other special circumstances suggest[ing] that the criminal prosecution is unconstitutional or improper").

prior to 2015 (Resp. at 11).  The Government also contends that because Mr. Herrera is not charged

with "money laundering or banking compliance," the Court cannot possibly find that it ever

coopted OCIF and its civil investigation of the Bank.  (*See* Resp. at 16.)  But this contention reflects

a deep misunderstanding of the law.  As the court in *United States v. Scrushy* explained, "the

separate investigations should be like the side-by-side train tracks that never intersect."  366 F.

Supp. 2d at 1139.  Here, OCIF's investigation and the Government's criminal investigation not

only intersected, but they were operating on the same tracks.  Indeed, the Government was not just

"following leads," but also providing "notice and direct input" into OCIF's investigation, and using

OCIF officials as informants to gather evidence for the criminal investigation, which the law makes

clear is wholly improper.  *Id.* at 1138.

## III.   THE GOVERNMENT IMPROPERLY PURSUED MR. HERRERA BY ANY MEANS NECESSARY

The Government has employed a "by any means necessary" approach to this case and has

outright ignored multiple instances of illegal government misconduct.  As detailed in the Motion,

the cumulative impact of misconduct that permeated the Government's investigation and

prosecution in this matter arose from multiple infractions, none of which the Government refuted

in its Response.

*First*, the Government is wrong as to what communications are "authorized by law."  (*See*

Resp. at 18.)  The Government's efforts to convince the Court that communications of the kind

that took place here, *i.e.*, involving represented parties, were nonetheless "authorized by law" is

refuted by seminal case law.  For example, in *United States v. Hammad*, 858 F.2d 834 (2d Cir.

1988), the Second Circuit explained that the prosecution "violated [its] ethical obligations by

communicating directly with [the defendant] after learning that he had retained counsel" via an

informant who served as the "alter ego" of the prosecutor.  *Id.* at 836; *see also United States v.*

*Carona*, No. SA CR 06-224-AG, 2008 WL 1970218, at *5 (C.D. Cal. May 2, 2008), *aff'd*, 630 F.3d 917 (9th Cir. 2011), and *aff'd*, 660 F.3d 360 (9th Cir. 2011) (holding that surreptitious recordings by cooperating witness of conversations with defendant ***prior to defendant's indictment in a non-custodial setting*** violated rules of professional conduct, as cooperating witness improperly became the "alter ego" of the prosecutors who were "too involved in manufacturing the contact" between cooperating witness and defendant).

Contrary to the Government's assertions, it does not have unbridled access to represented parties via alter egos, Government conduits, or otherwise. *See United States v. Pierce*, 893 F.2d 669, 673 (5th Cir. 1990) (Fourth Amendment standards apply to search conducted by private party acting as agent or instrument of the government) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)). To be sure, the case law does not permit the Government to circumvent longstanding ethical rules and Due Process protections by deploying "alter egos" to collect evidence from Mr. Herrera and others knowingly represented by counsel, and the Government does not (because it cannot) refute this. To wit, the Government's contention that communications with represented parties by alter egos is "authorized by law" is belied by the Government's ***very own*** conduct in this case. Indeed, Special Agent Ronald Daniels' removal from this case following his directive to ████████████████████████ to surreptitiously record Mr. Herrera was in direct contravention of Assistant United States Attorney Scott Anderson's instructions to FBI agents not to contact parties represented by counsel. (*See* Motion at 34–35). That the Government refused to explain Special Agent Daniels' removal, as well as AUSA Anderson's directive to refrain from speaking with represented parties, is telling.

*Second*, the Government attempts to distance itself from the misconduct permeating this case by pointing to the "independent" filter team that was installed to review search warrant

11

returns.  (*See* Resp. at 23–24.) ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████  *See* Motion at 38.)  That the Government still attempted, and did ultimately, bypass the "independent" filter team to use privileged materials to further prosecute this case demonstrates not just a propensity to engage in prosecutorial misconduct, but a consistent pattern of misconduct. *See, e.g.*, *United States v. Isgro*, 974 F.2d 1091, 1094 (9th Cir. 1992) (holding that constitutional error may be found where "defendant can show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed.").

