**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL NO. 22-342 (SCC) |
| [2] JULIO HERRERA VELUTINI | |
| Defendant. | |

**DEFENDANT JULIO HERRERA VELUTINI'S MOTION TO DISMISS
THE INDICTMENT FOR FAILURE TO ALLEGE
AN "OFFICIAL ACT" AND UNCONSTITUTIONAL VAGUENESS**

Defendant Julio Herrera Velutini ("Mr. Herrera"), by and through his undersigned counsel, respectfully requests that the Court dismiss the Indictment, Dkt. 3, pursuant to Federal Rule of Criminal Procedure 12 for two reasons. First, for failure to state a claim, because the allegations relating to the actions purportedly agreed to by former Governors Vazquez and Pierluisi cannot be "official acts" as a matter of law; and in any event, were not alleged to be "official acts." Second, because 18 U.S.C. § 666(a)(2) is unconstitutionally vague as applied in violation of the Fifth Amendment's Due Process Clause. In support, the following is provided.

## I.      Introduction

The Government indicted Mr. Herrerra on August 3, 2022, charging him with honest services wire fraud pursuant to 18 U.S.C. §§ 1343 and 1346 (Counts Four and Seven), federal program bribery pursuant to 18 U.S.C. § 666(a) (Counts Two and Six), and conspiracy to defraud the United States pursuant to 18 U.S.C. § 371 (Counts One and Five). Dkt. 3. Counts One through Four relate to the alleged conspiracy to bribe former Governor Wanda Vazquez in exchange for the resignation of OCIF Commissioner Joyner and nomination of OCIF Commissioner Bonilla. *Id*. at ¶¶ 29, 128. Counts Five through Seven allege a conspiracy to bribe Governor Pedro Pierluisi

with campaign contributions in return for a promise by Governor Pierluisi to use his influence to ensure a favorable outcome for Mr. Herrera's bank, Bancrédito International Bank and Trust Corporation ("Bancrédito"), from an ongoing examination by the Puerto Rico Office of the Commission of Financial Institutions ("OCIF"). *Id*. at ¶¶ 137-138, 177, 179-180. The Indictment has been the subject of prior motions to dismiss.[1]

However, on June 26, 2024, the Supreme Court changed the landscape for federal program bribery under 18 U.S.C. § 666.  In *Snyder v. United States*, the Court held that § 666 criminalizes bribery, and not gratuities, and that "[a] state or local official can violate § 666 when he accepts an up-front payment for a future ***official act*** or agrees to a future reward for a future ***official act***." 144 S. Ct. 1947, 1959 (2024) (emphasis added). The Court found § 666 "shares the defining characteristics of § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the ***official act***." *Id*. at 1955 (emphasis added).

*Snyder* thus presents an independent basis to dismiss the Indictment against Mr. Herrera based on the Government's inability to establish that former Governors Vazquez or Pierluisi agreed to commit an "official act" in exchange for anything of value. In addition, *Snyder* supports Mr. Herrera's contention that 18 U.S.C. § 666 was unconstitutionally vague at the time he was indicted.  For these reasons, the Indictment must be dismissed.

---

[1] Former Governor Vazquez, joined by Mr. Herrera, moved to dismiss Counts One through Four of the Indictment on the basis that there was no express *quid pro quo* alleged under *McCormick v. United States*, 500 U.S. 257, 273 (1991), and that the prosecution of the charges as alleged run afoul of the First Amendment.  Dkt. 193, 198.  The Court denied that motion because it found an explicit *quid pro quo* was properly alleged in the Indictment. *See* Dkt. 498. Mr. Herrera separately moved to dismiss Counts Five through Seven, arguing that there was no express *quid pro quo* alleged between Mr. Herrerra and Governor Pierluisi under *McCormick*, and that campaign contributions are a First Amendment Protected activity. Dkt. 224. The Court severed Counts Five through Seven to be separately tried, Dkt. 427, and held Mr. Herrera's motion in abeyance.  Dkt. 499.  Mr. Rossini also moved recently to dismiss the Indictment. Dkt. 677.

## II.    Argument

Despite its length and gratuitous innuendo, the Indictment's fatal flaw is that it fails to allege that the *quo* of the supposed *quid pro quo* between Mr. Herrera and Governors Vazquez and Pierluisi were "official acts," as defined and narrowed by the Supreme Court. Over the past decade, the Supreme Court has significantly circumscribed the Government's ability to prosecute federal program bribery and honest services wire fraud by requiring proof of an "official act," an element rooted in the federal bribery statute, *see* 18 U.S.C. § 201, and by limiting the scope of federal prosecutors' authority to prosecute local government officials in other ways. Though Mr. Herrera is not charged with violating § 201, its text features prominently in Supreme Court decisions involving statutes Mr. Herrera is charged with: honest services wire fraud and federal program bribery.