*Third*, and as noted above, the Government cannot evade responsibility for its willful violation of privilege protections afforded to Mr. Herrera by disclaiming the true scope of Dominguez's representation of the Bank.  (*See* Resp. at 22–23.)  Supreme Court precedent, including specifically the landmark, *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) is fatal to the Government's position.  *Upjohn* provides that, in the context of a corporation, the attorney-client privilege "safeguard[s]" communications between counsel and the corporation's "control group," such as executives and other decisions-making personnel,[4] and that "the principles of *Upjohn* apply to current as well as former employees."  *Miramar Const. Co. v. Home Depot, Inc.*, 167 F. Supp. 2d 182, 184-85 (D.P.R. 2001).  In that regard then, as the Government well knows,

---

[4] Case law in the District of Puerto Rico and the First Circuit explains that *Upjohn* affords protections not just to the "control group" of a corporation but to any employee who has "the information necessary for the corporate counsel to advise his or her client, and the corporation's attorney."  *See, e.g.*, *Rivera v. Kmart Corp.*, 190 F.R.D. 298, 302 (D.P.R. 2000).

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████

      The failure of the Government to disclose these facts to the Grand Jury, which are essential

in determining ████████████ credibility as a witness, is further evidence of misconduct and

prejudice to Mr. Herrera.  *See United States v. Smith*, 77 F.3d 511, 515–17 (D.C. Cir. 1996)

(reversing and remanding for a new trial where prosecutorial witness's plea agreement omitted

agreement to dismiss two additional cases and court failed to review, for relevance, "medical

records [which] might have indicated a relevant, ongoing problem"); *United States v. Samango*,

607 F.2d 877, 881–82 (9th Cir. 1979) (finding error where "prosecutor knew but did not warn the

grand jury of [a witness's] doubtful credibility" and recognizing that "[i]f evidence exists . . . which

casts serious doubt on the credibility of testimony which the jurors are asked to rely upon in finding

an indictment, the prosecutor has an ethical duty to bring it to their attention"); *see also United*

*States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1432 (D. Md. 1986) (holding that where "there was

a considerable amount of false, wrong testimony," and "not merely a few, isolated incidents that

can be shrugged aside," the "effect of this testimony and the obvious prejudice which resulted

cannot be so easily dismissed."). ██████████████████████████████████████

██████████████████████████████████████████████████████████████

          ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████. (*See* Resp. at 27.); *see*

*also* DOJ-0000432215 at 13:02 (After ████████ asks Mr. Rossini "if there was a way to throw [Mr.

Herrera] under the bus," Mr. Rossini, responds "no, because we did nothing wrong, there is no one

bribing. No one bribed Wanda, no one bribed anybody, no one bribed a soul. So . . . where is the crime?"). But the Government's contention that such evidence is "self-serving" is concerning. The Government ignores the fact that Mr. Rossini did not know he was being recorded, undermining any notion that he was making such statements out of self-interest. Further, Mr. Rossini believed he and ███ were "friends," and both parties openly discussed a project to funnel Lebanese money – *which they both acknowledged is illegal* – which further serves to undercut the Government's assertion that Mr. Rossini was making any statements out of his own self-interest. (*See* Resp. at 27.) Additionally, the contention that the statements are purportedly "self-serving" to Mr. Rossini is irrelevant as it is *Mr. Herrera* who is seeking their disclosure. In any event, federal courts are loath to permit prosecutors from making improper or disingenuous determinations as to what constitutes exculpatory information necessitating disclosure. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (reversing conviction based government's failure to disclose *Brady* evidence and explaining that "the prosecution, [] alone can know what is undisclosed" and is "assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure[s]"); *Serubo*, 604 F.2d at 819 (finding that prosecutorial misconduct could not be ignored and instructing trial court to "furnish to the Attorney General of the United States copies of the transcripts reflecting prosecutorial misconduct so that the Justice Department may consider appropriate discipline.").

      *Third*, the Government does not meaningfully address its obligation to disclose cooperating agreements or leniencies with confidential informants and/or key witnesses in exchange for testimony before the Grand Jury, much less any of the case law cited on that point by Mr. Herrera's Motion. While the Government may feebly contend that it disclosed the *existence* of certain cooperating agreements, it did not disclose any details of the cooperating agreements or leniencies,

or the true extent of each informant's (extensive) criminal history.  Failure to make such disclosures warrants dismissal.  *See United States v. Chapman*, 524 F.3d 1073, 1079, 1087 (9th Cir. 2008) (affirming dismissal of indictment where prosecution "did not even bother to introduce" evidence required under *Brady/Giglio* including "rap sheets, plea agreements, cooperation agreements . . . related to numerous government witnesses"); *see also United States v. Roberts*, 481 F. Supp. 1385, 1389–90 (C.D. Cal. 1980) ("cumulative effect" of prosecutor's misconduct, including failure to present exculpatory evidence to the grand jury that corroborated an alternative version of events, attempts to discredit an exculpatory witness, and failure to provide certain polygraph evidence, warranted dismissal).