### A.  Honest Services Wire Fraud – The Two-Part "Formal Exercise of Governmental Power" Test in *McDonnell v. United States*

In 2016, *McDonnell v. United States* imported the "official act" requirement from § 201 to an honest services wire fraud prosecution, holding that "the Government was required to prove that [the defendant] committed or agreed to commit an '***official act***' in exchange for the loans and gifts from [the businessman]." 579 U.S. 550, 563 (2016) (emphasis added). The issue in *McDonnell* was what constituted an "official act." *Id.* at 566-67. The "official act" element stems from the federal bribery statute, § 201, that makes it a crime for "a public official or person selected to be a public official, directly or indirectly, corruptly" to demand, seek, receive, accept, or agree "to receive or accept anything of value" in return for being "influenced in the performance of any ***official act***." 18 U.S.C. § 201(b)(2) (emphasis added); *see also United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999) ("In other words, for [§201] bribery there

must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an **official act**." (emphasis added)).

"Official act" is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  18 U.S.C. § 201(a)(3).

The honest services wire fraud statute states, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343; *see also* 18 U.S.C. § 1346 (defining "scheme or artifice to defraud" to include a scheme or artifice to deprive another of the intangible right of honest services).

Notably, §§ 1343 and 1346 do not contain the term "official act." Nevertheless, the Supreme Court imported the "official act" requirement found in § 201 in finding that "the Government was required to prove that [the defendant] committed or agreed to commit an '**official act**'. . . ." 579 U.S. at 563 (emphasis added). *McDonnell's* facts and procedural history bear mentioning.

In *McDonnell*, then-Governor of Virginia, Robert McDonnell, was charged with, *inter alia*, honest services fraud and conspiracy to commit honest services fraud. *Id*. at 562. The Government's theory was that Governor McDonnell accepted bribes from a businessman.  *Id*.  The parties agreed to define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201, but disagreed as to what constituted an "official act." *Id*.

The district court instructed the jury that, to convict Governor McDonnell, it had to find that he agreed "to accept a thing of value in exchange for official action." *Id*. at 564. The jury instructions also included a list of official acts the Government alleged in the indictment: arranging meetings, hosting events, and contacting other government officials. *Id*. Finally, the jury instructions advised that the term "official act" encompassed "acts that a public official customarily performs," including acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end." *Id*. at 564–65. The Government argued that the term "official act" encompassed nearly any activity by a public official concerning any subject, including a broad policy issue such as Virginia economic development because it was a "priority of Governor McDonnell's administration." *Id*. at 556.

The Supreme Court examined the term "official act" in § 201(a)(3) and found that it did not, as urged by the Government, apply to almost any action taken by an official within the ambit of his office. *Id*. Rather, the Supreme Court substantially narrowed the definition of the term, "official act," to limit the types of actions susceptible to bribery to a "formal exercise of governmental power."

> In sum, an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a **formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee**. It must also be something **specific and focused that is "pending" or "may by law be brought" before a public official**. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so.

*Id*. at 574 (emphasis added). The "pertinent 'question, matter, cause suit, proceeding or controversy' must be more focused and concrete." *Id*. at 570 (citing § 201(a)(3)). "May by law be

brought conveys something within the specific duties of an official's position—the function

conferred by the authority of his office." *Id*. at 570 (quotations omitted).

The Supreme Court provided examples of conduct that ***does*** qualify as an "official act."

> For example, a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—would qualify as an "official act." A public official may also make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy" by using his official position to exert pressure on another official to perform an "official act." In addition, if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an "official act" by another official, that too can qualify as a decision or action for purposes of § 201(a)(3).

*Id*. at 572.

The Supreme Court also provided examples of conduct that ***does not*** qualify as an "official

act."

> Setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a research study or to gather additional information, however, does not qualify as a decision or action on the pending question whether to initiate the study. Simply expressing support for the research study at a meeting, event, or call—or sending a subordinate to such a meeting, event, or call—similarly does not qualify as a decision or action on the study, as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an "official act." Otherwise, if every action somehow related to the research study were an "official act," the requirement that the public official make a decision or take an action on that study, or agree to do so, would be meaningless.

*Id*. at 573.

*McDonnell* identified two elements to establish an "official act" under § 201. *See United States v. Silver*, 864 F.3d 102, 116–17 (2d Cir 2017) (detailing two-part test for "official act" identified in *McDonnell*); *United States v. Boyland*, 862 F.3d 279, 289–90 (2d Cir. 2017) (same).

*First*, the Government must identify a "question, matter, cause, suit, proceeding or controversy," that (a) is "pending' or that "may by law be brought before [a] public official"; and

(b) involves "a formal exercise of governmental power" similar in nature to "a lawsuit, hearing, or administrative determination." *Id.* at 567 (quoting § 201(a)(3)). The Court interpreted a "pending" matter as "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 570. A matter that "may by law be brought" is "something within the specific duties of an official's position." *Id.*

*Second*, "the Government must prove that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *Id.* at 567 (quoting § 201(a)(3)). Such a decision or action could "include using [one's] official position to exert pressure on another official to perform an *'official act,'* or to advise another official, knowing or intending that such advice will form the basis for an *'official act'* by another official." *Id.* at 574 (emphasis added). But, without more, "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)" are not official acts—although such actions "could serve as evidence of an agreement to take an *official act*." *Id* (emphasis added).