## V.    THE GOVERNMENT WAS OBLIGATED TO PRODUCE EXCULPATORY MATERIAL IN OCIF'S POSSESSION

Finally, the Government cannot feign ignorance as to the materials in OCIF's possession that would exculpate Mr. Herrera.  As it was inexorably intertwined with the Government, OCIF was an agent of the Government, and thus, a part of the prosecution team, such that the Government is required to produce all exculpatory material in OCIF's possession.

Indeed, the Government has an obligation to produce information in its custody, possession, and control, which extends to and encompasses information in the possession of government agents.  *See Strickler v. Greene*, 527 U.S. 263, 281 (1999) (explaining that to "comply with *Brady*," "***the individual prosecutor has a duty to learn of any favorable evidence known*** to the others acting on the government's behalf in this case, including the police") (emphasis added).  Moreover, the Government admitted in its Response that it "issued subpoenas to OCIF to obtain documents," thereby demonstrating that it is more than capable of securing exculpatory information.  (Resp. at 30.)

The Government cannot evade responsibility by hiding behind the fiction that it is not required to produce exculpatory evidence that may be in the possession of OCIF. *See, e.g.*, *United States v. Bundy*, 968 F.3d 1019, 1037 (9th Cir. 2020) (the "government's attempts to absolve itself of wrongdoing for other agencies' failures [] fall flat," because "[t]o the extent that any government agencies or actors, through their own flagrant misconduct, failed to make known exculpatory information, the flagrant nature of such conduct will be imputed to the prosecution—just as the agencies' or actors' *Brady* violations are imputed to the prosecution") (emphasis added); *Casey v. Duckworth*, 738 F.2d 875, 877–78 (7th Cir. 1984) ("[P]rosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case").

## <u>CONCLUSION</u>

WHEREFORE, in light of the foregoing, Mr. Herrera respectfully prays that this Honorable Court GRANTS the Motion to Dismiss at Docket No. 262 and thereafter orders the dismissal of the Indictment.  In the alternative, to the extent the Court requires additional argumentation or evidentiary support to grant this Motion to Dismiss, Mr. Herrera requests an evidentiary hearing be scheduled to further develop the facts to support this Motion.

**RESPECTFULLY SUBMITTED**

Date: October 10, 2023

**KASOWITZ BENSON TORRES LLP**

By:    <u>*/s/ Jason M. Short*       </u>
       Marc E. Kasowitz (admitted *pro hac vice*)
       Jason M. Short (admitted *pro hac vice*)
       1633 Broadway
       New York, NY 10019
       mkasowitz@kasowitz.com
       jshort@kasowitz.com
       Telephone: (212) 506-1700

       Robin Rathmell (admitted *pro hac vice*)
       1401 New York Avenue NW
       Suite 401
       Washington, D.C. 20005
       rrathmell@kasowitz.com
       Telephone: (202) 760-3410

**DLA PIPER (PUERTO RICO) LLP**

By:    <u>*/s/ Sonia I. Torres-Pabon*     </u>
       Sonia I Torres-Pabon (USDC-PR No.
       209310
       500 Calle de la Tanca
       Suite 401
       San Juan, Puerto Rico 00901
       sonia.torres@us.dlapiper.com
       Telephone: (787) 281-8100

**THE LS LAW FIRM**

By:    <u>*/s/ Lilly Ann Sanchez*      </u>
       Lilly Ann Sanchez
       One Biscayne Tower
       Suite 2530
       2 South Biscayne Boulevard
       Miami, FL 33131
       lsanchez@thelsfirm.com
       Telephone: (305) 503-5503

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this same date, the undersigned attorney filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for all parties in this action.

Date: October 10, 2023

**KASOWITZ BENSON TORRES LLP**

By:   _/s/ Jason M. Short_
      Jason M. Short
      1633 Broadway
      New York, NY 10019
      jshort@kasowitz.com
      Telephone: (212) 506-1700