In at least one case in the First Circuit, the Government has taken the position that it could prove a public official's intent to violate the honest services fraud statute by proving the public official had "such a bribery-like, corrupt intent by showing that she received a bribe by accepting a thing of value while intending to be influenced by it to perform an *official act*." *United States v. Falcon-Nieves*, 79 F.4th 116, 126 (1st Cir. 2023) (emphasis added). There, the First Circuit found that the defendant, the Vice President of Administration and Finance for the Puerto Rico Aqueduct and Sewer Authority, committed an official act by "using h[er] official position to provide advice to" the Director of IT, "knowing or intending that such advice [would] form the basis for" the Director of IT's "official act" to recommend or decline to recommend an entity for an IT contract with the Puerto Rico Aqueduct and Sewer Authority. *Id.* at 130. The official acts undertaken by

both public officials involved the "formal exercise of governmental power" because they involved the recommendation or lack thereof of a contract to the leadership of the Puerto Rico Aqueduct and Sewer Authority. *Id*. at 127.

**B. Federal Program Bribery – The *"Official Act"* Requirement in *Snyder v. United States***

In *Snyder*, the Supreme Court held that 18 U.S.C. § 666 only applies to bribes: payments or benefits that are tied to an official act and agreed upon before the act occurs, because § 666 is not violated where a public official accepts a gratuity: a reward obtained after the official act has been taken. 144 S. Ct. at 1959. Though *Snyder* grappled with whether § 666 (a)(1)(B) made it a federal crime for state and local officials to accept gratuities for past official acts, *id*. at 1954, the Court, in what can only be described as an effort to reign in overzealous prosecutors, went even further by importing the § 201 "official act" requirement to federal program bribery prosecutions.

Section 666(a)(1)(B) makes it a crime for state and local officials to:

[C]orruptly solicit[] or demand[] for the benefit of any person, or accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more . . . .

Section 666(a)(2), which Mr. Herrera is charged with, criminalizes "corruptly" offering or giving a bribe to state and local officials:

Whoever . . . corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more[.]

Like in §§ 1343 and 1346 involving honest services fraud, federal program bribery under § 666 does not contain the term "official act." But as *McDonnell* and its progeny instruct, the text of § 666 is the beginning of the inquiry, rather than the end. *Snyder* found six reasons why § 666

is a bribery statute and not a gratuities statute: (1) text; (2) statutory history; (3) statutory structure; (4) statutory punishments; (5) federalism; and (6) fair notice. The Court's rationale thus amply supports Mr. Herrera's contention that the Supreme Court intended for prosecutors to plead—and prove—an "official act" in § 666 cases.

In analyzing § 666's text, statutory history, and statutory structure, the Court found that § 666 was a bribery statute modeled on § 201(b), the bribery provision for federal officials. *Id*. at 1954; *see also id.* at 1955 ("Section 666 shares the defining characteristics of § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the **official act**." (emphasis added)). The Court also looked to an amendment of § 666 in 1986 that brought it more in line with the bribery provision in § 201(b). *See id*. at 1953 ("As a result of its amendment in 1986, the text of § 666 for state and local officials now closely resembles the bribery provision for federal officials, § 201(b), rather than the gratuities provision for federal officials, § 201(c)."). "The absence of a separate gratuities provision in § 666 reinforces that § 666 is a bribery statute for state and local officials, not a two-for-one bribery-and-gratuities statute." *Id*. at 1956.

Though the dispute in *Snyder* centered around the dividing line between bribery and gratuities, the Court made plain that "[a] state or local official can violate § 666 when he accepts an up-front payment for a future **official act** or agrees to a future reward for a future **official act**. *Id*. at 1959 (emphasis added). "[A] state or local official does not violate § 666 if the official has taken the **official act** before any reward is agreed to, much less given." *Id.* (emphasis added). Indeed, the Solicitor General noted in her *Snyder* Supreme Court brief that § 666 "does not adopt the Section 201 term 'official act' . . . ." *Snyder* Resp. Br. at 37. Yet, the Court's opinion is replete with references to the term "official act" in the context of § 666 and bribery, generally:

> ➤ "As a general matter, bribes are payments made or agreed to before an ***official act*** in order to influence the official with respect to that future ***official act***." *Snyder*, 144 S. Ct. at 1951 (emphasis added).

> ➤ "Gratuities are typically payments made to an official after an ***official act*** as a token of appreciation."  *Id*. at 1951 (emphasis added).

> ➤ "[G]ratuities after the ***official act*** are not the same as bribes before the ***official act***. After all, unlike gratuities, bribes can corrupt the ***official act***—meaning that the official takes the act for private gain, not for the public good." *Id*. at 1952 (emphasis added).

> ➤ "The question in this case is whether 18 U.S.C. § 666(a)(1)(B) makes it a federal crime for state and local officials to accept gratuities for their past ***official acts***." *Id*. at 1954 (emphasis added).

> ➤ Section 666 shares the defining characteristics of § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the ***official act***." *Id*. at 1955 (emphasis added).

To be sure, pre-*Snyder*, an open question existed in the First Circuit as to whether § 666 required proof of an "official act," because of the Government's seeming haphazard approach to the issue. *See United States v. Carrasco,* 79 F.4th 153 (1st Cir. 2023).[2] However, "when the Supreme Court speaks clearly, [lower courts] are bound to obey." *Cervantes v. Guerra,* 651 F.2d 974, 981 (5th Cir. 1981); *see also Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 2024 WL 4052976, at *3 (6th Cir. Sept. 5, 2024) ("[L]ower courts must follow Supreme Court precedent.").

---

[2] In *Carrasco*, the defendant charged under § 666(a)(1)(B) urged the First Circuit to apply *McDonnell's* official act requirement to § 666. 79 F.4th at 160-61. The First Circuit refused to decide that issue because defense counsel did not appeal the jury instructions. *Id*. at 161, n.6. Nevertheless, the court made several observations relating to the defendant's argument. *First*, *Carrasco* observed "the text of § 666, unlike the text of § 201 that the Supreme Court construed in *McDonnell*, does not include the phrase 'official act.'" *Id*. at 161. *Second*, *Carrasco* cited to other circuit cases that held the government need not show that a defendant engaged in an "official act" to secure a conviction under § 666. *Id*. (collecting cases). *Third*, *Carrasco* noted that, in prior cases in the First Circuit, the Government had not disputed that § 666 contained an "official act" element, and that a jury was so charged as a result.  *Id*. (citing *United States v. Martínez*, 994 F.3d 1, 6-7 (1st Cir. 2021)).

While few courts have had the opportunity to interpret *Snyder*, which was decided only three months ago, at least one post-*Snyder* decision acknowledged *Snyder*'s pronouncement that § 666 requires proof of an "official act." *See United States v. Macrina*, 109 F.4th 1341, 1347 (11th Cir. 2024) (affirming conviction under 18 U.S.C. § 666 but citing *Snyder's* official act language for the proposition that the "key difference between a gratuity and a bribe is whether the official and the payer agreed to a payment for the ***official act***" (emphasis added)).  For good reason, applying the "official act" requirement to § 201's bribery provision involving federal officials, but not to § 666's analogous provision involving state and local officials, presents the very "fair notice" issue *Snyder* counseled against. 144 S. Ct. at 1957 (finding the Government's interpretation of § 666 *vis-à-vis* § 201 creates "traps for unwary state and local officials").  State and local officials —and the public who take great interest in their duties—must have fair notice of what § 666 proscribes, and there is no legitimate due process or federalism argument for defining bribery of federal officials more narrowly than bribery of state and local officials.  Thus, given the Supreme Court's unambiguous language in *Snyder*, it would be untenable to suggest that the "official act" requirement applies only to federal officials and not state and local officials.

## C. The Indictment Must be Dismissed Because it Fails to Allege an Agreement for Former Governors Vazquez and Pierluisi to Perform an "Official Act"

The Indictment must be dismissed because it fails to allege an essential element, namely, any agreement for former Governors Vazquez and Pierluisi to perform an "official act."

### 1. Counts One, Two, and Four – The "Resignation" of Commissioner Joyner and "Nomination" of Commissioner Bonilla Are Not "Official Acts"

The Indictment alleges that former Governor Vazquez agreed to terminate OCIF Commissioner Joyner and appoint a new commissioner of Mr. Herrera's choosing, Commissioner Bonilla, in exchange for "funding in support of Vazquez's election campaign." Dkt. 3 ¶¶ 29-30.

11

The Indictment is fatally defective because the supposed "termination" of Commissioner Joyner and nomination of Commissioner Bonilla are not "official acts" as defined by *McDonnell* and its progeny. Because the Indictment's allegations must be taken as true for purposes of this motion, a review of the pertinent averments is instructive.

As a threshold matter, the Indictment's allegations regarding the purported "termination" of Commissioner Joyner are blatantly false at worst and grossly negligent at best because they are materially inconsistent. *Compare* Dkt. 3 p. 17 Heading ("Vazquez **Terminates** OCIF Commissioner A" (emphasis added)); ¶ 128 ("[D]efendants did corruptly give . . . thousands of dollars in funding . . . with the intent of influencing and rewarding Vazquez . . . to wit: the ***termination*** of OCIF Commissioner A . . . ." (emphasis added)), *with* ¶ 72 ("Vazquez's Chief of Staff told Commissioner A that he had to ***resign*** from his position by February 28, 2020." (emphasis added)); ¶ 73 ("Today I talked to [OCIF Commissioner A]. He's ***resigning*** effective February 28. Finally!" (emphasis added)); ¶ 74 ("OCIF Commissioner A would be "***leaving***" on Friday, February 28, 2020." (emphasis added)); ¶ 75 ("Individual A forwarded a screenshot of OCIF Commissioner A's ***resignation*** letter to Individual C . . . ." (emphasis added)); ¶ 76 ("Individual A sent a text message to Blakeman containing a photograph of OCIF Commissioner A's ***resignation*** letter." (emphasis added)).[3]

The "termination" allegations contradict the Government's own discovery, because it is undisputed that Commissioner Joyner was not "terminated," he resigned. *See* Ex. 1 (Resignation Letter of Commissioner Joyner). This inconsistency is critical to the "official act" analysis,

---

[3] If the Court is not inclined to dismiss due to this material inconsistency, the Court should, at a minimum, order the Government to provide a bill of particulars that identifies whether it is pursuing a "termination" or "resignation" theory, and thereafter strike the inconsistent allegations from the Indictment. *See* Federal Rule of Criminal Procedure 7(d) (strike) and 7(f) (bill of particulars).

because, to properly plead that Commissioner Joyner's resignation was an action capable of being an "official act," the Government must allege the resignation was a

> question, matter, cause, suit, proceeding or controversy . . . involv[ing] a **formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee** . . . **that is pending or may by law be brought before a public official**. To qualify as an official act, the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, or agree to do so.

*McDonnell*, 574 U.S. at 574 (emphasis added) (cleaned up).

The Government failed to do so because the facts do not support their concocted theory. This Circuit has held, relying on *McDonnell*, that using "federal criminal statutes to police the hiring practices of [ ] state officials" represented an overreach requiring reversal of federal corruption convictions. *United States v. Tavares*, 844 F.3d 46, 49 (1st Cir. 2016). In *Tavares*, a patronage-based hiring scheme was found to be unappealing, "[b]ut not all unappealing conduct is criminal. As sovereigns, states have 'the prerogative to regulate the permissible scope of interactions between state officials and their constituents,' and the Supreme Court has warned against interpreting federal laws 'in a manner that . . . involves the Federal Government in setting standards of good government for local and state officials." *Id.* at 54 (quoting *McDonnell*, 579 U.S. at 576-77) (internal quotation marks omitted).

Here, the Government seeks to intervene in local government personnel practices that are not similar at all to "a lawsuit before a court, a determination before an agency, or a hearing before a committee." *McDonnell*, 574 U.S. at 574. The personnel practices that serve as the basis for the charges involve a complex set of rules related to how Puerto Rico chooses to govern itself. Under Puerto Rican law, a governor of Puerto Rico may nominate, but cannot unilaterally appoint, a Commissioner of OCIF. There is no restriction under Puerto Rican law why an OCIF Commissioner may be nominated by a Governor, or why the Senate of Puerto Rico should grant

or decline to give advice and consent to the Commissioner's nomination. *See* P.R. Laws tit. 7, § 2005. Thus, the nomination can be made and confirmed or rejected due to patronage, politics, personal loyalty, influence, or other reasons that may be "unappealing" but that federal criminal law should not police as a setter of "standards of good government for local and state officials." Similarly, a governor can request that an OCIF Commissioner resign of his own accord, which the Commissioner is free to do or refuse to do, for reasons of loyalty, trust, politics, influence, or for no reason at all. Again, the relationship between a governor and another public official in ordering the internal affairs of the Government of Puerto Rico is not for the federal government to police and has nothing to do with the restrictive definition of "official act" provided in *McDonnell*.

Moreover, the Indictment does not even use the term "official act" to describe the internal personnel practices that are the sole purported object of Counts One through Four of the Indictment, and it does not allege any other conduct charged in these counts as an "official act." This is for good reason. The Government did not make these allegations because there was no factual support for them: there was no federal program bribery because Mr. Herrera did not seek to influence, and former Governor Vazquez did not agree to take, any official act concerning the bank audit that was the purported object of the charged scheme.

Commissioner Joyner's decision to resign was within his sole discretion.  It was not a "question, matter, cause, suit, proceeding or controversy" and most certainly did not involve the "formal exercise of governmental power" as it was merely Commissioner Joyner's decision to end his time at OCIF.  For the sake of argument, even accepting the Government's apparent theory that Commissioner Joyner was "forced" to resign, Dkt. 3 ¶ 10, it is nonsensical that an official's resignation could be considered an "official act" taking into account the fact that  internal personnel determinations are not "focused and concrete . . . [,] similar in nature to a lawsuit before a court, a

14

determination before an agency, or a hearing before a committee," and not something that is "pending" or "may be law be brought before a public official," *McDonnell*, 574 U.S. at 570, 574, unlike situations where public officials have agreed to act on a "focused and concrete" matter within the scope of their traditional duties. *Compare McDonnell*, 576 U.S. at 570 (allocation of government resources); *United States v. Lindberg,* 39 F.4th 151, 157 (4th Cir. 2022) (vacating jury verdict where defendant argued the removal or replacement of a Senior Deputy Commissioner was not an official act); *Cordaro v. United States*, 933 F.3d 232, 242 (3d Cir. 2019) ("Entering into contracts is a 'formal exercise of governmental power' that falls 'within the specific duties of any official's position.'"); *Boyland*, 862 F.3d at 291 (licenses and permits); *United States v. Lee*, 919 F.3d 340, 357 (6th Cir. 2019) (decision about whether to bring charges).

As for the nomination of Víctor Rodríguez Bonilla, it cannot be an "official act" because, under Puerto Rico law, commissioners lack authority until they are confirmed by the Puerto Rico Senate. See Act No. 4 of 1985. Because Commissioner Joyner's resignation was effective March 6, 2020, see Ex. 1, in the middle of a legislative session, per Act. No. 4 of 1985, a successor is not vested with authority to discharge his duties unless and until the Senate provides its advice and consent to his nomination.  To that end, upon Commissioner Joyner's resignation, he appointed attorney Alejandro Blanco Dalmau, an OCIF legal division staffer, as a Sub-Commissioner, and once Commissioner Joyner's resignation became affective on March 6, 2020, Mr. Dalmau became the interim Commissioner and served in that position until Víctor Rodríguez Bonilla's confirmation.

At all events, for purposes of pleading an "official act," the Indictment does not plausibly allege the nomination was a "question, matter, cause, suit, proceeding or controversy" that involved the "formal exercise of governmental power."  McDonnell, 574 U.S. at 574.  At the time

former Governor Vazquez appointed him, Víctor Rodríguez Bonilla was merely a private citizen with no government authority to wield. It was not until after his Senate confirmation that he was cloaked with the necessary public authority to exercise his duties. Thus, though his confirmation may bear similarity to "a lawsuit before a court, a determination before an agency, or a hearing before a committee," because it was "pending," his nomination certainly does not. McDonnell, 574 U.S. at 574. [4] Counts One, Two, and Four must therefore be dismissed.

### 2. Counts Five through Seven – The Resolution of Bancrédito's OCIF Examination Is Not An "Official Act"

Counts Five through Seven stem from a purported bribery scheme in which a private individual, Joseph Fuentes (Witness 1 in the Indictment), purported to be able to influence former Governor Vazquez's successor, Governor Pierluisi, in a manner that would allow Mr. Herrera to obtain a positive resolution of the OCIF examination of Bancrédito. See Dkt. 3 ¶¶ 135-80. Mr. Herrera reserves the right to fully brief issues related to the many flaws in these counts, which were severed from the counts at issue in the upcoming trial, at a later point in time. However, it is apparent from a review of the allegations, and relevant recent Supreme Court decisions *post-dating the Indictment*, including *Snyder* and *Percoco v. United States,* 598 U.S. 319 (2023), that the Government seriously overreached in bringing these charges, which do not allege any *quid pro quo* agreement involving official acts.

---

[4] One out-of-Circuit decision, *United States v. Fattah*, 914 F.3d 112, 156 (3d Cir. 2019), concluded that a congressman's hiring of a staffer in exchange for a bribe constituted an official act covered by § 201, but that decision is not binding and is distinguishable on numerous grounds, including that (a) as noted above, the nomination of Rodríguez Bonilla ultimately was made by the Senate in giving advice and consent; (b) the decision predates *Snyder* and subsequent decisions, including *Percoco v. United States,* 598 U.S. 319 (2023), that narrow the scope of federal corruption law, (c) the conduct at issue here relates to the internal structure and personnel decisions of a territorial government that *McDonnell*, *Tavares*, and other cases say should not be regulated through federal criminal prosecution; and (d) the litigants in that case did not fully contest or subject to analysis the Government's allegations, as Mr. Herrera does here.

For reasons set forth above, *Snyder*, decided months ago, requires that all of Counts Five through Seven require proof of an official act. In *Percoco*, decided last year, the Supreme Court found that a private citizen owed no duty of honest services—and thus could not have performed official acts giving rise to federal criminal liability—even where he had a "special relationship" with the Governor and had a unique position of power and influence over government officials. *Percoco*, 598 U.S. at 330. A contrary rule, according to the Court, would enable overzealous prosecutors to charge "individuals who lacked any formal government position but nevertheless exercised very strong influence over government decisions."  *Id.* at 331.

In this case, Joseph Fuentes—the serial liar who was sentenced to jail for criminal conduct that included destroying evidence in this investigation and whose early termination from Probation the Government vehemently opposed due to his persistently obstructive conduct[5]—pretended, at the direction of the FBI, to be a ***private party*** who had a "special relationship" with Governor Pierluisi and who could, in turn, influence Governor Pierluisi to engage in official acts benefiting Mr. Herrera. Fuentes also solicited contributions to a Super PAC supporting Governor Pierluisi, rather than purporting to seek any personal financial benefit for Governor Pierluisi or himself.

Setting aside the fact that Mr. Herrera never met or spoke with Mr. Fuentes and was not a knowing participant in any alleged *quid pro quo* agreement with Mr. Fuentes, all these counts are fatally flawed in view of *McDonnell*, *Percoco*, and *Snyder*.  There is no support, particularly after

---

[5] The Court need not look any further than the Government's own articulation of Mr. Fuentes's deceptive chicanery, as elucidated in the Government's opposition to Mr. Fuentes's motion for early termination of supervised release:

> For three years—between 2020 and 2022—Defendant Joseph Fuentes-Fernandez piled lies upon lies upon lies . . . engaged in a brazen scheme . . . leaked information [as a cooperator] . . . and effectively functioned as a double agent . . . Finally, he repeatedly lied to government agents about these obstructive efforts and destroyed evidence.

*United States v. Fuentes-Fernandez*, Case No.: 3:22cr182-JL, Dkt. 71 at 1. *See* Ex. 2 (Government's Opposition to Mr. Fuentes's Motion for Early Termination of Supervised Release). The Government also noted Fuentes's "layers upon layers of lies" and "his pattern of lies and deceit." *See id*. at 6-7.

*Percoco*, for the proposition that a purported arrangement with (a) an FBI informant, who (b) pretended to be a politically influential advisor to a public official, and who (c) pretended to advise the public official to (d) purportedly agree to advise or pressure yet other public officials, involves conduct that satisfies *McDonnell*, *Percoco,* and *Snyder*.  To do so would allow criminal bribery liability to attach to commonplace interactions between individual businesspeople, on the one hand, and politically influential advisors, lobbyists, and bundlers of campaign contributions—or those who pretend to serve in this role, as did Mr. Fuentes.

The Indictment also fails to aver that Governor Pierluisi agreed to perform an "official act" that fell within his gubernatorial authority because, pursuant to Act No. 4 of 1985, the OCIF Commissioner has final determination as to issues of financial regulation, including bank examinations.  Act No. 4 further provides that the OCIF Commissioner shall answer directly to the Secretary of the Treasury in the performance of his functions. *See* P.R. Laws tit. 7, § 2005. Thus, the resolution of Bancrédito's OCIF examination was under the exclusive statutory authority of the OCIF Commissioner and Secretary of the Treasury.

Because the purported agreement with Mr. Fuentes alleged in the Indictment did not involve a trade of things of value for official acts, and the resolution of OCIF's examination was not under Governor Pierluisi's authority, Counts Five through Seven of the Indictment must be dismissed.

### D. Counts Two and Six Should be Dismissed Because 18 U.S.C. § 666 is Unconstitutionally Vague as Applied

Title 18, Section 666 was unconstitutionally vague as applied to Mr. Herrera at the time of the Indictment, as evidenced by *Snyder's* requirement that the Government plead—and prove —an "official act," a term that does not appear in § 666.  "In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).  The vagueness doctrine

"rests on the twin constitutional pillars of due process and separation of powers." *Id*. at 2325. First, "[v]ague laws contravene the first essential of due process of law that statutes must give people of common intelligence fair notice of what the law demands of them." *Id*. (cleaned up). Second, "[v]ague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect." *Id*.; *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) ("[T]he [vagueness] doctrine is a corollary of the separation of powers— requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not.").

"To satisfy due process concerns, Congress must ensure that a criminal law not only provides the kind of notice that will enable ordinary people to understand what conduct it prohibits but also that it does not authorize or "even encourage arbitrary and discriminatory enforcement." *United States v. Di Pietro*, 615 F.3d 1369, 1371 (11th Cir. 2010). "[P]reventing discriminatory law enforcement is the more important aspect of the vagueness doctrine." *United States v. Biro*, 143 F.3d 1421, 1426 (11th Cir. 1998). "Under the 'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear ***at the relevant time*** that the defendant's conduct was criminal.'" *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (cleaned up) (emphasis added). Thus, the relevant question is whether, at the time the Indictment alleges the crime(s) occurred, Dkt. 3 ¶ 127 (alleging criminal activity occurred in 2019 and 2020), ¶ 176 (alleging criminal activity occurred in 2021), Mr. Herrera had fair notice that federal program bribery contained a requirement that a public official agree to perform an "official act."

Up and until *Snyder* was decided this summer, courts were reluctant to import the "official act" requirement from § 201 and *McDonnell* to § 666. *See, e.g.*, *United States v. Roberson*, 998 F.3d 1237, 1247 (11th Cir. 2021) ("The only Circuit Courts of Appeals to directly consider the

issue in published cases post-*McDonnell*, the Second and Sixth, have not imported an "official act" requirement into section 666.... Consistent with the views of our sister Circuits, ... we do not read into section 666 limitations unsupported by the language of the statute."); *United States v. Ng Lap Seng*, 934 F.3d 110, 139 (2d Cir. 2019) ("[T]he "official act" requirement that *McDonnell* locates in § 201(a)(3) is not a part of § 666. Thus, the district court should not have charged "official act" at all as to the § 666 counts in this case."); *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018) ("In *McDonnell*, the Supreme Court limited the interpretation of the term 'official act' as it appears in § 201, an entirely different statute than the one at issue here [*i.e.*, § 666]."); *Boyland*, 862 F.3d at 291 ("We do not see that the *McDonnell* standard applied to [18 U.S.C. § 666].").

Like § 201 at issue in *McDonnell*, the plain text of § 666 makes no reference to the term "official act." Yet, the Supreme Court's decision in *Snyder* was unabashedly clear that "[a] state or local official can violate § 666 when he accepts an up-front payment for a future ***official act*** or agrees to a future reward for a future ***official act***." 144 S. Ct. at 1959 (emphasis added). This seismic shift in the application of § 666 is important when evaluating whether Mr. Herrera was on notice that his alleged conduct might be illegal. *Snyder* further illustrates that § 666 invited arbitrary and discriminatory enforcement prior to its decision. In situations like these, "an ambiguous criminal statute is to be construed in favor of the accused." *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994).

This is especially true where the conduct alleged in the Indictment raises significant First Amendment considerations. In 2022, the Supreme Court reaffirmed that an "official act" performed in the hope of securing campaign donations is not a bribe; rather, it is a fundamental element of the American political system.

> [I]nfluence and access "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." . . . To be sure, the "line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights."

*FEC v. Ted Cruz for Senate*, 596 U.S. 289, 307 (2022) (quoting *McCutcheon v. Federal Election Comm'n*, 572 U.S. 185, 192, 209 (2014)). More recently, in *Percoco*, the Supreme Court reversed the conviction of private citizen prosecuted for conspiracy to commit honest services fraud, holding that private individuals who influence government decisions cannot be subjected to criminal prosecution based solely on their influence; they must be actual agents of the government in order to be chargeable. *Percoco*, 598 U.S. at 330

As noted above, the overbroad interpretation advanced by the Government in this case risks criminalizing commonplace interactions between businesspeople, on the one hand, and influential advisors and campaign officials, on the other.  Indeed, Mr. Herrera is being persecuted for exercising the constitutional right to petition government.  He correctly and justifiably complained (to everyone including the FBI and members of the intelligence community) about corruption and incompetence at OCIF and FinCEN. But instead of investigating his complaints, the Government "circled the wagons" and concocted a scheme to prosecute Mr. Herrera.

Accordingly, at the time of the alleged criminality, § 666 was unconstitutionally vague because it did not put Mr. Herrera on fair notice that his conduct was proscribed, and because it permitted the Government to arbitrarily and discriminatorily enforce the statute against him until the Supreme Court decided *Snyder*.  Counts Two and Six must therefore be dismissed.

### III.    Conclusion

For the reasons stated, Mr. Herrera respectfully requests that the Court enter an order dismissing the Indictment because the allegations relating to the actions purportedly agreed to by former Governors Vazquez and Pierluisi cannot be "official acts" as a matter of law; and in any event, were not alleged as "official acts," and because § 666 is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 2nd day of October 2024.

**CONTINENTAL PLLC**
*/s/ Christopher M. Kise*
Christopher M. Kise (FBN 855545)
Admitted *Pro Hac Vice*
Primary Email: ckise@continentalpllc.com
Secondary Email:
cforjet@continentalpllc.com
101 North Monroe Street, Suite 750
Tallahassee, FL 32301
Telephone: (850) 332-0702

**DLA Piper (Puerto Rico) LLC**
*/s/ Sonia I. Torres-Pabón*
Sonia I. Torres-Pabón (USDC-PR No. 209310)
sonia.torres@us.dlapiper.com
500 Calle de la Tanca, Ste. 401
San Juan, PR 00901-1969
Tel: 787-281-8100

**The LS Law Firm**
*/s/ Lilly Ann Sanchez*
Lilly Ann Sanchez, Esq.
Fla. Bar No. 195677
One Biscayne Tower, Suite 2530
2 South Biscayne Blvd.
Miami, Florida 33131
Email: lsanchez@thelsfirm.com
Telephone: (305) 503-5503
Facsimile: (305) 503-6801

### CERTIFICATION

**IT IS HEREBY CERTIFIED** that on this same date I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Sonia I. Torres-Pabón*
Sonia I. Torres-Pabón